No. 18-____

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

———————————————

IN RE UNITED STATES, PETITIONER

(LORENZO BLACK ET AL., REAL PARTIES IN INTEREST)

———————————————

PETITION FOR WRIT OF MANDAMUS
TO THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
NO. 2:16-CR-20032 (HON. JULIE A. ROBINSON)

———————————————

## PETITION FOR A WRIT OF MANDAMUS

———————————————

STEVEN D. CLYMER
Assistant United States Attorney
Special Attorney

JOHN P. CRONAN
Acting Assistant Attorney General

WILLIAM A. GLASER
Attorney, Appellate Section
Criminal Division
U.S. Department of Justice
950 Pennsylvania Ave., N.W.
Washington, DC 20530
(202) 532-4495
William.Glaser@usdoj.gov

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

INTRODUCTORY STATEMENT ....................................................... 1

RELIEF SOUGHT ............................................................................. 2

ISSUE PRESENTED .......................................................................... 3

PROCEDURAL AND FACTUAL BACKGROUND ........................... 3

    1.    The *Black* Investigation and Prosecution ............................... 3

    2.    The FPD Rule 41(g) Motion and Video Recordings of
        Attorney-Client Meetings ....................................................... 4

    3.    The Audio Recordings of Inmate-Attorney Telephone Calls .............. 7

    4.    The Appointment of the Special Master ................................. 8

    5.    The Phase II Investigation ................................................... 11

    6.    The Phase III Order .............................................................. 13

    7.    The Special Master's Request for Information, the
        Government's Response, and the Special Master's Resulting
        Report ................................................................................... 16

    8.    The Special Master's Subpoenas and Production Order .......... 17

    9.    The Federal Public Defender's Subpoenas ........................... 18

    10.    The *Black* Defendant's Motions to Dismiss, Suppress, and Join ....... 19

    11.    The Government's Motions to Terminate the Phase III
        Investigation and Quash the Subpoenas ............................... 20

    12.    The District Court's Order .................................................... 21

REASONS WHY THE WRIT SHOULD ISSUE ................................. 22

1.  The Phase III Investigation Exceeds the District Court's
    Authority. ...........................................................................................22

2.  There is No Factual Predicate for a Judicially Sponsored
    Inquiry into the Government's Conduct and Decisions......................27

3.  The Federal Public Defender Represents no Client in *Black* and
    Lacks Standing to Issue Subpoenas and Interrogate Witnesses..........29

4.  The District Court's Assurance that it Will Entertain Objections
    at the Hearing is Insufficient. .............................................................31

5.  The Government Has No "Other Adequate Means" to Obtain
    Relief. ................................................................................................31

CONCLUSION ..................................................................................................32

CERTIFICATE OF SERVICE .................................................................................33

CERTIFICATE OF COMPLIANCE..........................................................................35

CERTIFICATE OF DIGITAL SUBMISSION .......................................................36

ADDENDUM

# TABLE OF AUTHORITIES

## Cases

*De Beers Consol. Mines, Ltd. v. United States*, 325 U.S. 212 (1945) ....................22

*In re United States*, 398 F.3d 615 (7th Cir. 2005) ................................ 23, 24, 25, 26

*In re United States*, 441 F.3d 44 (1st Cir. 2006)....................................................25

*In re United States*, 503 F.3d 638 (7th Cir. 2007) ........................................ 24, 25

*Kerr v. United States Dist. Court*, 426 U.S. 394 (1976)........................................22

*State v. Maxwell*, 10 Kan. App. 2d 62, 691 P.2d 1316 (Kan. 1984)......................30

*Texas v. Cobb*, 532 U.S. 162 (2001)......................................................................29

*United States v. Adams*, 977 F.2d 596 (table), 1992 WL 279227 (10th Cir. 1992) ..........................................................................................................29

*United States v. Dominguez-Villa*, 954 F.2d 562 (9th Cir. 1992)..........................23

*United States v. Hatcher*, 323 F.3d 666 (8th Cir. 2003)........................................27

*United States v. Jones*, 44 F.3d 860 (10th Cir. 1995)............................................29

*United States v. Lau Tung Lam*, 714 F.2d 209 (2d Cir. 1983) ..............................23

*United States v. Mejia*, 655 F.3d 126 (2d Cir. 2011)............................................27

*United States v. Merida*, 828 F.3d 1203 (10th Cir.), *cert. denied*, 137 S. Ct. 325 (2016) ....................................................................................................27

*United States v. Morrison*, 449 U.S. 361 (1981) ...................................................28

*Weatherford v. Bursey*, 429 U.S. 545 (1977)........................................................28

*Will v. United States*, 389 U.S. 90 (1967)..............................................................22

**Constitutional Provisions and Rules**

U.S. Const. amend. VI ...........................................................................................29

28 C.F.R. § 16.21 ..................................................................................................16

Fed. R. Crim. P. 16................................................................................................30

## INTRODUCTORY STATEMENT

This case involves an extraordinary investigation by the Chief Judge of the District of Kansas, who is presiding over *United States v. Black, et al.,* a criminal case. The Chief Judge, believing that members of the U.S. Attorney's Office (USAO) may have violated the attorney-client privilege of inmates at a privately run detention facility, CCA-Leavenworth, has appointed a special master to conduct a wide-ranging inquiry into the practices, management, and culture of the USAO. The judge has also permitted the Federal Public Defender (FPD), who represents none of the *Black* defendants, to intervene, and the FPD and the special master have issued subpoenas seeking testimony from 13 present and former Department of Justice officials, including the U.S. Attorney and members of his leadership team, about a number of topics, including the inner workings of the USAO and alleged wrongdoing by various members of that Office. The judge has ordered those witnesses to appear and be questioned under oath at a hearing on January 18, 2018.

All of this would be highly unusual in any case. But what makes it especially so in this case is that the judge has launched this investigation in the context of a criminal prosecution, and the issues the judge and the special master are investigating appear to have nothing to do with the defendants in that case. Indeed, only one of the *Black* defendants, Karl Carter, was housed at CCA-Leavenworth,

and the special master has found no evidence showing that any prosecutor or agent listened to Carter's attorney-client communications.

Defendants charged in other cases who believe they have suffered an unlawful intrusion into their attorney-client communications while housed at CCA-Leavenworth may seek relief in their cases, and indeed the government has already agreed to relief for one defendant. But the district court has exceeded its authority by conducting a far-reaching investigation into the internal workings of the USAO in this case, and by permitting intervention by non-parties to conduct the inquiry.

## RELIEF SOUGHT

The government respectfully requests that this Court issue a writ commanding the district court to (1) terminate the investigation of the USAO by the special master, known as "Phase III"; (2) quash the Rule 17 subpoenas issued by the special master and the FPD, and by two *Black* defendants solely by virtue of their joinder in the FPD's subpoena requests; and (3) prohibit the use of Rule 17 subpoenas except by defendants charged in *Black* who are able to identify specific admissible testimony relevant to matters material to the charges in that case.[1]

---

[1] Consistent with Department of Justice ("DOJ") policy, the government has received authorization from the Solicitor General to seek mandamus relief.

## ISSUE PRESENTED

Whether the district court, during the prosecution of a criminal case, exceeded its authority and impermissibly intruded into the affairs of a coordinate branch of government by (1) directing a special master to conduct a broad investigation into allegations of intrusions into attorney-client communications between defense lawyers and inmates at CCA-Leavenworth where there is no evidence that any federal prosecutor reviewed recorded communications in this case; (2) permitting a federal public defender who does not represent a defendant charged in the case to intervene and participate in the inquiry; (3) authorizing Rule 17 subpoenas for testimony related only to the conduct and decision-making of the USAO; and (4) refusing to terminate the investigation or to quash those subpoenas.

## PROCEDURAL AND FACTUAL BACKGROUND

### 1.    The *Black* Investigation and Prosecution

On April 9, 2016, the government charged Lorenzo Black and six others by complaint with offenses related to smuggling contraband into a detention facility in Leavenworth, Kansas, operated by Corrections Corporation of America ["CCA-Leavenworth"].   A:31.[2]   Two were CCA inmates (Stephen Rowlette and Karl

---

[2] References to the appendix are preceded by "A."  References to the district court's docket report in *United States v. Black, et al*., D. Kansas No. 2:16-CR-20032-JAR, are preceded by "Dkt."  The docket report appears at A:1-26.

Carter), one was a corrections officer (Anthon Aiono), and the others (Lorenzo Black, Alicia Tackett, Catherine Rowlette, and David Bishop) provided funds and contraband from outside the facility. On May 4, 2016, a federal grand jury in Kansas returned an 11-count indictment charging all but Stephen Rowlette. A:54; Dkt. #52. Counsel were appointed for the defendants. Dkt. #12, #15, #21, #24, #28, #32. The FPD has never has represented any defendant in the *Black* case. All defendants except Carter and Bishop have pleaded guilty, and two have been sentenced. Dkt. #209, #212, #233, #264.

## 2.    The FPD Rule 41(g) Motion and Video Recordings of Attorney-Client Meetings

On August 5, 2016, the FPD filed a motion in *Black* under Fed. R. Crim. P. 41(g) for "return of information." Dkt. #82. Two days later, the FPD filed an amended motion alleging that "[o]ur privileged communications with clients at CCA Leavenworth have been recorded by CCA staff and, at times, provided to the government upon request." A:64 (footnotes omitted). The FPD alleged that "at least in certain visitation rooms, CCA Leavenworth has recorded video of our legal visits with our clients" and that "all legal calls are also recorded, and the content of those calls are provided to the USAO." A:64-65.

The FPD acknowledged that it "does not represent any of the listed defendants in this case" and did not identify any client whose communications were recorded. A:65. The motion did not allege facts showing that any FPD client had been

4

"aggrieved by an unlawful search and seizure of property or by the deprivation of property," as Rule 41(g) requires.[3]

At an August 9 hearing, the FPD reported learning that "the United States Attorney's Office as part of the *Black* case had subpoenaed from CCA all external and internal videotape for a period from July of 2015 until April of 2016," and that this video "includes video of all attorney-client meetings in that time, not just pertaining to Mr. Black, but every attorney-client meeting that occurred at CCA in that 10-month period, whether they're FPD, CJA, or retained." A:78; Dkt. #101. The FPD acknowledged, however, that it did not know if the recordings captured "audio." A:78.

The FPD raised the possibility of using a special master. A:79. Government counsel agreed only that a master could be "appointed to review [the CCA Leavenworth recordings] and determine whether or not they contain attorney-client privileged material." A:80-81. The district court took the Rule 41(g) motion under advisement. Dkt. #101.[4]

---

[3] Other *Black* defendants and non-parties filed motions to join the FPD Rule 41(g) motion. Dkt. #89 (defendant Catherine Rowlette); #92 (non-party Richard Dertinger); #94 (non-party David Lougee); #96 (defendant Black); #97 (defendant Carter). Defendants in other cases in the District of Kansas have filed similar motions. None have been granted.

[4] The hearing included discussion of a dispute about statements that Special Assistant United States Attorney Erin Tomasic and Assistant United States Attorney

On August 15, 2016, the government filed a written opposition to the Rule 41(g) motion.  Dkt. #110.  The government explained that, as part of the *Black* contraband-smuggling investigation, the government had subpoenaed from the CCA all video footage and still images taken between July 2014 and April 12, 2016.  A:106.  The government argued that Rule 41(g) was "an improper mechanism for bringing this matter before the Court" because "these recordings were not 'seized' by the government pursuant to a search warrant or warrant exception, making Rule 41 and the Fourth Amendment inapplicable."  A:111.  The government noted that the FPD's clients and other non-parties lacked standing to seek relief and that it remained an open question "whether any of the CCA video recordings provided pursuant to a subpoena, constitute privileged materials, and, if so, whose communications are involved."  A:112.

---

Kim Flannigan had made to attorney Jackie Rokusek, who then was representing CCA-Leavenworth inmate Richard Dertinger in a different criminal case.  Rokusek claimed that the government had indicated in August 2016 that an investigative agent would be viewing videos of Rokusek's meetings with Dertinger.  A:82-103.  According to the prosecutors, the government represented that the agent was viewing video taken outside the attorney-client rooms to see what Dertinger did after meeting Rokusek.  This dispute is described at A:321-25.  Dertinger raised claims concerning these events in his own case, 14-20067-JAR, but pleaded guilty before they were resolved.

3.    **The Audio Recordings of Inmate-Attorney Telephone Calls**

On August 15, 2016, the FPD filed a motion alleging that the USAO had obtained recordings of attorney-client telephone calls and that those calls had been distributed in discovery.  A:121.  The FPD argued that the government's actions "violate[d] constitutional, legal, and ethical rules" and asked the district court to impound the evidence.  A:120-21.

At a hearing the next day, government counsel told the court that there was a process at CCA Leavenworth that permitted entry of an attorney's telephone number into a system so that inmate calls to that number would be exempted from recording, and that any inmate who placed a call after warnings that it would be monitored and recorded waived the attorney-client privilege.  A:125-26.  Government counsel asked for time to investigate the surrounding circumstances and agreed to have the audio recordings impounded "until we can figure everything out."  A:127.

The district court acknowledged that the government and FPD "don't agree on the scope and the duties of the special master" except that both agreed that the special master could ascertain whether there was privileged information on the drives containing the video evidence and, if so, segregate it.  A:128.  The court asked for input about the scope of a special master's duties, A:129, and heard argument from the FPD about why the court should vest a special master with "broad[ ]

powers." A:130.  The district court said it would appoint a special master.  A:131-

33.  And it impounded the audio recordings of the inmate-attorney telephone calls.

On August 23, 2016, the government opposed impoundment, explaining that

"inmates and attorneys knew their conversations were being recorded" and thus "any

privilege has been waived."  A:134; Dkt. #121.  It further explained:

> As part of an investigation into widespread drug and contraband
> trafficking inside the Corrections Corporation of America (CCA)
> facility in Leavenworth, Kansas, agents obtained recorded telephone
> calls made by approximately forty inmates housed at CCA.  Counsel
> for the government was aware of CCA's procedure that privatizes
> attorney-client calls prior to requesting the recorded inmate calls in this
> case. Counsel for the government did not intend to receive attorney-
> client calls as part of this investigation and prosecution. The
> government does not intend to review or use any attorney-client calls
> as part of this investigation or prosecution. The United States
> Attorney's Office produced the recorded CCA calls to defense counsel
> as part of discovery in this case.

A:135.

## 4.    The Appointment of the Special Master

On August 23, 2016, the FPD filed a proposed special master appointment

order and a supporting memorandum.   Dkt. #119.   The government filed a

recommendation concerning the scope of a special master's appointment.  Dkt. #120.

Among other things, the government stated that: "no employee of the United

States Attorney's Office or law enforcement officer has viewed any recording of

attorney-client meetings provided by CCA," A:147; "[c]ounsel for the government

did not intend to obtain any recordings of attorney-client meetings when issuing the

subpoena" for the video recordings, A:149; and "[a]fter defense counsel verified CCA provided recordings of attorney-client meetings, the U.S. Attorney's Office immediately secured the recordings."     A:153.    The government noted its understanding that the video recordings of the inmate-attorney meetings did not include audio and explained that there had been no showing that the videos captured any privileged non-verbal communications and that, in any event, because the videos were not viewed, it would be "extremely difficult to find actual prejudice." A:156-57.    The government argued that the special master's role should be limited to reviewing the video of inmate-attorney meetings to identify and safeguard any privileged communications contained therein.    A:162-70.    The government denied wrongdoing and argued that there was no need to employ a special master with respect to the outgoing inmate-attorney telephone calls because they were not privileged.    A:171-72.    Both the government and the FPD filed supplemental pleadings regarding the appointment of a special master.[5]

---

[5] In its supplemental reply, the FPD provided an affidavit from an attorney who reported instances in 2011 and 2012 in which an inmate's calls from CCA Leavenworth to his telephone number were recorded after he had undertaken the process of having his number marked private.  A:180.  There was no allegation that this attorney or the inmate was involved in the contraband smuggling investigation or the *Black* case.

9

The Court held a hearing on September 7, 2016, regarding appointment of a special master. The court questioned SAUSA Tomasic, who was assigned to the investigation and prosecution in *Black*,[6] and the government called three witnesses. Near the end of the hearing, the government refused to consent to the special master serving any role other than as a filter for potentially privileged information, A:231-33.

On October 11, 2016, the district court appointed a special master "pursuant to Fed. R. Civ. P. 53 and the inherent authority of the Court." A:236. The order tasked the special master with first conducting "Phase I," which involved determining the feasibility of identifying and filtering privileged materials. A:237. The order provided that after the district court received a feasibility report from the special master, it would determine whether Phase II should proceed. Phase II would involve the special master acting as a filter for privileged information. A:238. The appointment order also described possible "[c]omplementary [d]uties," including providing status reports, and "additional investigative duties as requested by the

_____

[6] Tomasic, who is no longer employed by DOJ, made an in-court representation that required a record correction based on her later (and belated) admission that, in another case, *United States v. Herrera-Zamora*, Case No. 14-20049-01-CM, she listened to inmate-attorney telephone calls before they were screened by a filter team. Dkt. #276. (The USAO thereafter agreed to a new trial for Herrera-Zamora.) Tomasic also entered the presiding District Court Judge's chambers after hours and without permission to deliver some impounded evidence.

FPD," such as investigating specified CCA practices.  A:239-40.  The order required cooperation with the special master.    A:246.[7]    On November 16, 2016, after the special master filed a feasibility report, Dkt. #176, the district court ordered Phase II to proceed.  Dkt. #179.

5.    **The Phase II Investigation**

Between December 6, 2016, and March 16, 2017, the special master filed reports regarding the CCA Leavenworth video and audio recordings.  Dkt. #183, #187, #193, #214.  Among other things, these reports establish that:

(a) The recording of inmate-attorney meetings and outgoing inmate-attorney telephone calls at CCA Leavenworth was incidental to standard recording practices, not directed by the USAO or law enforcement officials.  A:255, 273, 286 n.24.

(b) The videos of inmate-attorney meetings at CCA Leavenworth were soundless and there was no evidence that any USAO or law enforcement official had viewed them.  A:261, 285-86.

(c) Inmates making outgoing telephone calls from CCA received multiple warnings that the calls would be monitored and recorded, and consented to

---

[7] The government moved for reconsideration of the appointment order, Dkt. #163, and the district court denied the motion. Dkt. #182.

this scrutiny. This was done through an inmate handbook and a signed consent form upon their arrival at the facility, signage on the walls and telephones, and an audible warning to the caller and recipient involved in each outgoing call. A:274-79.

(d) CCA had a process by which an attorney could designate his or her office telephone number designated as "private" within the telephone system. That process was designed to prevent the recording of outgoing inmate telephone calls to that telephone number. A:270, 275, 279-80.[8]

(e) During the smuggling investigation, the government received 229 audio files of outgoing CCA inmate telephone calls to a known attorney telephone number, but the special master's report did not state that any of these numbers was marked "private" when the calls were placed or that any government official listened to any of these calls. A:251.

---

[8] This system was not foolproof. The special master found that from November 26, 2012, to December 15, 2016, there were 54 recorded outgoing inmate telephone calls that were made to an attorney telephone number that was then designated as "private"; those calls were later "selected" for production to a prosecutor, law enforcement official, or defense attorney. A:280-82. There is no evidence in the special master's report that the person who "selected" any one of those calls was a government official or was aware that the telephone number to which the call had been placed was marked as "private."

The special master's reports do not state or suggest that the Sixth Amendment rights of any defendant named in *Black* were violated or that any violations occurred during the contraband smuggling investigation.[9]

## 6.     The Phase III Order

On May 17, 2017, without evidence of any constitutional violations in *Black*, and despite making no ruling "upon the issues of privilege, waiver, and Sixth Amendment violations," A:304, the district court directed Phase III to proceed. Dkt. #253.  It ordered "the Special Master to investigate the actions and conduct of the government, the USAO attorneys and staff, and the participating investigative agencies (hereinafter, collectively the 'government'), in procuring, obtaining and perhaps using video and audio recordings of attorney-client meetings and phone calls at CCA."  A:293-94.  Specifically, the court directed the special master "to

---

[9] Carter, a defendant in *Black*, recently moved to dismiss the charges against him, claiming that two calls he made to his attorney in *Black*, and five calls to an attorney representing him in an out-of-district case, all involving legal matters, were recorded and produced to the government during the contraband smuggling investigation. Dkt. #333.  Carter did not allege that any of these telephone calls were made to an attorney telephone number then designated as "private" and did not deny that he had consented to and been warned about the recording.  Nor did he offer evidence that any government official listened to these calls.  Carter also claimed that facility logs show that he met on multiple occasions with counsel at CCA Leavenworth during the time period when soundless recordings later produced to the government were being made of such meetings. Dkt. #333.  Carter did not allege that he or his attorney engaged in privileged non-verbal conduct during these meetings and there is no evidence that any government official obtained or viewed video of these meetings, or indeed, that such video exists.

investigate whether or not the government intentionally and purposefully procured and obtained recordings of attorney-client communications, and whether intentionally, or not, the government listened, viewed and/or used such recordings." This was "necessary to the Court's analysis of whether there were violations of the attorney-client privilege, prejudice to the affected clients, and Sixth Amendment violations," and, if there were, to "inform the Court's decision about appropriate relief and remedies." A:294.[10]

Expressing "grave concerns about government intrusion into attorney-client communications" and noting that "other CCA inmates may also be affected by these matters," the district court ordered that the special master's Phase III investigation extend beyond the *Black* defendants to "all of the recordings procured and obtained by the government in connection with this case, including defendants in this case, defendants in other cases who have moved for relief, and CCA inmates who are subjects or targets of the ongoing CCA investigation." A:294-95.

---

[10] The district court was critical of the government's handling of the litigation, with an emphasis on the conduct of former SAUSA Tomasic. A:298-99, 302-04, 310, 313-28. The district court also criticized the CCA procedures for warning inmates about the recording of telephone calls and enabling them to make private calls to their counsel. A:304-08. The district court's order further lamented a "culture of distrust" between prosecutors and the defense bar in Kansas City. A:328-31.

14

The district court directed that the Phase III inquiry encompass the government's "investigative strategy," "charging decisions," "litigation posture on bond," and strategy for "defending motions," and tasked the special master with determining whether "the government obtain[ed] information, directly or indirectly, that it has or could use at trial, in plea negotiations, or in any other way[.]"  A:311. The order directed "a Phase III investigation of the government's knowledge and intent, the government's procurement of the recordings, and whether the government listened to, watched, or otherwise used the audio and video recordings of attorney-client communications."  A:331-32.

The order further provided that, during the Phase III investigation, the special master should determine "how and when the USAO and investigative agencies . . . came into possession of audio and video recordings of attorney-client communications"; "whether the USAO . . . watched video recordings of attorney-client communications"; "whether the USAO . . . purposefully, intentionally, unintentionally or inadvertently" procured the recordings; and whether the USAO "used or attempted to use the substance of attorney-client communications in any investigation, grand jury proceeding, or litigation" or "interfered or attempted to interfere with a defendant's attorney-client relationship."  A:333-34.  The Phase III order further directed the special master to "[d]etermine what remedial measures, if any, have been taken and/or planned by the USAO . . . to address" the intentional or

inadvertent procurement, dissemination, and use of video or audio recordings of attorney-client communications.  A:335.

### 7.    The Special Master's Request for Information, the Government's Response, and the Special Master's Resulting Report

On July 10, 2017, the special master requested that the United States Attorney disclose and produce 14 categories of information and documents.  Dkt. #298-7.  On September 12, 2017, a "Special Attorney" appointed by the Attorney General pursuant to 28 U.S.C. § 515 to respond to the Phase III investigation, explained in a letter that the so-called *Touhy* regulations, 28 C.F.R. § 16.21 *et seq.*, and the substantive law, including various privileges, "compel[ed] [him] to respectfully decline to provide most of the information and documents sought [by the special master's letter]."  A:350-51; Dkt. #298-9.  The government's letter also described "authority demonstrating that wide-ranging investigations like this one— particularly in the absence of any evidence that the government has violated the *Black* defendants' constitutional or statutory rights—trigger separation of powers concerns" and explained that "[a] district court lacks constitutional and supervisory authority to investigate the operations and decisions of an executive-branch agency like a United States Attorney's Office."  A:371.

On October 20, 2017, the special master issued a report describing the government's response.  Dkt. #298.  The report acknowledged "that the [USAO] may have valid bases upon which to refuse production of information."  A:381

16

(emphasis omitted).  It also updated the special master's findings: "Indeed, the Phase III investigation to date suggests there is only *one* instance where the [USAO] even made a *request* for video-recordings of meetings at CCA between inmates and their attorneys, and the [USAO] did not actually view any such meeting."  A:382.

8.    **The Special Master's Subpoenas and Production Order**

On December 5, 2017, the special master issued subpoenas *ad testificandum* to the United States Attorney, his senior management team, members of his staff, and former SAUSA Tomasic.  Dkt. #336-1.  Each subpoena demanded appearance and testimony at a hearing on January 18, 2018, and was accompanied by a summary of the testimony sought from that person, as required by 28 C.F.R. § 16.23(c).  The summary pertaining to the intended questioning of United States Attorney Thomas E. Beall provides in part as follows:

> Beall will be asked about when he first knew of grand jury subpoenas that were issued or returned for the *Black* case demanding information from CCA regarding its audio and/or video monitoring and/or recording practices at CCA.  He will be asked about any discussions with Tomasic, her supervisor AUSA Kim Flannigan, or their supervisor, AUSA Debra Barnett, concerning such subpoenas.

> Beall will be asked to explain why he did not direct that a formal litigation hold be placed concerning the *Black* case immediately after the Court's orders arising from the August 9, 2016, hearing.  He will also be asked to explain why the search terms negotiated with the Special Master were not implemented.

> Beall will be asked [what], if anything, he did to address the unpermitted, after-hours intrusion into the chambers of the *Black* trial judge, and what he has since done to better educate his staff and the

17

U.S. Marshal's staff concerning any inappropriate activity connected with their positions.

Beall will be asked what he has done during his tenures as First Assistant U.S. Attorney, Interim U.S. Attorney, and Acting U.S. Attorney to help the Court understand what the Special Master found to be widespread mistrust, tension and other problems between the USAO in Kansas City and the criminal defense bar at the Kansas City, Kansas, branch office, as opposed to the other two branch offices.

A:386.

The special master also issued a subpoena *duces tecum* for production of government documents and an "order of production" making the same demands. Dkt. #317, #336-1.

## 9.    The Federal Public Defender's Subpoenas

In response to motions from the FPD made under Fed. R. Crim. P. 17(b), the district court approved the issuance of subpoenas *ad testificandum* for 18 witnesses for the January 18, 2018, hearing.  Docket #318, #320, #330, #331, #347, #349, #359, #363-1, #367, #368, #369.  These witnesses include 12 present and former USAO employees, including the United States Attorney and his senior management staff.  The FPD plans to ask the United States Attorney about the following:

(5) What remedial action, if any, he took or had taken to ensure defense attorney-client communications were not further being obtained and reviewed by his office;

(6) What remedial action, if any, he took or had taken regarding misconduct by SAUSA Tomasic or any other USAO prosecutor or employee;

18

(7) His decision not to "correct the record" regarding SAUSA Tomasic entering into Chief Judge Robinson's chambers after-hours, as detailed during a hearing on September 7, 2016;

. . .

(9) The nature of the "conflict" in the USAO's representation of the government in this case, as evidenced by communications with the Special Master;

(10) Any and all communications with Main Justice concerning the Phase III investigation, the USAO's conflict in continuing to represent the government in this investigation, and guidance received from Main Justice concerning the conflict; and

(11) The government's decision to limit or cease cooperation with the Special Master's Phase III investigation.

A:388-89.[11]

## 10.    The *Black* Defendant's Motions to Dismiss, Suppress, and Join

The two defendants awaiting trial in *Black* also filed motions.  Defendant Carter moved to dismiss the indictment, alleging that his Sixth Amendment rights were violated.  Dkt. # 333.  Defendant Bishop, who was released shortly after his arrest, moved to suppress evidence seized from his residence on Fourth Amendment grounds unrelated to the claims giving rise the appointment of the special master.  Dkt. #338.  Both Carter and Bishop moved to join the FPD subpoena motions but did not describe what information the USAO witnesses have that relates to their

---

[11] The FPD also issued a court-approved Rule 17 subpoena *duces tecum* for documents and materials from CCA.  Docket #328, #329.

claims.   Dkt. #337, #339.   The government opposed these joinder motions, Dkt. #354, #355, but the district court granted them.   Dkt. #366.

## 11.    The Government's Motions to Terminate the Phase III Investigation and Quash the Subpoenas

On December 18, 2017, the government moved to terminate the Phase III investigation, arguing, *inter alia*, that the district court lacks authority to conduct an investigation of the USAO untethered to the case before it; that there is no evidence of constitutional violations in *Black* or the underlying investigation; and that any defendant who has a valid Sixth Amendment claim can raise it in his own case.  Dkt. #336.   The government also moved to quash the special master's and FPD's subpoenas, as well as the joinder-based subpoenas of Carter and Bishop, citing the lack of authority for the Phase III investigation, the FPD's lack of standing, and arguing that the subpoenas are an abuse of Rule 17 because they are investigatory, not evidentiary, and seek only evidence not relevant to the *Black* case.  Dkt. #334, #335, #340, #341, #360, #370.  The special master and FPD responded, Dkt. #350, #357, and the government replied,  Dkt. #361.

## 12.   The District Court's Order

On January 12, 2018, the district court denied the government's motions to terminate the Phase III investigation and to quash the subpoenas *ad testificandum*.[12] Dkt. #372.  The court appeared to find that the FPD itself—not any of its clients— has standing in the *Black* case *and* that it can raise issues "central to the Phase III investigation" because it had filed a Rule 41(g) motion.  The court reasoned that "[t]he injury to the FPD in having its communications with clients at CCA recorded and disseminated in this case" was "concrete and particularized," was "fairly traceable to the [government's] particular conduct," and was "potentially remediable by curative measures the Court may implement following the conclusion of Phase III of the Special Master's investigation."   A:412.   The district court further concluded that, in any event, it would not quash the subpoenas because "[d]efendants Carter, Bishop, and other Defendants have appeared alongside the FPD and have joined in the FPD's arguments and motions."  A:412.

The district court denied the motion to terminate Phase III and quash the special master's subpoenas for similar reasons, describing Phase III as "a limited investigation grounded in the Rule 41 motions at issue in this case and other, related

---

[12] Because it previously stayed compliance with the special master's and FPD's subpoenas *duces tecum*, and the special master's order of production, Dkt. #345, the district court did not rule on the government's motion to quash those subpoenas and vacate the production order, A:409.

21

cases." A:413. The district court explained that "Phase III . . . is to determine whether the USAO or investigative agencies intentionally or unintentionally viewed or listened to attorney-client communications, as alleged in the Rule 41 motions at issue in this and related cases." A:414. The district court further concluded that Rule 17 does not provide for a motion to quash in order to prevent a subpoenaed witness from appearing in court. A:415.

## REASONS WHY THE WRIT SHOULD ISSUE

Under the All Writs Act, 28 U.S.C. § 1651(a), an appellate court may issue a writ of mandamus in "exceptional circumstances" to correct "a judicial 'usurpation of power.'" *Will v. United States*, 389 U.S. 90, 95 (1967) (quoting *De Beers Consol. Mines, Ltd. v. United States*, 325 U.S. 212, 217 (1945)). Although that remedy "is a drastic one," *Kerr v. United States Dist. Court*, 426 U.S. 394, 402 (1976), courts do not hesitate to use it where a party has a "clear and indisputable" right to relief and "no other adequate means to attain" that relief, *id.* at 403 (citation omitted). Both conditions are satisfied here.

## 1.    The Phase III Investigation Exceeds the District Court's Authority.

The court-ordered Phase III investigation, which has become a wide-ranging investigation into the conduct and decision-making of the USAO, is an impermissible intrusion upon the independence of the Executive Branch. Although federal courts have authority to remedy constitutional violations in specific cases,

the separation of powers prevents them from probing the internal workings of the executive branch. *See United States v. Dominguez-Villa*, 954 F.2d 562, 565 (9th Cir. 1992) ("A district court does not have general supervisory powers over the co-equal executive branch of government."); *United States v. Lau Tung Lam*, 714 F.2d 209, 210 (2d Cir. 1983) ("[T]he federal judiciary's supervisory powers over prosecutorial activities that take place outside the courthouse is extremely limited, if it exists at all.").

On the rare occasions in which a federal district court has undertaken an investigation into the conduct and decisions of a federal prosecutor's office, federal appellate courts have made clear through writs of mandamus that doing so is improper. In one case, a federal district judge sought to investigate the government's application for an overly broad grand jury disclosure order. *In re United States*, 398 F.3d 615, 616-17 (7th Cir. 2005) (per curiam). The judge "threatened to hold the [AUSA who sought the disclosure order] in criminal contempt of court, and he demanded to know who within the United States Attorney's Office participated in the decision to file such a request and why they had approved it." *Id.* at 617. The Court of Appeals issued a writ of mandamus, concluding "that the inquiry is inappropriate and must cease." *Id.* It explained that "[t]he fundamental problem with this inquiry is that the United States Attorney is not answerable to a judge for the deliberations among his staff." *Id.* at 618. Moreover, "[t]he intra-office

conversations and memoranda that the judge wants to see are covered by multiple privileges." *Id.* "How the United States reaches its litigating positions, who said what to whom within the prosecutor's office, and so on, are for the Attorney General and the President to evaluate." *Id.* Although "[j]udges often are tempted to seek a larger role in the conduct of litigants," that "temptation must be resisted in order to maintain separation between executive and judicial roles." *Id.* "In the rare situations when a prima facie case of criminal contempt has been made out, and the contempt is not committed in the judge's presence (and thus amenable to summary disposition), the judge must turn the matter over to a prosecutor rather than assume an inquisitorial role inappropriate to the Judicial Branch." *Id.*

A similar outcome resulted in *In re United States*, 503 F.3d 638 (7th Cir. 2007), where a federal district court judge "propounded [a] set of interrogatories to the United States Attorney" concerning a cooperating defendant's eligibility for a government motion under U.S.S.G. § 5K1.1; the court refused accept or reject the defendant's guilty plea until it received answers. *Id.* at 639-40. The Seventh Circuit issued a writ of mandamus requiring that the district court rule on the government's motion "without requiring access to information about ongoing investigations or deliberations within the Executive Branch." *Id.* at 643. The district court's questions were "questions a United States Attorney might well ask of an Assistant United States Attorney; they are not appropriate questions for the Judicial Branch to ask of

the Executive Branch." *Id.* at 641.  The court also noted that "[m]ultiple privileges cover the internal deliberations of the Executive Branch, just as they do for the Judicial Branch's internal deliberations." *Id.*

In yet a third case by the same name, the First Circuit granted the government's petition for mandamus, terminated a judicial investigation, and ordered the judge's recusal where the district court continued its own investigation into alleged government misconduct in the grand jury where the DOJ's Office of the Inspector General and Office of Professional Responsibility had concluded that there was no misconduct.  *In re United States*, 441 F.3d 44, 67-68 (1st Cir. 2006).  The appellate court observed that "[a] judge's investigation of a prosecutor's office under the label of government misconduct . . . poses the risk that the line will be crossed 'between executive and judicial roles, and between the formulation and evaluation of positions in litigation.'"  *Id*. at 67 (quoting *In re United States*, 398 F.3d at 618). Although "the court's inherent supervisory authority undoubtedly provided some authority to investigate misconduct as to the grand jury proceedings," this authority was "subject, of course, to the broader constitutional principle of the separation of powers."  *Id*. at 58.  The "constraints" of the separation of powers "mean that there must be some reasonable basis for a district court to launch an inquiry" into claims of government misconduct. *Id*.  And "there are limits on who should investigate and how the investigation should be done."  *Id*.

The district court's effort to distinguish its inquiry in this case—by noting that Phase III is not a "'means to supervise the internal operations' of the USAO or an attempt to obtain evaluations of evidence in ongoing investigations," A:414—misses the point. It is the judicial inquiry into the USAO's conduct that violates the separation of powers, not the objective of the inquiry. *See In re United States*, 398 F.3d at 619 ("Our legal system does not contemplate an inquisitorial role for federal judges.").

The district court's further contention that the Phase III investigation "is both proper and necessary to the resolution of the underlying Rule 41 motions in this case," A:414, is unpersuasive for multiple reasons. First, this is a newly minted rationale. Nothing in the district court's Phase III order suggests that an alleged unlawful search, seizure, or deprivation of property – the only harms that Rule 41(g) addresses – factored into the special master's investigation. Second, Rule 41(g) cannot serve as a basis for the judicial inquiry here because the recordings were made as part of a broad CCA recording policy that did not implicate Rule 41's warrant requirements, and the USAO obtained them through subpoenas, not through a "search" or "seizure." Rule 41(g) simply does not apply. Third, if any of the FPD's clients believes the government has seized their property, they must litigate those claims in their own cases. Any narrow claims they may have under Rule 41(g) do not provide a reason to continue the broad Phase III investigation in this case.

2.    **There is No Factual Predicate for a Judicially Sponsored Inquiry into the Government's Conduct and Decisions.**

There is no finding by the district court or by the special master that the government violated the Sixth Amendment rights of any defendant in *Black* or any other CCA Leavenworth inmate during the underlying investigation.  Indeed, because the videos of the inmate-attorney meetings are soundless, and thus can reveal only non-verbal communication, it is unlikely (and certainly unproven) that this evidence disclosed any privileged communications, even had a government official viewed one.  *See, e.g., United States v. Merida*, 828 F.3d 1203, 1209 (10th Cir.), *cert. denied*, 137 S. Ct. 325 (2016) ("In order to be covered by the attorney-client privilege, a communication between a lawyer and client must relate to legal advice or strategy sought by the client.") (citation and emphasis omitted).  Similarly, even if someone from the USAO had listened to recorded CCA attorney-inmate telephone calls, there would not necessarily have been a violation of the attorney-client privilege or the Sixth Amendment right to counsel.  Numerous federal courts have concluded that the attorney-client privilege does not apply to calls where the participants are informed that they are being recorded.[13] And to show a violation of

---

[13] *See, e.g., United States v. Hatcher*, 323 F.3d 666, 674 (8th Cir. 2003) (finding no privilege attached to inmate-attorney calls because "the parties to these conversations were aware that they were being recorded by the prison" and "[t]he presence of the prison recording device destroyed the attorney-client privilege"); *United States v. Mejia*, 655 F.3d 126, 132-34 (2d Cir. 2011) (holding that the

the Sixth Amendment right to counsel, a defendant must show both "purposeful intrusion" by the government and prejudice. *Weatherford v. Bursey*, 429 U.S. 545, 558 (1977). That is, there must be some "communication of defense strategy to the prosecution," *id*. at 558, or the intrusion must "ha[ve] or threaten[ ] some adverse effect upon the effectiveness of counsel's representation or has produced some other prejudice to the defense," *United States v. Morrison*, 449 U.S. 361, 365 (1981).

At most, the evidence shows that an agent, at a prosecutor's direction, may have viewed a soundless video of an inmate (not one of the *Black* defendants) meeting with counsel and that SAUSA Tomasic may have listened to recorded telephone calls an inmate (again, not a *Black* defendant) made to his lawyer after consenting to the recording.[14] If the special master and FPD can use Rule 17 to interrogate the United States Attorney and his senior staff about the conduct and decision-making of the USAO under these circumstances—where there is, at most, evidence of possibly impermissible intrusions into inmate-attorney communications *involving non-parties who were able to raise claims in their own cases*—it is hard to imagine when similar intrusions would be forbidden.

---

privilege does not cover a telephone call an inmate knows will be recorded by prison authorities  because the prisoner could not intend such call to be confidential).

[14] *See* notes 4 and 6, *supra*.

3.    **The Federal Public Defender Represents no Client in *Black* and Lacks Standing to Issue Subpoenas and Interrogate Witnesses.**

Because the FPD does not represent any client in *Black*, it lacks standing to assume party status, and the district court overstepped its authority in permitting the FPD to intervene for the purpose of conducting a far-ranging inquiry into possible Sixth Amendment violations in other cases. Accordingly, the district court erred as a matter of law by concluding that the United States Attorney and his management team may be compelled to appear in court and answer the FPD's questions.

The text of the Sixth Amendment establishes that only an "accused" defendant in a "criminal prosecution[]" has standing to seek judicial relief for an alleged violation of his or her constitutional right to counsel: "In all criminal prosecutions, the accused shall enjoy the right to . . . have the Assistance of Counsel for his defence." U.S. Const. amend. VI. Accordingly, the Supreme Court has explained that "[t]he Sixth Amendment right to counsel is personal to the defendant and specific to the offense." *Texas v. Cobb*, 532 U.S. 162, 172 n.2 (2001); *see also United States v. Jones*, 44 F.3d 860, 873 (10th Cir. 1995) ("The Sixth Amendment right to counsel is a personal right."). "A defendant thus does not have standing to raise the Sixth Amendment claims of a co-defendant." *Id.*; *see also United States v. Adams*, 977 F.2d 596 (table), 1992 WL 279227, at *3 (10th Cir. 1992) (unpublished) ("The government also argues . . . that the Sixth Amendment right to counsel is a personal right and a co-defendant lacks standing to challenge a violation. We agree.").

29

The district court adopts the untenable position that the FPD—not any client—has standing here by virtue of its Rule 41(g) motion. A:412 ("the Court finds that the FPD has standing to litigate its Rule 41 motion and the issues central to the Phase III investigation in this case"); A:412 ("Thus, the FPD's injury, and its concern that recordings of its attorney-client communications obtained in this case could be used outside this case, was 'not conjectural or hypothetical.'"). In addition to the other problems with reliance on the Rule 41(g) motion, it is impossible for the FPD to have standing. It is not an "accused" under the Sixth Amendment, has no attorney-client privilege of its own, *State v. Maxwell*, 10 Kan. App. 2d 62, 64, 691 P.2d 1316, 1320 (Kan. 1984) ("The privilege belongs to the *client*."), and was not "aggrieved" by an unlawful search, seizure, or deprivation, as Rule 41(g) requires. Thus, contrary to the district court's decision, there is no basis for the FPD's participation.[15]

Nor does it matter, as the district court's decision suggests, that Carter and Bishop's joined the FPD subpoena requests. Neither has identified any relevant and admissible testimony that the subpoenaed witnesses have to offer (Bishop does not

---

[15] Federal Rule of Criminal Procedure 16(a)(1)(B) entitles defendants to obtain their relevant recorded statements in discovery in their criminal case. If the government produces recordings of communications with counsel, a defendant can pursue a remedy, if appropriate, in his criminal case.

even assert a Sixth Amendment violation and was not a CCA Leavenworth inmate) and their mere joinder cannot create standing or legitimize the FPD's otherwise impermissible subpoenas.

**4.     The District Court's Assurance that it Will Entertain Objections at the Hearing is Insufficient.**

The district court's assurance that "the Government will have a full opportunity to assert any applicable privileges at the January 18 hearing," A:415, is insufficient to permit the Phase III investigation to proceed or enable the special master and the FPD to probe into the USAO's conduct and decisions, especially where the purpose of the hearing is to vindicate the rights of non-party defendants, to address a "culture of distrust" occasioned by "prosecutorial practices," and to "restore . . . an environment of mutually earned respect, understanding, and trust" in the community." A:332. The entire inquiry has no relevance to the defendants in *United States v. Black, et al.*

**5.     The Government Has No "Other Adequate Means" to Obtain Relief.**

The government has no means of challenging the authority of the district court to conduct this far-reaching investigation other than by mandamus. Although the government could appeal an order dismissing the indictment or suppressing evidence for a Sixth Amendment violation as to defendant Carter, his specific claims are being separately addressed by the USAO in the criminal case. In any event, the Special Master's investigation did not reveal that any government official listened to any of

31

Carter's calls or that they were made to an attorney number then marked private. Carter provides no evidence of these things.    The Phase III inquiry extends far beyond Carter's recently filed motion and is intended to reveal whether the rights of non-party defendants or the FPD have been violated, and to examine the prosecutorial practices of the USAO and its reputation in the community.    Whether such a hearing would result in an appealable order is unlikely, but the district court lacks authority to conduct this investigation, and we ask this Court to stop it now.

## CONCLUSION

For the reasons stated above, the government respectfully requests that this Court grant the relief described above.

Respectfully submitted,

STEVEN D. CLYMER
Assistant United States Attorney
Special Attorney

JOHN P. CRONAN
Acting Assistant Attorney General

/s William A. Glaser

WILLIAM A. GLASER
Attorney, Appellate Section
Criminal Division
U.S. Department of Justice
950 Pennsylvania Ave., N.W.
Washington, DC 20530
(202) 532-4495
William.Glaser@usdoj.gov

## CERTIFICATE OF SERVICE

In accordance with Fed. R. App. P. 25(d), the undersigned counsel of record

certifies that the foregoing Petition for Writ of Mandamus was this day served via

email upon the following counsel, who all appear on the district court docket:

John Jenab
john.jenab@gmail.com
Counsel for Defendant Lorenzo Black

David J. Guastello
david@guastellolaw.com
Counsel for Defendant Karl Carter

Jason P. Hoffman
jphoffman@sbcglobal.net
Counsel for Defendant Anthon Aiono

Kathleen A. Ambrosio
kaambrosio@yahoo.com
Counsel for Defendant Alicia Tackett

Michael M. Jackson
jacksonmm@aol.com
Counsel for Defendant Catherine Rowlette

Cynthia M. Dodge
cindy@cdodgelaw.com
Counsel for Defendant David Bishop

David R. Cohen
david@specialmaster.biz
Special Master

Branden A. Bell
branden_bell@fd.org
Kirk C. Redmond
kirk_redmond@fd.org

Melody J. Brannon
melody_brannon@fd.org
Richard Federico
rich_federico@fd.org
Office of the Federal Public Defender – Topeka

Shazzie Naseem
snaseem@berkowitzoliver.com
Coordinating Discovery Attorney

Erin C. Thompson
ethompson@morganpilate.com
Counsel for Richard Dertinger, Interested Party

Jonathan L. Laurans
jlaurans@msn.com
Counsel for David Lougee, Interested Party

Melanie S. Morgan
mmorgan@morganpilate.com
Counsel for Michelle Reulet, Interested Party

Frederick A. Duchardt, Jr.
fduchardt@yahoo.com
Counsel for Charles Hall and Jerry Scott, Interested Parties

In addition, this document was served upon the Honorable Julie A. Robinson,

United Stated District Judge, via email.

DATED: JANUARY 16, 2018

/s William A. Glaser
WILLIAM A. GLASER

**CERTIFICATE OF COMPLIANCE**

1. This petition complies with the type-volume limitations of Fed. R. App. P. 21(d)(1) because it contains 7,550 words, excluding the parts of the petition exempted by Fed. R. App. P. 32(f) and 10th Cir. R. 32(b).

2.   This petition complies with the typeface requirements and type style requirements of Fed. R. App. P. 21(d) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in Times New Roman 14-point font in text and Times New Roman 14-point font in footnotes.

DATED: JANUARY 16, 2018

/s William A. Glaser
WILLIAM A. GLASER

## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing:

(1) all required privacy redactions have been made;

(2) if required to file additional hard copies, that the ECF submission is an exact copy of those documents;

(3) the digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program, McAfee Endpoint Security 10.5, which is constantly updated, and according to the program are free of viruses.

/s William A. Glaser
WILLIAM A. GLASER

# ADDENDUM

# TABLE OF CONTENTS

**Description**                                                                 **Page**

Order Appointing Special Master (Doc. 146)...................................................Add. 1

Special Master's Second Report Regarding Telephone Call Recordings
  (Doc. 187) .....................................................................................Add. 16

Special Master's Report Regarding Video Recordings (Doc. 193)...............Add. 21

Special Master's Report Regarding Issues at CCA Leavenworth (Doc.
  214) ..............................................................................................Add. 27

Order Regarding Phase III (Doc. 253) ...........................................................Add. 56

Special Master's Status Report Regarding Phase III (Doc. 298) ................Add. 104

Order Denying Government's Motions to Terminate Phase III and to
  Quash Subpoenas (Doc. 372) ................................................................Add. 114

16CR20032-ord(appt-specialmaster).wpd

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | **CASE NO. 16-20032** |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **JUDGE JULIE A. ROBINSON** |
| | ) | |
| **LORENZO BLACK, et al.,** | ) | **APPOINTMENT ORDER** |
| **Defendants** | | |

On August 9, 2016, the Court held an emergency hearing in connection with the Federal Public Defender's ("FPD's") Amended Motion for Return of Information (Doc. 82). The Court granted this motion, ordering the Government[1] to submit to the custody of the Court certain "video recordings depicting privileged attorney-client communications at the Corrections Corporation of America Leavenworth Detention Center" (hereinafter, "CCA"). Order at 1 (Doc. 102). At the hearing, the parties also "jointly request[ed] the appointment of a special master to segregate all recordings of attorney-client communications from the remainder of the recordings" that were submitted to the Court. *Id.* at 3.

Thereafter, the Court: (1) held additional hearings and received briefs regarding the appropriate scope of the Special Master's duties; and (2) ordered CCA and the Government to submit to the custody of the Court various additional materials, including audio recordings.

---

[1] As a general matter, the Court uses the term "the Government" in this Order to refer to the United States Attorney's Office for the District of Kansas, unless context requires a broader definition.

The parties' briefs reveal that: (1) the parties agree and consent to the Special Master's performance of certain duties; but (2) the parties are not in *full* agreement, as the FPD asserts the Special Master should pursue additional duties, to which the Government objects.   Further, the parties agree that, although this is a criminal case, the Court should follow the directives of Federal Rule of Civil Procedure 53, which governs the appointment of a Special Master in civil cases.[2]

The Court concludes that appointment of a Special Master is appropriate in this case. Accordingly, the Court hereby enters this Order of Appointment.

---

[2] It is clear a court may appoint a Special Master in a criminal case.  "Beyond the provisions of [Fed. R. Civ. P. 53] for appointing and making references to Masters, a Federal District Court has 'the inherent power to supply itself with this instrument for the administration of justice when deemed by it essential.'"  *Schwimmer v. United States*, 232 F.2d 855, 865 (8th Cir. 1956) (quoting *In re: Peterson*, 253 U.S. 300, 311 (1920)); *see Ruiz v. Estelle*, 679 F.2d 1115, 1161 n.240 (5th Cir. 1982), *cert. denied*, 460 U.S. 1042 (1983) ("[R]ule 53 does not terminate or modify the district court's inherent equitable power to appoint a person, whatever be his title, to assist in administering a remedy."); *Reed v. Cleveland Bd. of Educ.*, 607 F.2d 737, 746 (6th Cir. 1979) (the authority to appoint "expert advisors or consultants" derives from either Rule 53 or the Court's inherent power); 18 U.S.C. §3626(g)(8) (defining "special master" as "any person appointed by a Federal court pursuant to Rule 53 . . . *or* pursuant to any inherent power of the court to exercise *the powers of a master*") (emphasis added).

Other district courts have relied on similar authority to appoint Special Masters in criminal cases.  *See, e.g., United States v. Stewart*, 2002 WL 1300059 at *4 (S.D.N.Y. June 11, 2002); *United States v. Abbell*, 914 F. Supp. 519 (S.D. Fla. 1995).  Indeed, the United States Attorney's Manual ("USAM"), issued by the Department of Justice, lists using a Special Master as one method of reviewing documents seized from a law office in a criminal case.  *See* USAM §9–13.420(F) (available at www.justice.gov/usam/united-states-attorneys-manual).

**I.      Appointment of the Special Master.**

Having given the parties notice and an opportunity to be heard, the Court now appoints as

Special Master David R. Cohen, Esq., of the following law firm:

> David R. Cohen Co. LPA
> 24400 Chagrin Blvd., Suite 300
> Cleveland, OH  44122
> 216-831-0001  tel
> 866-357-3535  fax
> E-Mail:   david@specialmaster.law
> www.SpecialMaster.law

This appointment is made pursuant to Fed. R. Civ. P. 53 and the inherent authority of the

Court.  As Rule 53 requires, the Court sets out below the duties and terms of the Special Master and

reasons for appointment, and orders the Master to "proceed with all reasonable diligence," Rule

53(b)(2).

**II.      Rule 53(b)(2).**

Rule 53 requires an order of appointment to include certain contents.  *See* Fed. R. Civ. P.

53(b)(2).  The following discussion sets forth the matters required.

**A.      Special Master's Duties.**

Rule 53(a)(1)(A) states the Court may appoint a Special Master to "perform duties consented

to by the parties."  In addition, Rule 53(a)(1)(C) states the Court may appoint a Special Master to

"address pretrial and posttrial matters that cannot be effectively and timely addressed by an available

district judge or magistrate judge of the district."  The Court has reviewed legal authority addressing

the duties of a Special Master that are permitted under the Federal Rules of Civil Procedure and

Article III of the Constitution.[3]  Consistent with this legal authority and the currently-anticipated needs of the Court, as well as the parties' consent, the Court decrees that the Special Master shall have the authority to perform the following duties.[4]

**Initial Duties**

    **Phase I**

The Special Master shall begin by evaluating the feasability of: (1) identifying privileged and confidential information contained within the recordings and other materials submitted by the Government and CCA to the Court; (2) excising and retaining this information; and (3) providing to the Government and Coordinating Discovery Counsel copies of the remaining, non-privileged and non-confidential materials.

The Special Master's feasability evaluation shall include an assessment of the time, labor, and cost to index, cull, and segregate the privileged and confidential materials.[5]  This evaluation will include determination of: (1) the volume of the recordings (digital size and/or number of hours); (2) the number of audio and video recordings of the defendants and all other CCA detainees produced to the Government; (3) the number of audio and video recordings of attorney-client communications

---

[3] *See generally Appointing Special Masters and Other Judicial Adjuncts: A Benchbook for Judges and Lawyers* (5th ed. 2013) (available at www.SpecialMaster.law); Fed. R. Civ. P. 53, advisory committee's notes, 2003 amendment (discussing the range of duties and authority of a Special Master).

[4] The Court may amend this Order to add additional duties.  With regard to the "Initial Duties" listed here, the Court will schedule a discovery hearing within the next few weeks, where the Special Master will meet with the parties and the Court to determine the most efficient way to proceed.

[5] It is expected the Special Master will employ IT professionals and others to assist with performance of the Initial Duties.

of defendants and all other CCA detainees produced to the Government; (4) whether it is possible

to index the recordings and cull and segregate the confidential information; and (5) the technology,

equipment, software, and personnel required to undertake these tasks.  This evaluation will inform

the Court and the parties as to the appropriate process for discovery in this case.

**Phase II**

After the Special Master submits a feasability report, the Court will determine whether the

Special Master should proceed.  If so, the Special Master will, as soon as reasonably possible:

•    Identify, excise, and retain privileged or confidential information from the video recordings
     made at CCA that have been submitted to the Court;

•    Provide copies of these video recordings with the privileged or confidential information
     removed to the Government and Coordinating Discovery Counsel;

•    Identify, excise, and retain privileged or confidential information from the audio recordings
     made at CCA that have been submitted to the Court;

•    Provide copies of audio recordings with the privileged or confidential information removed
     to the Government and Coordinating Discovery Counsel;

•    Identify, excise, and retain privileged or confidential information in the computers seized
     from CCA's inmate law libraries; and

•    Provide images of law library computers with the privileged or confidential information
     removed to the Government and Coordinating Discovery Counsel.

During pursuit of these Initial Duties, the Special Master shall keep the Court and the parties

apprised of his progress and provide an anticipated time line toward completion.

The parties agree and the Court orders that the Special Master's pursuit of these Initial Duties

and any other duties shall not constitute or be deemed a waiver of attorney-client privilege.

**Complementary Duties**

In conjunction with the "Initial Duties" listed above, the Court may also call upon the Special

Master to undertake any of the following complementary and auxiliary duties.

• Provide periodic status reports to the Court.

• Make formal or informal recommendations and reports to the parties, and make recommendations and reports to the Court, regarding any matter pertinent to the above-listed duties.

• Communicate and meet with the parties and attorneys as needs may arise in order to permit the full and efficient performance of these duties.

• Employ staff as may be necessary to assist the Special Master in performing his duties, including experts, consultants, or advisors.  The Special Master shall incur only such fees and expenses as may be reasonably necessary to fulfill his duties.

• Assist with preparation for attorney conferences (including formulating agendas), court scheduling, and case management.

• Compile data and assist with, or make findings and recommendations with regard to, interpretation of forensic, scientific, and technical evidence.

• Assist with legal analysis of the parties' motions or other submissions, whether made before, during, or after trials, and provide the Court with formal and informal recommended rulings on those motions.

• Assist with responses to media inquiries.

• Help to coordinate other, related litigation.

• Direct, supervise, monitor, and report upon implementation and compliance with the Court's Orders, and make findings and recommendations on remedial action if required.

• Interpret and enforce any agreements reached by the parties.

• Propose structures and strategies for negotiation of any issues as may become necessary.

• Monitor compliance with structural injunctions, as may become necessary.

6

**Additional, Investigative Duties**

The Court continues to consider whether to direct the Special Master to undertake additional investigative duties as requested by the FPD.  Generally, the FPD asks the Court to direct the Special Master to investigate whether, and the extent to which, the Government has violated the Sixth Amendment and/or Fed. R. Crim. P. 6(e) in this and other criminal cases.

The Court has chosen to limit the Special Master's duties to those to which the Government consents *at this time*.  The Court may later expand the scope of the Special Master's appointment (or may appoint a second Special Master and/or a neutral expert) to include the following duties, among others:[6]

•       Determine what, if any, steps were taken by CCA or other pretrial holding facilities to protect confidential audio communications, such as blocking certain phone numbers or warning callers, and whether those measures were communicated to either detainees or their attorneys.

•       Determine whether any other protected communications, such as legal mail or videoconferencing, were recorded by CCA or other pretrial holding facilities, or were obtained by the Government.

•       Determine how the Government came into possession of any confidential or protected materials, and determine any Government policy or practice related to obtaining those materials; and identify any specific cases or specific Government attorneys or agents who obtained those materials.

•       Determine the prior policy and practices of CCA and other pretrial holding facilities under contract with the United States Marshal Service with regard to recording protected communications.

---

[6] These additional investigative duties are copied from the FPD's proposed appointment order (Doc. 119-1).  By listing them here, the Court does not mean to limit the Special Master's ability to pursue his "Initial Duties."  For example, if the Special Master concludes it is necessary to review certain CCA records in order to identify privileged or confidential information in the CCA recordings, he is authorized to do so notwithstanding reference to that as an "additional investigative duty" below.

- Identify past occasions when CCA or other pretrial holding facilities have made available to the Government or any law enforcement agency recordings of protected communications.

- Determine whether the Government intentionally sought production, formally or informally, of any protected communication from any pretrial holding facility for use in an investigation, grand jury proceeding, or prosecution; and by what means.

- Determine whether the Government inadvertently came into possession of protected materials from any pretrial holding facility, and whether appropriate remedial or protective measures were taken to notify the parties and protect the security of the communications.

- Determine whether and how the Government has used or attempted to use protected material in any investigation, grand jury proceeding, or litigation, regardless of whether the use or attempted use was disclosed to the Court or to the parties; and whether the Government did or attempted to interfere with a defendant's attorney-client relationship, such as requesting attorney fees or alleging conflicts of interest.

- Identify, by using visitation logs and other facility records, the attorneys and clients who met during the time span covered by the recordings of protected meetings in this case, or any other case involving Government possession of protected material discovered during this inquiry.

- Identify the attorneys and clients who communicated by phone or videoconferencing during the time span covered by the audio recordings in this case, or any other case involving Government possession of protected material discovered during this inquiry.

- Inspect and copy files, documents, communication, and electronic data of any pretrial holding facility, the United States Marshal Service, and the Government as necessary to complete the above duties.

- Report to the Court the identity of parties affected by any breaches of privilege, confidence, Constitutional rights, statutory rights, or ethical obligations, and recommend available remedies, in this case or others, if appropriate.

**B.**      **Communications with the Parties and the Court**.

Rule 53(b)(2)(B) directs the Court to set forth "the circumstances, if any, in which the [Special Master] may communicate ex parte with the court or a party."  The Special Master may communicate ex parte with the Court at the Special Master's discretion, without providing notice to the parties, regarding logistics, the nature of his activities, management of the litigation, and other

8

appropriate matters, and also to assist the Court with legal analysis of the parties' submissions. The Special Master may communicate ex parte with any party or his attorney, as the Special Master deems appropriate, for the purposes of ensuring the efficient administration and management and oversight of this case, and for the purpose of mediating or negotiating a resolution of any dispute related to this case. The Special Master shall not communicate to the Court any substantive matter the Special Master learned during an ex parte communication between the Special Master and any party.[7]

### C.    Special Master's Record.

Rule 53(b)(2)(c) states the Court must define "the nature of the materials to be preserved and filed as a record of the [Special Master's] activities." To the extent the Special Master takes possession of the original or copies of any materials submitted by the CCA or the Government (including materials containing audio or video recordings, and CCA law library computers), the Special Master shall work with the parties and qualified personnel to ensure those materials are preserved. The Special Master shall maintain normal billing records of his time spent on this matter, with reasonably detailed descriptions of his activities and matters worked upon. If the Court asks the Special Master to submit a formal report or recommendation regarding any matter, the Special

---

[7] The Court may later modify the Special Master's ex parte communications with the Court with respect to certain functions, if the role of the Special Master changes. *See, e.g., In re Propulsid Products Liab. Litig.*, 2002 WL 32156066 (E.D. La. Aug. 28, 2002) (after the Special Master was given additional mediation duties, the scope of his ex parte communications with the parties and the Court, as well as his record-keeping obligations, changed); Rule 53(b)(4) (noting that an order of appointment may be amended). On the other hand, imposition of different limits on ex parte communications does not necessarily require amendment of this Order.

9

Master shall submit such report or recommendation in writing, for filing on the case docket.[8]  The

Special Master need not preserve for the record any documents created by the Special Master that

are docketed in this or any other court, nor any documents received by the Special Master from

counsel or parties in this case.


### D.    Review of the Special Master's Rulings.

Rule 53(b)(2)(D) directs the Court to state "the time limits, method of filing the record, other

procedures, and standards for reviewing the [Special Master's] orders, findings, and

recommendations."  The Special Master shall either: (1) reduce any formal order, finding, report,

ruling, or recommendation to writing and file it electronically on the case docket via Electronic Case

Filing ("ECF"); or (2) issue any formal order, finding, report, ruling, or recommendation on the

record before a court reporter.  Pursuant to Rule 53(f)(2), any party may file an objection to an order,

finding, report, ruling, or recommendation by the Special Master **within 14 calendar days** of the

date it was filed; failure to meet this deadline results in permanent waiver of any objection to the

Special Master's orders, findings, reports, rulings, or recommendations.[9]  Absent timely objection,

---

[8]  The Court expects the parties and the Special Master will need to file many submissions under seal.  Accordingly, the Court lifts the requirement of Local Cr. R. 49.6.  If the parties or the Special Master have good reason to believe a document they wish to file contains confidential or privileged information, they may file those documents under seal without further order of the Court.

[9]  Rule 53(f)(2) provides that parties may file objections "no later than 21 days after a copy of the [Special Master's order, report, or recommendations] is served, unless the court sets a different time."  FPD suggested setting a time of 7 days instead of 21, while the Government suggested 14 days.  The Court chooses to set a 14-day period for filing of objections; however, the Special Master may provide in his order, finding, report, or recommendation that the period for filing objections to that particular document is some different period, if warranted.  Motions for extensions of time to file objections will not normally be granted unless good cause is shown.

the orders, findings, reports, rulings, and recommendations of the Special Master shall be deemed approved, accepted, and ordered by the Court, unless the Court explicitly provides otherwise.

If the Special Master issues an informal ruling or order that is not on the record (such as the resolution of a discovery dispute) either orally, via email, or through other writing, and a party wishes to object to that ruling or order, the party shall ask the Special Master to formalize the ruling or order by filing it on the docket or appearing before a court reporter.  Such request shall be made within three days of issuance of the informal order or ruling, else the opportunity to object shall be waived.  The procedures and deadlines outlined in this section shall then apply.

As provided in Rule 53(f)(4, 5), the Court shall decide de novo all objections to conclusions of law made or recommended by the Special Master; and the Court shall set aside a ruling by the Special Master on a procedural matter only for an abuse of discretion.  The Court shall retain sole authority to issue final rulings on matters formally submitted for adjudication, unless otherwise agreed by the parties, and subject to waiver of objection to written orders or recommendations as noted above.   To the extent the Special Master enters an order, finding, report, ruling, or recommendation regarding an issue of fact, the Court shall review such issue de novo, if any party timely objects pursuant to the Rules and within the 14 calendar day time period set forth herein; *see* Rule 53(f)(3).  Failure to meet this deadline results in permanent waiver of any objection to the Special Master's findings of fact.

### E.        Compensation.

Rule 53(b)(2)(E) states that the Court must set forth "the basis, terms, and procedure for fixing the [Special Master's] compensation;" *see also* Rule 53(g) (addressing compensation).  The Special Master shall be compensated at his current rate of $500 per hour, with the Government

bearing 100% of this cost.[10]  Normal annual increases to this rate of compensation shall be calculated by reference to the Laffey Index.[11]  The Special Master shall incur only such fees and expenses as may be reasonably necessary to fulfill his duties under this Order, or such other Orders as the Court may issue.  The Court has "consider[ed] the fairness of imposing the likely expenses on the parties and [has taken steps to] protect against unreasonable expense or delay."  Rule 53(a)(3).

From time to time, on approximately a monthly basis, the Special Master shall file <u>under seal</u> an Itemized Statement of fees and expenses (not to include overhead).  Given that, at this juncture in the litigation, one of the duties of the Special Master is to assist the Court with legal analysis of the parties' submissions and review of confidential and privileged information, the Court expects these Itemized Statements may reveal confidential communications between the Special Master and the Court.  Accordingly, the Court shall maintain these Itemized Statements under seal, and they shall not be made available to the public or counsel.  The Special Master shall file with the Itemized Statement a Summary Statement, which shall list only the total amount billed, <u>shall not be filed under seal</u>, and shall contain a signature line for the Court, accompanied by the statement "approved for disbursement."  If the Court determines the Itemized Statement is regular and reasonable, the Court will sign the corresponding Summary Statement and transmit it to the parties.  The

---

[10]  Unlike civil cases, where all parties typically have funds to contribute toward payment of a Special Master, the criminal defendants in this case are impoverished.  Further, there are no funds available from the Defender Services Office of the Administrative Office of the United States Courts.  Thus, the Court exercises its discretion and orders the Government to pay the Masters' fees and expenses.  *See Atlantic Richfield Company v. American Airlines, Inc.*, 98 F.3d 564, 572 (10th Cir. 1996) (noting that "[d]istrict courts have discretion to apportion the compensation of a special master among the parties"); *Brock v. Ing*, 827 F.2d 1426, 1428 (10th Cir. 1987) ("In a given case, fairness may suggest that the expense [of the Special Master] be borne by [only] one of the parties.").

[11]  *See* www.laffeymatrix.com/see.html.  Annual increases will be limited to the *percentage* increases shown in the Laffey Matrix, not the *numerical* increases.

Add. 12

Government shall then remit to the Special Master the Court-approved amount, within 20 calendar days of Court approval.[12]

### F.     Other Matters.

### 1.     Affidavit.

Rule 53(b)(3)(A) notes that the Court may enter an Order of appointment "only after the [Special Master] files an affidavit disclosing whether there is any ground for disqualification under 28 U.S.C. §455." *See also* Rule 53(a)(2) (discussing grounds for disqualification). The Special Master shall submit the required affidavit within seven days of the date of this Order.

### 2.     Cooperation.

All Relevant Parties[13] shall all provide full cooperation to the Special Master, and any staff or consultant employed by the Special Master, and observe faithfully the requirements of any orders of the Court and rulings by the Special Master. The Relevant Parties shall timely comply with rulings of the Special Master issued pursuant to this Order. Pursuant to Rule 53(c)(2), the Special Master may, if appropriate, "impose on a party any noncontempt sanction provided by Rule 37 or 45, and may recommend a contempt sanction against a party and sanctions against a nonparty." As

---

[12] The Court notes that numerous other District Court Judges have followed this same procedure. *See, e.g., Sibley v. Sprint Nextel Corp.*, 298 F.R.D. 683, 688 (D. Kan. 2014) (Vratil, J.); *In re Welding Rod Prods. Liab. Litig.*, 2004 WL 3711622 at *5 (N.D. Ohio Nov. 10, 2004); *In re Sears, Roebuck and Co. Front-Loading Washer Prods. Liab. Litig.*, case no. 06-CV-7023 (docket no. 436 at 7) (N.D. Ill. Dec. 29, 2014).

[13] "Relevant Parties" includes the parties and their counsel, the Government, the FPD, the United States Attorney's Office, the United States Marshall Service, and CCA, including their successors in office, agents, and employees.

Add. 13

an agent and officer of the Court, the Special Master (and those working at his direction) shall enjoy the same protections from being compelled to give testimony and from liability for damages as those enjoyed by other federal judicial adjuncts performing similar functions.[14]


3.      **Access to Information**.

All Relevant Parties will make readily available to the Special Master any and all individuals, information, documents, materials, programs, files, databases, services, facilities, and premises under their control that the Special Master requires to perform his duties.  The Relevant Parties will make readily available to the Special Master any and all facilities, files, databases, computer programs, and documents necessary to fulfill the Special Master's functions under this Order.  The Special Master is authorized to issue subpoenas for the production of documents or taking of testimony on the record.

The Special Master may require reports from the Relevant Parties in a format specified by the Special Master, as reasonably required to enable the Special Master to perform all assigned duties.

**IT IS SO ORDERED.**

/s Julie A. Robinson
**JULIE A. ROBINSON**
**UNITED STATES DISTRICT JUDGE**

**Dated: October 11, 2016**

---

[14]  *See, e.g., Atkinson-Baker & Assocs., Inc. v. Kolts*, 7 F.3d 1452, 1454-55 (9th Cir. 1993) (applying the doctrine of absolute quasi-judicial immunity to a Special Master).

**Affidavit of David R. Cohen**
**Tendered Pursuant to Fed. R. Civ. P. 53**


STATE OF OHIO         )
                ) SS.                     AFFIDAVIT
COUNTY OF CUYAHOGA )


       David R. Cohen, being first duly sworn according to law, states the following:

1.      I am an attorney at law, duly licensed to practice law in the States of Ohio, Colorado, and New York.  My bar admissions are as follows:

| | |
|---|---|
| Ohio Supreme Court, Atty. No. 0055347 | Nov. 18, 1991 |
| Colorado Supreme Court, Atty. No. 022420 | Feb. 24, 1993 |
| New York Supreme Court, Atty. No. 5082193 | Dec. 5, 2012 |
| United Stated District Court, Northern District of Ohio | Dec. 10, 1992 |
| Sixth Circuit Court of Appeals | Mar. 2, 1993 |
| United States Supreme Court | Jan. 16, 2007 |

2.      I have familiarized myself with the issues and persons involved in the case captioned *United States v. Black*, case no. 16-20032 (D. Kansas).  As a result of my knowledge of that case, I can attest and affirm that there are no non-disclosed grounds for disqualification under 28 U.S.C. §455 that would prevent me from serving as Special Master in the captioned matter.


FURTHER AFFIANT SAYETH NAUGHT.


_____
David R. Cohen

Sworn to before me and subscribed in my presence this  11th  day of October, 2016.


_____
Notary Public

Add. 15

16CR20032i-ord(AudioCallAnalysis2).wpd

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | **CASE NO. 16-CR-20032** |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **SPECIAL MASTER DAVID R. COHEN** |
| | : | |
| **LORENZO BLACK,** *et al.*, | : | **SECOND REPORT REGARDING** |
| **Defendants** | : | **TELEPHONE-CALL** |
| | : | **AUDIO RECORDINGS** |

In its Order appointing the undersigned, the Court directed me to "[i]dentify, excise, and retain privileged or confidential information from the audio recordings made at CCA that have been submitted to the Court;" and to "[p]rovide copies of audio recordings with the privileged or confidential information removed to the Government and Coordinating Discovery Counsel." *Appointment Order* at 5 (docket no. 146).   Two weeks ago, I filed a *First Report Regarding Telephone-Call Audio Recordings* (docket no. 183), explaining interim efforts undertaken to fulfill those directives.   This *Second Report* sets out my final findings.

Earlier, the Court ordered the Government to produce all copies of all telephone-call audio recordings the Government had obtained from CCA (which, in turn, had obtained the recordings from Securus).   The responsive materials submitted by the Government included: (1) 153 separate CDs containing audio files, and (2) five thumb-drives containing audio files. The Special Master aggregated all of the audio files on the CDs and the thumb-drives, and then de-duplicated.   This

Add. 16

process yielded a universe of 48,802 individual, recorded telephone-call audio files.  These telephone calls were made to a total of 1,433 different telephone numbers, by a total of 58 different inmates.

Given the large number of different telephone numbers called, the Special Master suggested to the Government as follows:

• it would take substantial time and expense to identify and cull, from the entire universe of audio files, all recordings of calls to attorneys.  Even after identifying known attorney telephone numbers, calls to all of the other telephone numbers would still have to be checked to see if the call recipient was an attorney.

• instead, it would be easier and less expensive to identify recordings to specific telephone numbers in which the Government was interested, and which were known *not* to be an attorney telephone number.

The Government agreed that the latter approach was appropriate and sufficient.  Accordingly, the Government provided the undersigned with a list of 13 "critical telephone numbers," which are owned by eight alleged co-conspirators.

The Special Master identified 5,612 audio files of calls made by 22 different inmates to these 13 critical telephone numbers.  Within the next few days, the Special Master will provide these audio files to the Government (Chris Oakley) and Coordinating Discovery Counsel (Shazzie Naseem), along with associated metadata (such as caller-identity, call-date and -time, and call-duration).

The Special Master also undertook efforts to identify the recorded calls by CCA inmates that were made to an attorney.  Specifically, the Special Master created a database of known attorney telephone numbers by obtaining lists from the following sources: (1) the Federal Public Defender's offices for  the District of Kansas, the Western District of Missouri, and the District of Nebraska; (2) the Criminal Justice Act Panels for the District of Kansas, the District of Nebraska (partial list),

2

and the Western District of Missouri (partial list); (3) all attorneys who are admitted to practice in federal court in the District of Kansas (including admission pro hac vice and by reciprocity from the Western District of Missouri); and (4) attorneys who submitted their telephone numbers to the Special Master pursuant to an invitation issued in the *First Report*. *See First Report* at 4. After de-duplication, these sources combined to produce an inventory of 18,494 known attorney telephone numbers.[1]

Analysis reveals that, of the 48,802 individual telephone audio files produced by the Government, 229 of those recorded calls were made to one of the known attorney telephone numbers in the inventory. A chart of these known attorney telephone numbers associated with the recorded inmate telephone calls produced by the Government is attached.[2] As directed, the Special Master will ensure the audio recordings of these telephone calls to known attorney telephone numbers are retained and not produced to the Government or Coordinating Discovery Counsel.

If an attorney listed in the chart below wishes to obtain access to the recordings of the calls to his or her own telephone number(s), then the attorney should send an email to Ken Smiley (ksmiley@americandiscovery.com), with a copy to the undersigned (david@specialmaster.law), that makes this request and also supplies full contact information. Each such attorney will receive

---

[1] Of course, CCA inmates may have called attorneys at telephone numbers not included in any of these lists. For example, many attorneys provided the Court with their law firm's main telephone number only, and not their direct-dial number or cell-phone number. Thus, the Special Master's analysis would not identify an inmate's call to these latter telephone numbers as a call to a "known attorney telephone number" ("KATN"). Accordingly, the "recorded calls to KATNs" statistic cited here is almost certainly underinclusive.

[2] The Special Master is aware that the total number of calls listed in the chart for attorney Jacquelyn E. Rokusek (11) does not jibe with the total number of calls listed in the chart submitted by attorney Michael Jackson (12), *see* docket no. 112 at 5 (exhibit 449)). Efforts to reconcile this difference are ongoing.

directions on how to obtain internet password-access to only those inmate calls made to that attorney. (Access will not be available for a few more days.) Where the chart lists a law firm and not an individual, directions will be provided to a single attorney, who may share access as appropriate.

**RESPECTFULLY SUBMITTED,**

/s/ David R. Cohen
**David R. Cohen**
**Special Master**

**DATED**: December 21, 2016

4

| Known Attorney Telephone Number ("KATN") | Name Associated with KATN | Number of Recorded Calls to KATN |
|---|---|---|
| 8162833535 | Angela Hasty | 15 |
| 3162655511 | Ariagno, Kerns, Mank and White, LLC | 2 |
| 9136529800 | Bath & Edmonds | 3 |
| 8162927076 | Brian Palmer | 1 |
| 8162927000 | Brown & Ruprecht PC | 31 |
| 9139486680 | Christian Webb | 2 |
| 8162130384 | Christine Blegen | 1 |
| 8165240404 | Dana Altieri | 30 |
| 8162560835 | David J Guastello | 3 |
| 8165317100 | David Johnson | 1 |
| 3143595690 | Edward Fehlig | 1 |
| 9139489490 | Erickson Scherff Attorney LLC | 1 |
| 7853310300 | Fagan, Emert & Davis LLC | 1 |
| 8162218989 | Gaddy Weis LLC | 11 |
| 9139486682 | Garretson & Toth, LLC | 5 |
| 8167394538 | J. Johnston | 5 |
| 9132381281 | Jacquelyn E Rokusek | 3 |
| 9139489311 | Jacquelyn E Rokusek | 8 |
| 9134887100 | James Spies | 1 |
| 8165258200 | John Osgood | 4 |
| 7852343272 | Joseph Hollander & Craft, LLC | 43 |
| 9135516943 | Kansas Federal Public Defender Office | 1 |
| 8165475625 | Lisa Nouri | 1 |
| 8162298686 | Mark A Thomason | 5 |
| 8162298787 | Mark Thomason | 13 |
| 9139629800 | R. Bruce Kips | 4 |
| 8163632795 | Rebecca Woodman | 1 |
| 7858458500 | Richard Benson | 1 |
| 8165218249 | Rick Johnson | 11 |
| 7852351650 | Rork Law Office | 1 |
| 8163095147 | William T Session | 1 |
| 8162216400 | Yonke Law | 18 |

5

Add. 20

*16CR20032J-ord(VideoAnalysis).wpd*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | **CASE NO. 16-CR-20032** |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **SPECIAL MASTER DAVID R. COHEN** |
| | : | |
| **LORENZO BLACK,** *et al.*, | : | **FIRST REPORT REGARDING** |
| **Defendants** | : | **VIDEO RECORDINGS** |
| | : | |

In its Order appointing the undersigned, the Court directed me to "[i]dentify, excise, and retain privileged or confidential information from the video recordings made at CCA that have been submitted to the Court;" and to "[p]rovide copies of video recordings with the privileged or confidential information removed to the Government and Coordinating Discovery Counsel." *Appointment Order* at 5 (docket no. 146). This Report explains what I have done in pursuit of those directives.

Earlier, the Court ordered the Government to submit to the custody of the Court certain "video recordings depicting privileged attorney-client communications at the Corrections Corporation of America Leavenworth Detention Center" (hereinafter, "CCA-Leavenworth"). Order at 1 (Doc. 102). The Special Master's review of the responsive materials shows the Government submitted video-recordings obtained from CCA-Leavenworth's PELCO multi-camera video system, which were stored on: (a) six DVR hard drives; and (b) 31 DVD disks. The recordings were made between November 24, 2015, and May 16, 2016.

The Special Master visited CCA-Leavenworth in order to understand how the PELCO video system worked. The PELCO system allowed prison personnel to monitor and record activity using approximately 154 video cameras throughout the facility. The input from these cameras was recorded onto a total of six different DVR hard drives. For example, DVR drive no. 1 contains video recordings from 16 different cameras, while DVR drive no. 5 contains video recordings from 32 different cameras. A given camera was always recorded onto the same DVR drive. Thus, for example, video from the Front Gate Camera was always recorded onto DVR drive no. 1, while video from the South Barber Shop Camera was always recorded onto DVR drive no. 5.[1] Each DVR drive held, at most, about three months' worth of video, with new video replacing old video in a looping fashion. On May 16, 2016, the Government took possession of the six PELCO DVR drives and subsequently delivered them to the Court. It is unclear when the Government obtained possession of the 31 DVD disks, which it also delivered to the Court.

CCA-Leavenworth has nine attorney-inmate meeting rooms. Only seven of these rooms have cameras in them. All seven of these cameras were recorded only onto DVR drive no. 6. These seven cameras, out of the 154 cameras in the facility, are the only ones that might have captured privileged or confidential information, because they recorded meetings between clients and their attorneys.[2]

Further analysis reveals that CCA-Leavenworth did not use two of the attorney-client

---

[1] Defense Exhibit 439, which is a chart created by the Government, is an accurate list of the PELCO video cameras and the DVR drives to which they were assigned.

[2] DVR drive no. 5 captured video from a camera in the hallway adjacent to the attorney-client meeting rooms. This camera is referred to as "low custody attorney" in Defense Exhibit 439. It does not capture any privileged or confidential information.

2

meeting rooms – both of which do have cameras – during the entire recording period.[3]  The chart

below summarizes this information.

| Camera Location | PELCO Camera Number | Used for Attorney Meetings? | Privileged Material Recorded? |
|---|---|---|---|
| Attorney Meeting Room 1 | [no camera] | Yes | No |
| Attorney Meeting Room 2 | [no camera] | Yes | No |
| Attorney Meeting Room 3 | 6-18 | Yes | YES |
| Attorney Meeting Room 4 | 6-19 | No | No |
| Attorney Meeting Room 5 | 6-20 | No | No |
| Attorney Meeting Room 6 | 6-21 | Yes | YES |
| Attorney Meeting Room 7 | 6-22 | Yes | YES |
| Attorney Meeting Room 8 | 6-23 | Yes | YES |
| Attorney Meeting Room 9 | 6-24 | Yes | YES |

This information leads to three fundamental conclusions, set out below.

•    ***DVR Drive Nos. 1-5, and the 31 DVD disks, Will Be Released to the Parties.***

First, only DVR drive no. 6 contains video recordings of privileged or confidential

information.   Drive nos. 1-5 do *not* contain video recordings of privileged or confidential

information.  Further, none of the video recordings on the 31 DVD disks were captured using

PELCO Cameras 6-18 to 6-24, so these DVD disks also do not contain privileged or confidential

---

[3] CCA-Leavenworth states it almost never uses attorney rooms 4 and 5 for inmate meetings. Further, CCA-Leavenworth's attorney visitation logs, used to document which rooms were assigned for each attorney-inmate meeting, show no assignments to attorney rooms 4 or 5.  Spot-checking the video recordings confirms that no meetings occurred in these two rooms during the recording period.

information.  Accordingly, within the next few days, the Special Master will arrange for delivery

of copies of these five DVR drives and 31 DVD disks to the Government (Chris Oakley), which will

make them available to Coordinating Discovery Counsel (Shazzie Naseem).

• **_DVR Drive No. 6 Will Not Be Released to the Parties._**

Second, although some of the video recordings on DVR drive no. 6 contain privileged or

confidential information, many do not.  Specifically, in addition to video from the seven cameras

that recorded attorney-client meeting rooms, DVR drive no. 6 also holds video from 21 other

cameras in CCA-Leavenworth.  These 21 other cameras, which are in the kitchen, parking lot,

recreation yard, and so on, did not record privileged or confidential information.

The mechanics of the PELCO video system, however, make it very difficult to isolate

recordings from a given camera.  This means it would be challenging and expensive to extract from

DVR drive no. 6 only those recordings that are from the 21 cameras that are not recording attorney-

client meeting rooms.  To avoid this problem, the Government has agreed it will not use and does

not need video-recordings taken from these 21 other cameras.  Accordingly, the Special Master will

not produce to counsel *any* video recordings contained on DVR drive no. 6, and will retain DVR

drive no. 6.[4]

---

[4]  In connection with analysis of the *audio* recordings submitted by the Government, the Special Master made available to each attorney recordings of inmate calls made to that attorney. *See Second Report Regarding Telephone-Call Audio Recordings* at 3-5 (docket no. 187).  The mechanics of the PELCO video system make it expensive to provide to each attorney analogous video material.

4

Add. 24

• ***Hundreds of Attorney-Inmate Meetings were Recorded.***

And third, in order to understand the scope of the privilege issue addressed by the parties in their briefs, the Special Master undertook a summary examination of the video from the seven cameras on DVR drive no. 6 that recorded attorney-client meeting rooms. These recordings were made between February 20 and May 16, 2016, a period of 86 days, for a total of about 14,000 hours.[5] Even assuming the seven cameras could only record attorney-client meetings during 40 business hours per week, and that two of these cameras (in Meeting Rooms 4 and 5) never recorded a meeting, the Special Master would still have to review about 2,400 hours of video to determine exactly which, and how many, attorney-client meetings were recorded.

Instead, the Special Master obtained visitor logs from CCA-Leavenworth and randomly chose about 30 attorney visits that occurred throughout the 12 weeks in the recording period. The Special Master then examined the video recordings to determine if these attorney visits with an inmate were recorded. This analysis revealed that every attorney-inmate meeting listed on the attorney visitor log that took place in an attorney room that held a video camera was, in fact, recorded. The attorney visitor logs for the 12-week recording period showed a total of over 700 attorney visits to the attorney rooms where recording took place (marked by the cells shaded in red

---

[5] Seven cameras x 86 days x 24 hours/day = 14,448 hours of video. For some reason, however, certain time periods were not recorded. For example, there are no recordings on DVR drive no. 6 (from *any* cameras) from April 27-28, 2016. Various recording gaps exist on the other DVR drives, as well.

5

Add. 25

in the chart above).  It appears all of these attorney-inmate meetings were recorded.  Of course, this analysis does not address whether any person ever viewed these recordings.

**RESPECTFULLY SUBMITTED,**

/s/ David R. Cohen
**David R. Cohen**
**Special Master**

**DATED**: January 31, 2017

16CR20032K-ord(AudioAnalysis3).wpd

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | **CASE NO. 16-CR-20032** |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **SPECIAL MASTER DAVID R. COHEN** |
| | : | |
| **LORENZO BLACK**, *et al.*, | : | **REPORT REGARDING** |
| **Defendants** | : | **OTHER ISSUES RELATED TO** |
| | : | **RECORDINGS AT** |
| | : | **CCA-LEAVENWORTH** |

At the direction of the Court, the Special Master has earlier filed three Reports addressing audio- and video-recording of attorney-client communications at CCA-Leavenworth.  *See* docket nos. 183, 187, & 193.  In addition to reviewing the materials seized from CCA-Leavenworth by the Government, the Special Master has: (1) visited CCA-Leavenworth several times and interviewed personnel there; (2) ordered CCA-Leavenworth and Securus to produce various materials, *see* docket nos. 180, 184, & 186 (*Preservation Order* and *Production Orders*); and (3) requested additional information from the Office of the United States Attorney for the District of Kansas ("OUSA").

As of this writing, Securus has responded to its *Production Order*, and CCA-Leavenworth is in the process of doing so.  Both have been laudably cooperative.  For example, the Special Master has received: (1) unfettered access to the CCA-Leavenworth facility and its personnel; (2)

permission to use the online Securus Call Platform;[1] and (3) numerous spreadsheet reports containing various details about calls made by CCA-Leavenworth inmates on Securus telephones for the last five years.  The OUSA has also produced some of the requested information.

In an effort to provide answers to some of the questions raised by the parties in their submissions to the Court, and in response to the Court's earlier directives, this Report documents various matters related to audio- and video-recording at CCA-Leavenworth, as revealed by the information so far obtained by the Special Master.

**The Video Recordings Do Not Include Audio.**

As noted in the *First Report Regarding Video Recordings*, the Government obtained from CCA-Leavenworth video-recordings made between November 24, 2015, and May 16, 2016.  These recordings included video of over 700 attorney-inmate meetings.  To be clear, however, ***none*** of the thousands of hours of video-recordings (including the recordings of the 700-plus attorney-inmate meetings) include audio.  Put differently, CCA-Leavenworth's PELCO multi-camera video system *records only video*; it does not record audio.  The Special Master's earlier Report did not make this clear.

---

[1] The Securus Call Platform is a web-based interface that allows users to obtain access to information related to calls made on Securus telephones.  Users located at a given prison normally have access only to information regarding Securus telephones at that site.  Thus, for example, even though Securus has telephones installed at both CCA-Leavenworth and the Shawnee County, Kansas Adult Detention Center, the Securus Call Platform allows guards at CCA-Leavenworth access only to information connected to their own location.  The Special Master was afforded the same level of access to the Securus Call Platform as CCA-Leavenworth's Warden, Linda Thomas. *See also* footnote 11.

- **The CCA-Leavenworth Intercom System Has No Recording Capacity, And Is Not Used to Monitor Conversations.[2]**

CCA-Leavenworth has a "Master Control Room," known as "Unit 4," where prison personnel sit and oversee movement through the prison. This oversight occurs using both video and audio. As noted above, however, the video and audio are not integrated – the video cameras in the prison do not transmit (or record) any audio. Rather, the video cameras transmit only video images. Prison guards in Unit 4 use computer monitors to view "live-video-feed" from the various cameras around the prison, and the guards can choose which cameras to view. The photo below shows a Guard in Unit 4 using these computer monitors.



_____

[2] In this Report and others previously filed, the Special Master has been careful to use the terms "monitor" and "record" to mean different things. When video or audio is "monitored," a person is watching or listening to an activity "live," as it occurs; the activity being monitored may or may not also be recorded. When video or audio is "recorded," an activity is documented and preserved; a person may or may not later watch or listen to this recorded activity. For example, the vast majority of phone calls made by inmates at CCA-Leavenworth on Securus telephones are recorded, but only a very small portion are monitored live, or later reviewed.

Separately, an intercom system inside the prison is designed to transmit audio.  For the most part, intercom speakers are located on either side of locked prison access points, such as doors and sally-ports.  The Special Master explains below how the intercom system works generally, and also how it works specifically in relation to the attorney-client meeting rooms.

•   ***The Intercom System Generally***

The following example illustrates how the intercom system works generally.  If Joe is inside the prison and wants to move from one area to another through a locked gate or door – say, from the Vehicle Sally-Port to outside of the prison, or from the Inmate Medical Holding Cell into the Medical Department – then Joe must press a button on an intercom located next to the locked door. The intercom sends a signal to Unit 4, causing an icon to flash on a computer touchscreen.  In response, a guard in Unit 4 touches the icon to "select" the signaling intercom, which establishes a walkie-talkie-type audio link between the guard and Joe.  At the same time, the computer monitor displays video from one or more cameras near the intercom, allowing the guard to view Joe and his surroundings.

The guard then depresses a button on a microphone to speak to Joe, and the guard must release the button to hear Joe's response.  Once the guard is satisfied that allowing passage to Joe is appropriate, the guard presses an icon on the computer screen to remotely unlock the door associated with the intercom.[3]  The guard in Unit 4 can also activate a remote intercom *sua sponte* – that is, not in response to a signal from that intercom – and listen to whatever is happening in the

---

[3] Some doors in the facility are unlocked with keys only, and cannot be unlocked remotely. These doors do not have intercoms.

4

vicinity, or initiate audio communication with persons nearby. The redacted photo below shows the
touchscreen in Unit 4 that activates the intercom audio-links and associated video-camera feeds.



    Theoretically, the guard in Unit 4 could leave open the link to Joe's intercom indefinitely,
even after having allowed Joe passage, thereby continuing to monitor conversation near the
intercom. As a practical matter, however, this is virtually impossible, because the guard can
maintain an audio link to only one intercom location at a time. In other words, the guard must
terminate the link to Joe's intercom in order to converse with another person located at a different

intercom – and there are many dozens of intercom locations,[4] and a lot of individuals seeking passage through various prison doors and sally-ports.  In practice, it is unusual for a guard to maintain an audio link to a given intercom for more than 10 seconds.[5]

It must also be noted there is no mechanism allowing for recording of intercom communications.  Thus, the conversation that includes the passage request from Joe to the guard in Unit 4, and the guard's acknowledgment to Joe, is almost always very short, and always unchronicled.

• **_Intercoms in the Attorney-Client Meeting Rooms._**

CCA-Leavenworth has nine attorney-client meeting rooms.  The workings of the intercom system connected to these meeting rooms is slightly different than the general system described

---

[4] There are easily over 200 intercom locations throughout CCA-Leavenworth that Unit 4 controls.  Some of these intercoms, however, are in the inmate housing units (known as Pods), and different Control Rooms co-control, and have primary responsibility for, answering these Pod intercoms.  For example, Unit 7 co-controls the 20 intercoms in Pods J and K.  Unit 4 retains sole control of about 50 intercoms that are outside of the Pods and control passage into, out of, and through all other areas of the facility.

[5] During visits to Unit 4, the Special Master observed guards operate the computerized system that controls the intercoms, video cameras, and door-locks for the entire facility.  The speed with which these guards connect and disconnect the intercoms, and change camera views, and unlock and re-lock doors, was remarkable.  It was not unusual for Unit 4 to receive several intercom requests for passage at the same time, forcing the guards working the system to speak and to press various buttons with great dispatch.

The point is this: it is inconceivable that a Unit 4 guard would use intercoms to monitor conversations between attorneys and inmates in the attorney-client meeting rooms; the guards are, by necessity, moving their attention far too quickly to do so.  Moreover, even if the guards could keep an audio-link open for more than a few seconds, the quality of the sound over the intercom is often quite poor.  Specifically, while in Unit 4, the Special Master experimented with listening via intercom to conversations of assistants inside an attorney-client room, and about half of the conversation was unintelligible.  Moreover, as discussed in footnote 7, prison guards know that monitoring attorney-client conversation is not allowed, even if it was technically possible.

above.  Moreover, the intercom system connected to these meeting rooms changed in June or July of 2016.  An historical description follows.

Before mid-2016, there were two separate intercom links – one connected only to attorney-client meeting rooms 1 and 3, and another connected only to attorney-client meeting rooms 2 and 4-9.  The intercoms in meeting rooms 1 and 3 were connected with Unit 4 as described above.  If an attorney in one of these meeting rooms pressed the intercom button, a guard in Unit 4 would respond.

The intercoms in meeting rooms 2 and 4-9, however, were not connected to Unit 4; rather, they were connected to an intercom in CCA-Leavenworth's main lobby.  Thus, if an attorney inside one of meeting rooms 2 or 4-9 pressed the intercom button, it was the guard in the main lobby who would respond, and not a guard in Unit 4.

In mid-2016, CCA-Leavenworth upgraded the intercoms in rooms 2 and 4-9, and also installed new, additional intercoms in meeting rooms 1 and 3.  Thus, there is now an intercom in all nine attorney-client meeting rooms that connects with the main lobby.  For some reason, however, CCA-Leavenworth did not remove from meeting rooms 1 and 3 the older intercoms that connect with Unit 4.  Thus, meeting rooms 1 and 3 now each contain *two* intercoms, one connecting with the main lobby and one with Unit 4.  This current situation is summarized in the following chart.

| Location | Intercom Connections | Used for Attorney Meetings? |
|---|---|---|
| Attorney-Client Meeting Room 1 | Main Lobby & Unit 4 | Yes |
| Attorney-Client Meeting Room 2 | Main Lobby | Yes |
| Attorney-Client Meeting Room 3 | Main Lobby & Unit 4 | Yes |
| Attorney-Client Meeting Room 4 | Main Lobby | No |

| Location | Intercom Connections | Used for Attorney Meetings? |
|---|---|---|
| Attorney-Client Meeting Room 5 | Main Lobby | No |
| Attorney-Client Meeting Room 6 | Main Lobby | Yes |
| Attorney-Client Meeting Room 7 | Main Lobby | Yes |
| Attorney-Client Meeting Room 8 | Main Lobby | Yes |
| Attorney-Client Meeting Room 9 | Main Lobby | Yes |

The photo below shows the two intercoms in attorney-client meeting room 3; the Unit 4 intercom is on the left, and the lobby intercom is on the right.



The nine intercoms in the attorney-client meeting rooms that connect with the main lobby are less sophisticated than the two intercoms that connect with Unit 4. When an attorney presses a button on one of the nine intercoms that connect to the lobby, an icon flashes on a touchscreen in

the lobby – this is similar to the two intercoms that connect to Unit 4.  But the guard in the lobby cannot then use the touchscreen to remotely unlock the door to the attorney-client meeting room; rather, the lobby guard must send an assistant to manually unlock the door.  Also, the touchscreen in the lobby is not capable of displaying video from remote cameras;[6] all it does is show which intercom button was pressed, and allow activation of an audio link.  The quality of the audio from the nine meeting room intercoms to the lobby, however, is better than from the two meeting room intercoms to Unit 4.  The photo below shows the lobby touchscreen (on the right) and the microphone / speakers the lobby guard uses to communicate walkie-talkie-style over the intercom.  The screen for the X-ray security scanner is on the left.



---

[6] Pursuant to Court Order, video cameras inside the attorney-client meeting rooms were removed in August of 2016.  The touchscreen in the lobby, however, has always been incapable of displaying video, unlike the touchscreen in Unit 4.

As with the guards in Unit 4, it is theoretically possible for the guard in the lobby to leave open indefinitely an audio link to an intercom inside an attorney-client meeting room, thereby monitoring an attorney's conversation with an inmate. Again, however, doing so would be extremely impractical, for the simple reason that the lobby is a public space – everyone present would also be privy to the conversation. And, of course, the lobby guard is principally occupied with checking in visitors, scanning their bags with the X-ray security scanner, and so on.

A final note is that, like the two meeting room intercoms that connect to Unit 4, there is no mechanism allowing for *recording* of conversations between the nine meeting room intercoms that connect to the main lobby.

What all of this means is that the Special Master has found no evidence that any individuals used the intercom system at CCA-Leavenworth to monitor or record conversations between attorneys and inmates in the attorney-client meeting rooms.[7]

• **Inmates Who Confer With Their Attorneys Using CCA's Own Telephones (as opposed to Securus Telephones) Do Not Have Private Conversations.**

Inmates at CCA-Leavenworth are provided with a total of 121 pay-telephones. The inmates can use these telephones to contact individuals outside the prison, including their attorneys. Pursuant to contract, the hardware and software for these pay-telephones is installed and maintained

---

[7] It should go without saying, but the Special Master adds that all prison guards and other CCA-Leavenworth personnel with whom he spoke, including lobby guards and Unit 4 guards, stated they knew it was inappropriate to listen to attorney-client conversations, had never done so, and had never seen any other persons attempt to do so. The discussion above makes clear that, even if, *contrary to consistent witness statements*, an individual attempted to use the intercom system to listen to communications taking place in an attorney-client meeting room, it would be extremely difficult to succeed.

10

by Securus.  Normally, any call made by an inmate on a Securus telephone is recorded.  As discussed further below, however, telephone numbers belonging to attorneys may be designated as "Private;" Securus is supposed to refrain from recording calls to these "Private" numbers.

For various reasons, some attorneys prefer their inmate-client not use the Securus telephones located in the inmate housing Pods, so they contact CCA-Leavenworth to arrange for the inmate to use a CCA telephone instead of a Securus telephone.  When this occurs, a prison guard, known as a Unit Team Manager, allows the inmate to use a CCA telephone located in a Unit Team Office.  The redacted photo below shows the CCA telephone available in the Unit Team Office.



The inmate, however, is normally not left alone in the Unit Team Office; rather, *for valid security reasons*, the Unit Team Manager remains in the Office with the inmate during the call.  Thus, even though the CCA telephones in the Unit Team Offices are not remotely monitored or

Add. 37

recorded,[8] it cannot be said that an inmate using one of these CCA telephones enjoys a truly private conversation – the Unit Team Manager can hear at least the inmate's side of the call.

- **The Inmate Video-Teleconference Option at CCA-Leavenworth Has No Monitoring or Recording Capacity.**

In addition to (1) the Securus pay-telephones in the inmate housing Pods, and (2) the CCA telephones in the Unit Team Offices, there is one other mechanism inmates can use to communicate with outsiders – CCA-Leavenworth also has (3) a Polycom Videoconferencing Telephone.[9] Known simply as a "Polycom," this device resides in attorney-client meeting room 3 and allows an inmate to engage in a video-teleconference with persons outside the prison.

For the video-teleconference to work, the inmate's call must be connected to a similar Polycom, or to a computer that has Polycom software. Thus, inmates in CCA-Leavenworth have communicated via the Polycom with: (a) attorneys using a similar Polycom located in Room 653 in the Kansas City United States District Court House; (b) probation officers using a similar Polycom located in the Probation Office within the Kansas City Court House; and (c) attorneys using software-enabled computers in their own offices. Inmates are only allowed to *receive* incoming video-teleconference calls on the Polycom, not to make outgoing calls.

The photos below show the Polycoms in attorney-client meeting room 3 (on left) and in Room 653 of the Kansas City Court House (on right).

---

[8] Counsel for CCA-Leavenworth confirmed the facility does not have the ability to monitor or record calls made using CCA's own telephones.

[9] The formal name for the device is "Polycom RealPresence Videoprotect 500," and it is also marketed as the "Judiciary Secure Unit." The Polycom in CCA-Leavenworth's attorney-client meeting room 3 is owned by this United States District Court.

12





In order for an attorney to use the Polycom to speak with an inmate-client at CCA-Leavenworth, the attorney must pre-arrange an appointment. At the appropriate time, the inmate is brought to attorney-client meeting room 3 and the incoming call is received on the Polycom.

Notably, the inmate is normally left alone in the meeting room during the video-teleconference. Unlike when an inmate uses a CCA telephone in a Unit Team Office, with the Unit Team Manager standing by, an inmate using the Polycom is not chaperoned and can have an entirely private conversation. Further, the Polycom in CCA-Leavenworth does not have any mechanism that would allow an outsider to monitor or record the conversation.[10]

---

[10] The Special Master confirmed this fact with Court personnel who oversaw purchase and installation of the Polycoms.

Appellate Case: 18-3007   Document: 1-1   Date Filed: 01/16/2018   Page: 83

• **Calls Made by Inmates on Securus Pay-Telephones Can Be Monitored and Recorded.**

The Securus telephone system normally records all telephone calls made by inmates from Securus phones. These recorded calls are preserved for some period of time, during which a person with access to the Securus Call Platform may, among other things: (1) extend the time the call is preserved on the Securus system; (2) listen to the recorded call; and/or (3) download the call, thereby preserving it outside of the Securus system.[11] If downloaded, a call can be shared with other individuals who do not have direct access to the Securus system. Thus, for example, a guard at CCA-Leavenworth with access to the Securus system can: (a) locate and download all recorded telephone calls made by inmate John Doe between January 1-10, 2017; (b) locate and download all recorded telephone calls made by any inmate between January 1-10, 2017 to telephone number 913-555-5555; and (c) then transmit all of these recorded telephone calls to a law enforcement officer.[12]

The example above discusses the circumstance that inmate phone calls may be *recorded* and then listened to *at a later time*. The Special Master also examined whether calls made on Securus telephones may be *monitored live*, as they occur. The Securus system does allow for live monitoring. Specifically, a person who has access to the Securus Call Platform can: (1) view a list of all calls currently in progress; (2) listen live to an ongoing call; and (3) remotely terminate an

---

[11] Pursuant to request, CCA gave the Special Master access to its Securus Call Platform, which allows the Special Master to, among other things: (1) view lists of all calls made by inmates, with details regarding recipient, time of call, duration, and so on; (2) identify when and whether CCA marked a recipient's telephone number as "Private," so that it should not be recorded; (3) live-monitor an ongoing inmate call (unless the telephone number the inmate called was marked "Private"); (4) listen to any calls that were earlier recorded; and (5) determine whether anyone at CCA or Securus listened to or downloaded recorded calls (and if so, who did so).

[12] As discussed below, the Special Master has identified numerous real-life examples of this sort of event. The Special Master has requested (but not yet fully received) from CCA-Leavenworth and from the OUSA documents that would disclose details of these occurrences.

ongoing call.  The Securus database maintains information regarding the monitoring of inmate calls, including the date, who monitored it, and so on.

The Special Master has requested from Securus, but not yet received, a spreadsheet setting out detailed information regarding inmate calls that were monitored.  Accordingly, the Special Master will set out findings of fact in a future Report addressing the extent to which attorney-inmate calls were monitored.

- **Calls Made by Inmates on Securus Pay-Telephones are Recorded, Sometimes Even After the Recipient's Telephone Number Has Been Marked "Private."**

As noted above, CCA-Leavenworth provides its inmates with a total of 121 Securus Pay-Telephones, which inmates can use to make calls to individuals outside the prison.  Inmates are warned that their calls on these Securus phones may be recorded.  This warning is delivered several different ways.

First, when inmates are initially received at CCA-Leavenworth, they are presented with an "Intake Booking Packet."  This Packet includes about eight forms, which the inmates must review and sign.  One of these forms is titled "MONITORING OF INMATE/DETAINEE TELEPHONE CALLS."  This form states:

> Corrections Corporation of America reserves the authority to monitor (this includes recording) conversations on any telephone located within its institutions, said monitoring to be done to preserve the security and orderly management of the institution and to protect the public.  An inmate's use of institutional telephones constitutes consent to this monitoring.  A properly placed phone call to an attorney is not monitored.  You must contact your unit team to request an unmonitored attorney call.
>
> I have read or had read to me (cross out one) the above notification on the monitoring of inmate telephone calls.  I understand that telephone calls I make from

institution telephones may be monitored and recorded.

Government exhibit 1.[13]

Second, within a few days of arrival at CCA-Leavenworth, inmates are issued an "Inmate

Handbook." The Handbook states:

> **Access to telephone**: Telephones are provided for inmates/detainees in the housing
> unit dayroom. Dayroom telephones are subject to monitoring. * * *
> Procedures for telephone use include:
> * * *
> 6. Your attorney may request of our facility that calls to their office not be recorded
> to ensure Attorney/Client privilege. They may request this by way of sending
> CCA/LDC a fax on their office letterhead. This request must include contact
> information and signature. They may fax it to (913)727-2231. **IT IS YOUR
> RESPONSIBILITY TO ENSURE THAT YOUR ATTORNEY IS AWARE OF
> THIS PROCEDURE; THEIR TELEPHONE CALLS ARE SUBJECT TO
> BEING RECORDED IF THEY DO NOT REQUEST THEY BE
> RESTRICTED**.

---

[13] See generally the testimony of Laurie Harrison, hearing tr. at 102-115 (Sept. 17, 2016), discussing the intake booking packet and the inmate handbook. As noted earlier in this Report, despite the suggestion in this form, inmate calls to attorneys made from the Unit Team Office are not truly "unmonitored."

Add. 42

Government exhibit 2 (emphasis in original).[14]

Third, there is a small sign on each Securus telephone entitled "Dialing Instructions." Among other things, this sign states: "Calls are subject to monitoring and recording."  *See* government exhibits 4, 5, & 6 (photographs of Securus telephones; some, but not all, of the Securus telephone signs set out the same warning in Spanish).

Fourth, CCA has posted its own signs near at least some of the Securus telephones.  One example is an engraved plastic sign that says "ALL CALLS MAY BE RECORDED/MONITORED."  *See* government exhibit 3 (photograph of sign, which also sets out the same warning in Spanish).

The photos below show Securus phones and associated signage in CCA-Leavenworth's G-Pod.

---

[14]   In early 2017, CCA-Leavenworth amended its procedures regarding attorney-client telephone calls.  Inmates are now given an "Attorney Verification Form," on which they can list their attorneys' names, addresses, and telephone numbers.  The Form explains:

> Attorney telephone calls can be placed through the inmate telephone system.  Telephone calls between inmates and their attorneys are privileged and should not be recorded or monitored.  To ensure attorney telephone calls placed on the inmate telephones in the units are not recorded and monitored, inmates must submit all attorney telephone numbers for authorization.  The attorney information will be verified for accuracy.  If the attorney telephone number is verified as a valid attorney, the attorney telephone number will be marked within the inmate telephone system as "privileged/do not record."

It is unclear to what extent the newer "Attorney Verification Form" procedure supercedes the requirements set out in the Inmate Handbook.

17







18

 

And fifth, the Securus telephones play a pre-recorded message when an inmate makes a call.

Specifically, when a recipient answers an inmate's call from a Securus telephone, the following

message is played automatically:

> Hello. This is a prepaid collect call from [inmate's self-recorded name], an inmate
> at CCA-Leavenworth Detention Center. This call is subject to recording and
> monitoring. To accept charges, press 1. To refuse charges, press 2. If you would
> like to permanently block your number from receiving calls from this facility, press
> 6. For balance and rate quotes, press 7.

This message is audible to both the call recipient and the inmate.[15, 16]

The Securus telephone system allows individual telephone numbers to be designated as: (1) "Blocked," so that a call from CCA-Leavenworth will not be connected to that number; or (2) "Private," so that a call to that number will not be recorded.[17]   It is CCA-Leavenworth, not Securus,

---

[15]   The pre-recorded message is slightly different, depending on whether the inmate calls collect or uses a prepaid calling card, but the statement that the "call is subject to recording and monitoring" is the same.  If the inmate earlier chose to hear dialing instructions in Spanish, the pre-recorded message is played in Spanish.  The Special Master transcribed the pre-recorded message above from a random inmate's outgoing call made on February 21, 2017.

[16]   In addition to using the Securus Call Platform to listen to the pre-recorded message that accompanies previously-recorded inmate calls, the Special Master also used Securus telephones inside CCA-Leavenworth to listen "live" to the pre-recorded message.  The Special Master placed calls from these Securus telephones to numbers that were and were not marked "Private."  For calls made to numbers marked "Private," it appeared the pre-recorded message did *not* state the call may be monitored or recorded.  For calls made to numbers not marked "Private," the pre-recorded message was sometimes the one detailed in the text above (stating the call may be monitored or recorded), and sometimes instead only asked the called party whether she wanted to set up an account to pay for and receive future calls – the call itself was never actually connected.  Partly because of lack of time, the Special Master was unable to come to a full understanding of which pre-recorded message was played for which type of phone call.  The Special Master has asked Securus to provide a "message script catalog" that answers this question.

[17]   Various CCA documents refer to designating an attorney's telephone number as "restricted," "privileged," "private," or some other term.  The Securus Call Platform uses the designation "Private," so the Special Master does also.

that applies these designations.[18]  The Special Master's review of Securus Data[19] reveals, however, that the designation of a telephone number as "Private" does not necessarily prevent calls to that number from being recorded or listened to.  This is true for two reasons.

First, if a telephone number is marked "Private," that does not work to erase, or otherwise change the status of, any *previously-recorded* calls made to that number.  Thus, the following sequence of events could occur: (1) an inmate calls his attorney and the call is recorded; (2) the attorney's number is *later* marked as "Private;" and (3) someone then listens to the earlier-recorded call.  The Special Master refers to this type of recorded call as a "Status-Change Call."  Review of the Securus Data shows that, between November 26, 2012 and December 15, 2016, the Securus Call

---

[18]   In other words, as a general matter, Securus provides the telephone hardware and software, and CCA-Leavenworth then uses the software to control, among other things, which calls are not recorded.  When CCA-Leavenworth receives a request that a telephone number be marked "Private," it sometimes uses a third-party administrator known as Praeses to: (1) confirm the number belongs to an attorney, and (2) designate the number as "private" in Securus's system.

[19]   Securus provided to the Special Master several spreadsheets containing data regarding certain calls made by inmates at CCA-Leavenworth.  In this Report, the Special Master refers to the information contained in these spreadsheets as "Securus Data."

Notably, the Securus Data do *not* list all calls from CCA-Leavenworth inmates that were recorded and are still in Securus's database.  There are probably millions of such calls.  Rather, the Securus Data provided to the Special Master includes only those calls that: (1) were recorded, (2) are still in Securus's database, *and* (3) were later "selected" in some way.  "Selected" generally means: (a) downloaded by a CCA-Leavenworth employee for the purpose of being listened to by a law enforcement officer, and/or a government attorney; or (b) downloaded by a Securus employee in response to a subpoena, which may have been issued by a government attorney or by defense counsel.  The Securus Data itself denominates this selecting activity as "save to folder," "playback," or "CD burning."

The Securus Data contains a total of about 182,084 telephone calls.  Of course, the great majority are calls from inmates to friends and loved-ones, not to attorneys.  Also, the Securus Data includes very short calls where nothing meaningful occurred, such as calls where: (1) the recipient refused the call after hearing the Securus pre-recorded message; (2) the recipient attempted to join a third party to the call, which normally leads to immediate call termination; or (3) the inmate terminated the call after learning the intended recipient was not present (such as when a receptionist answers the phone and informs the inmate his attorney is unavailable).

Appellate Case: 18-3007   Document: 1-1   Date Filed: 01/16/2018   Page: 91

Platform was used to access about 134 inmate Status-Change Calls.

Second, even though a telephone number is marked "Private," that designation apparently does not always work to prevent even **subsequent** calls to that number from being recorded. Thus, the following sequence of events could occur: (1) the attorney's number is marked as "Private;" (1) an inmate later calls his attorney and the call is recorded; and (3) someone then listens to the recorded call. In other words, marking an attorney's telephone number as "Private" does not always guarantee that calls to that number will not thereafter be recorded. The Special Master refers to this type of recorded call as a Private-But-Recorded Call. Review of the Securus Data shows that, between November 26, 2012 and December 15, 2016, the Securus Call Platform was used to access about 54 Private-But-Recorded Calls.[20]

It is not clear why there are any Private-But-Recorded Calls. One possible reason is that the Securus Call Platform allows CCA-Leavenworth the options of marking a telephone number as "Private" for: (1) all inmates in the facility; or (2) only certain sub-groups of inmates. Thus, it may be that a Private-But-Recorded Call was made to a telephone number that was marked "Private" for a sub-group that the inmate was not a part of. That said, the Special Master can discern no reason why CCA-Leavenworth would mark an attorney telephone number as "Private" for only a sub-group of inmates; perhaps it happens by mistake. Regardless, review of the Securus Data shows it does happen – there are 37 Private-But-Recorded Calls to attorney telephone numbers that were marked

---

[20] The Court heard evidence of the existence of Private-But-Recorded-Calls at the Sept. 7, 2016 hearing in this case. *See* hearing tr. at 99 (discussing exhibit 451, affidavit of attorney Gary Hart).

"Private" only for an inmate sub-group.[21]

A second possible reason – and this is simply conjecture – is that Securus made an update to its system and the update somehow mistakenly changed the "Private" status of an attorney telephone number, restoring its susceptibility to being recorded.  In any event, regardless of why or how it occurred, the Securus Data shows there are 17 additional Private-But-Recorded Calls to attorney telephone numbers that were marked "Private" for *all* inmates (not just a sub-group).

Thus, the Securus Data contains a total of about 188 recorded inmate calls to attorneys, where: (1) the attorney's telephone number was marked "Private," and (2) thereafter, the call was "selected," either for the purpose of review by a law enforcement officer or in response to a

---

[21]  To explain further: the Securus Call Platform allows an attorney telephone number to be marked "Private" for: (1) "All Sites," which means that calls from *any* inmate to that number will not be recorded; or (2) only for certain "Sites" – such as "County," or "MD DOC" [Maryland Department of Corrections] – which means that calls from inmates within that particular sub-group will not be recorded.  Thus, for example, if a telephone number is marked "Private" for the "County" Site (instead of "All Sites"), then a "County" inmate's call to that telephone number would not be recorded, but a call to that same number from any other inmate would be recorded.  The photo below shows a partial screen-shot of the Securus Call Platform interface, with the "County" Site highlighted.



23

Appellate Case: 18-3007    Document: 1-1    Date Filed: 01/16/2018    Page: 93

subpoena.[22]

- **CCA-Leavenworth Lists 528 Known Attorney Telephone Numbers.**

It is CCA-Leavenworth, not Securus, that creates and maintains the list of attorney telephone numbers marked "Private."  If a telephone number is marked "Private" by CCA-Leavenworth, then the Securus system is designed not to record any call from any inmate *housed in CCA-Leavenworth* to that telephone number.

Notably, however, CCA-Leavenworth's list of "Private" telephone numbers is "site-specific;" this means the same inmate could call the same telephone number from a Securus telephone in the Shawnee County, Kansas Adult Detention Center, and the call would normally be recorded (unless the number was also independently marked "Private" by the SCKADC).  For various technical and contractual reasons, the Securus system cannot treat a telephone number as "Private" across all Securus telephones at all of the facilities Securus serves.

As of December 15, 2016, CCA-Leavenworth's list contains 528 telephone numbers marked "Private."  This compares with the roughly 18,500 "Known Attorney Telephone Numbers" belonging to attorneys in the Kansas / Missouri / Nebraska area that were compiled by the Special

---

[22] As explained in footnote 19: (1) there are certainly other Status-Change Calls and Private-But-Recorded Calls in Securus's database that have not been "selected," and are therefore not in the Securus Data examined by the Special Master; and (2) it is likely that some of the Status-Change Calls and Private-But-Recorded Calls that *are* in the Securus Data are very short calls where nothing meaningful occurred.

Master.  *See First Report Regarding Video Recordings* at 3 (docket no. 183).[23]  There does not

appear to be any limit on the length of the list of telephone numbers that CCA-Leavenworth may

designate as "Private."

**Conclusion**

In this case, the Court appointed the undersigned after a spark lit a flame.  The spark was the

revelation in August of 2016 that, three months earlier, the Office of the United States Attorney for

the District of Kansas had obtained video-recordings of attorneys meeting with their inmate-clients

at CCA-Leavenworth.  This spark quickly ignited a passionate response from the defense bar,

including demands for investigation regarding whether the OUSA had viewed the video-recordings

of attorney-inmate meetings, and the extent to which the OUSA had obtained access to other

recordings (both video and audio) of inmate-attorney interactions – whether in this case or

otherwise.

In the course of pursuing the Court's directives so far, the Special Master has met and spoken

with many attorneys in the Kansas City area.  It appears to the undersigned that one reason the

defense bar's response has been so ardent – that is, one reason the spark lit a high flame, instead of

flaring and dying out – is that there is a widespread undergrowth of mistrust between the Office of

---

[23]  In the *First Report Regarding Video Recordings*, the Special Master invited "[a]ny attorney who may have received a telephone call from an inmate at CCA for the purpose of obtaining legal advice . . . to provide me with the telephone numbers those inmates may have called (including the attorney's direct-dial, home, and cell numbers, if applicable)." *Id.* at 4. The Special Master added these numbers to his inventory of "Known Attorney Telephone Numbers," but did NOT provide these numbers to CCA-Leavenworth for inclusion in its list of "Private" numbers.  It remains each individual attorney's responsibility to contact CCA-Leavenworth and request that their telephone numbers be marked "Private."

the United States Attorney for the District of Kansas and defense counsel. This level of mistrust is not typical; indeed, it appears to exist more in Kansas City, Kansas than Kansas City, Missouri, or even Topeka or Wichita.

The Special Master is hopeful that this Report helps to tamp down the flames. The August, 2016 disclosure that the OUSA had seized video-recordings of attorney-inmate meetings raised suspicions of regular incursion into attorney-client communications. But the Special Master is confident most of these suspicions are groundless. Specifically: (1) no individuals used the CCA-Leavenworth video system to monitor attorney-inmate meetings; (2) no individuals used the CCA-Leavenworth intercom system to monitor or record attorney-inmate meetings; (3) calls between inmates and their attorneys using CCA-Leavenworth telephones (as opposed to Securus telephones) are not recorded; (4) to the extent calls between inmates and their attorneys using CCA-Leavenworth telephones (as opposed to Securus telephones) are monitored by a Unit Team Manager, this monitoring is not hidden – it is obvious to the inmate; and (5) calls between inmates and their attorneys using the Polycom video-telephones are not monitored or recorded.

Moreover, the Special Master tentatively concludes that: (1) neither the OUSA nor any law enforcement officer actually viewed any of the video-recorded attorney-client meetings that were seized from CCA-Leavenworth in May of 2016; and (2) neither the OUSA nor any law enforcement officer have ever before obtained (much less actually viewed) video-recordings of attorney-client

meetings at CCA-Leavenworth.[24]

This leaves the question of the extent to which the OUSA or law enforcement officers obtained recordings of telephone calls made by inmates to attorneys from Securus telephones – and more particularly, the extent to which the government was not entitled to obtain those recordings. The parties have touched on these issues in their submissions to the Court.[25]  The Court has not asked the Special Master to issue a Report on these questions.  Accordingly, this Report is drafted only to provide a better factual background regarding the nature and scope of recording of Securus telephone calls; the Special Master hopes the information set out herein will lead to a better distillation and quicker resolution of these remaining issues.

Fundamentally, however, even after the issue of access to Securus telephone call recordings is resolved, the underlying mistrust between the prosecution and defense bars in Kansas City is corrosive and must be fixed.  Mutual suspicion not only makes it harder for counsel to work together; it manifests itself in the squandering of scarce judicial resources, increased expense and

---

[24]  The Special Master would need to conduct additional investigation to become fully confident in these last two conclusions.  Information obtained so far, however, suggests that: (1) those in possession of the video-recordings seized in May of 2016 viewed very few of them, and did not view any video of attorney-client meetings; and (2) none of the CCA-Leavenworth video-recordings obtained by the OUSA or law enforcement officers before May of 2016 included attorney-client meetings.  Even if the defense bar is correct that the OUSA's actions in distributing attorney-client information in discovery in this case were inappropriate, or that the OUSA's responses to the Court's inquiries have been inconsistent and dissembling, it cannot be said that the OUSA and law enforcement officers have used an array of tactics to intentionally obtain attorney-client communications.

[25]  *See, e.g.*, docket no. 121 at 1 (OUSA's assertion that, "[b]ecause the inmates and attorneys knew their [Securus telephone] conversations were being recorded, any privilege has been waived."); docket no. 130 at (Federal Public Defender's contention that "[defense] counsel had every reason to believe that the attorney-client communications were confidential" and the "waiver defense" fails on the facts).

27

frustration of all parties, and ultimately a diminished quality of justice for the entire community.

Accordingly, the Special Master concludes this Report with a list of actions the Court may want to consider, all of which are directed at reaching full and final conclusions of fact, and mending the parties' relationships:

• authorize further investigation by the Special Master into his tentative conclusions that: (1) neither the OUSA nor any law enforcement officer actually viewed any of the video-recorded attorney-client meetings that were seized from CCA-Leavenworth in May of 2016; and (2) neither the OUSA nor any law enforcement officer have ever before obtained (much less actually viewed) video-recordings of attorney-client meetings at CCA-Leavenworth.

• authorize further investigation into the extent to which the government's receipt of recorded inmate calls on Securus telephones was inappropriate; and if it was, how that circumstance should be addressed and rectified;

• authorize further investigation into the circumstances surrounding the after-hours entry into the Court's chambers by a member of the OUSA;

• request recommended rulings on the issues raised by the parties in their currently-pending motions and other, related submissions;[26] and

---

[26]   These motions and submissions include, but are not necessarily limited to: (1) the Governments' response to the motion to impound evidence (docket no. 121); (2) the Federal Public Defender's reply to the Governments' response to the motion to impound evidence (docket no. 130); (3) the Federal Public Defender's response to the Master's second report regarding telephone-call audio recordings (docket no. 188); (4) the Governments' objections to the Master's first report regarding video recordings (docket no. 197); and (5) the Federal Public Defender's motion for production of grand jury materials (docket no. 202).

- request recommendations of global mechanisms to mitigate the underlying problem of mistrust between the prosecution and defense bars.

   **RESPECTFULLY SUBMITTED,**

/s/ David R. Cohen                    
**David R. Cohen**
**Special Master**

**DATED**: March 16, 2017

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| UNITED STATES OF AMERICA,    ) | |
| ) | |
| Plaintiff,    ) | |
| ) | |
| vs.    ) | |
| )    **Case No. 16-20032-JAR** | |
| LORENZO BLACK,    ) | |
| KARL CARTER,    ) | |
| ANTHON AIONO,    ) | |
| ALICIA TACKETT, and    ) | |
| CATHERINE ROWLETTE,    ) | |
| ) | |
| Defendants.    ) | |
| ) | |

<u>**MEMORANDUM AND ORDER DIRECTING PHASE III INVESTIGATION**</u>

Before the Court is the March 16, 2017 Report of the Special Master (Doc. 214), to

which the Federal Public Defender ("FPD") has filed a Response (Doc. 220) and Objections to

Report of Special Master (Doc. 229).   The FPD has also filed a related Proposed Findings of

Fact and Supplemental Request to Expand the Special Master's Investigation (Doc. 230).   The

government has filed a consolidated Response (Doc. 237) to the FPD's filings; the FPD has filed

a Reply (Doc. 240); and the government filed a Motion for Leave to File a Surreply (Doc. 247),

which the Court granted (Doc. 248).   The government has filed its Surreply (Doc. 250), which

the Court has fully considered.   The FPD has also filed a Motion to Compel Production of Grand

Jury Materials to Special Master (Doc. 202), to which the government has filed a Response in

opposition (Doc. 218), and the FPD a Reply (Doc. 224).   Also pending are numerous related

motions for relief filed by Defendants in this case[1] and in other cases assigned to the

undersigned, as well as by defendants in cases assigned to other judges in the District of Kansas.

## I.   Procedural History

On May 4, 2016,  the Grand Jury returned an Indictment charging the Defendants with

various crimes stemming from their alleged involvement in a conspiracy to smuggle and

distribute contraband inside the Corrections Corporation of America, now known as Core Civic

(referred to as "CCA" in this Order), Detention Center in Leavenworth, Kansas.  On July 21,

2016, this Court held a discovery and status conference in this case.[2]   On August 5, 2016, the

FPD filed a Motion for Fed. R. Crim. P. 41(g) and a Motion for Access to Visitation Rooms at

CCA, based on information and belief that the government was in possession of video recordings

of the attorney client conference rooms at CCA that intruded into the privileged, confidential

communications of attorneys and clients housed at CCA.

The Court conducted an emergency hearing on these motions (and numerous motions to

join or intervene)  on August 9, hearing evidence presented by the FPD and various Defendants.

Based on the evidence presented at the hearing, the FPD and the government agreed that the

Court should appoint a special master, though the FPD and government disagreed about the

scope of the special master's investigation.  In short, the FPD urged a special master

investigation of how and why these video recordings had been made, how and why these

recordings were in the possession of the government, and whether the government had viewed

---

[1]Docs. 82, 85.

[2]The Court had previously entered an Order designating this a complex case under the Speedy Trial Act.
Doc. 64.

2

the recordings or otherwise engaged in misconduct violative of the parties' attorney-client

privilege and Sixth Amendment rights.  The government wanted the special master's work to be

limited to acting as a taint team or privilege master, culling the video recordings of attorney-

client conferences from the video recordings of all other recorded activity throughout the CCA

facility.

On August 10, this Court ordered the government to produce all originals and copies of

video recordings of attorney-client communications in its possession or in the possession of law

enforcement agencies.[3]  The Court further ordered CCA to immediately cease and desist from

recording of attorney-client communications inside the detention facility, attorney client phone

calls and attorney-client video conference calls.[4]  The Court later ordered CCA to produce to the

United States Marshals Service ("USMS") any and all video recordings of attorney-client

conference rooms for the time period May 1, 2016 through the date of production.[5]

On August 16, 2016, the Court held a second evidentiary hearing on these matters.  The

government did not offer evidence at the August 9 or August 16 hearings.  In fact, the

government attorneys of record in this case at that time did not appear at the August 9 or August

16 hearings to answer the Court's and parties' many questions about video and audio recordings

of attorney client communications.[6]   Thus, the Court scheduled a third evidentiary hearing for

---

[3]Doc. 102.

[4]The Court also ordered all detention facilities in Kansas and Missouri housing defendants charged in the District of Kansas to cease and desist recording.  Doc. 102.

[5]Doc. 114.

[6]The August 9 hearing focused upon video recordings; at the August 16 hearing, the FPD and other defense counsel presented evidence that attorney-client phone calls at CCA had been audio recorded.

3

September 7, 2016, this time ordering the attorneys of record, Special Assistant United States

Attorney ("SAUSA")[7] Erin Tomasic  and Assistant United States Attorney ("AUSA") Chris

Oakley to appear, and further ordering AUSA Kim Flannigan to appear, as the evidence

suggested that Flannigan had personal knowledge with respect to some of the events in this

matter.

After the September 7 hearing, based on the record developed in the three evidentiary

hearings, and informed by the parties' flurry of submissions, the Court entered an order[8] on

October 11 appointing David R. Cohen as Special Master in this case.  The Court ordered Mr.

Cohen to conduct an investigation into matters related to the government having obtained video

recordings of attorney-client meetings at CCA, and audio recordings of telephone calls from

CCA inmates to their attorneys.   The Special Master has since conducted an extensive

investigation, interviewed dozens of affected or knowledgeable people, ordered the preservation

and/or production of various types of evidence, and filed status reports to this Court,[9] completing

what the Court has denominated as Phase I and Phase II of the investigation.[10]

Both Phase I and Phase II of the Special Master's investigation were within the scope of

the investigation to which the government consented.  And, the Special Master's fees and

expenses for Phase I and II were paid by the Department of Justice.

---

[7]A SAUSA is a Special Assistant United States Attorney appointed for a certain term of service and
detailed to a United States Attorney's Office ("USAO") or the Department of Justice.

[8]Doc. 146.

[9]Docs. 176, 177, 182, 183, 186, 187, 193, 214.

[10]The Court expanded the investigation into Phase II matters in a Minute Order on November 16, 2016
(Doc. 179).

## II.     Scope of Phase III of Special Master investigation

In his March 16, 2017 Status Report, the Special Master made certain findings of fact, including tentative findings, and recommended that the Court authorize him to proceed with a third phase of the investigation.[11]  The FPD objects in part to the Status Report, in particular to certain tentative findings made by the Special Master, and the FPD further urges a broader scope of future investigation than the Special Master recommends.  The government apparently does not object to some components of the Special Master's findings of fact, but expressly objects to others; and the government expressly objects to some, but not all of the FPD's requests for further investigation.  The Court has considered all of these filings.  Of course the Special Master's findings of fact, whether final or tentative, are not the findings of the Court unless the Court adopts them.  In fact, the Court is charged to do a *de novo* review of the Special Master's findings.

Moreover, the Court had commenced an investigation before appointing the Special Master, conducting three evidentiary hearings.  The Court makes a number of findings of fact in this Order, informed by the evidentiary record before the Special Master was appointed and informed by the Special Master's extensive investigation.  Based on the Court's findings of fact, it now authorizes a Phase III investigation by the Special Master.

While this order will detail the parameters of Phase III of the investigation, in short, the Court directs the Special Master to investigate the actions and conduct of the government, the USAO attorneys and staff, and the participating investigative agencies (hereinafter, collectively

---

[11]Doc. 214.

the "government"), in procuring, obtaining and perhaps using video and audio recordings of

attorney-client meetings and phone calls at CCA.  While Phases I and II focused on CCA and its

contractor Securus,[12] to determine how the recording systems worked in design and practice, and

to determine the scope of recordings made and the scope of recordings produced to the

government, Phase III will focus on the government itself.  In Phase III, the Court directs the

Special Master to investigate whether or not the government intentionally and purposefully

procured and obtained recordings of attorney-client communications, and whether intentionally,

or not, the government listened, viewed and/or used such recordings.  This investigation is

necessary to the Court's analysis of whether there were violations of the attorney-client

privilege, prejudice to the affected clients, and Sixth Amendment violations.  And, if the Court

concludes there were any such violations or any such government misconduct, the Phase III

investigation will inform the Court's decision about appropriate relief and remedies.

To be clear, the Phase III investigation will focus on the government's conduct relative to

all recordings it obtained in connection with the CCA investigation.  There are grave concerns

about government intrusion into attorney-client communications, spawning motions filed not

only by the defendants in this case, but by CCA inmates charged in other cases in this court.

SAUSA Tomasic stated that the CCA investigation continues, and that as many as 95 persons

inside and outside the walls of CCA may be implicated and ultimately charged.  Thus, other

CCA inmates may also be affected by these matters.  Although the investigation focuses on the

defendants in this case and the defendants with pending motions for relief in other cases, the

---

[12]Securus is the third-party contractor that owns and administers the pay phone system installed at CCA that
allows inmates to place outgoing phone calls.

Special Master's Phase III investigation will focus on all of the recordings procured and obtained by the government in connection with this case, including defendants in this case, defendants in other cases who have moved for relief, and CCA inmates who are subjects or targets of the ongoing CCA investigation.

While this Order expands and directs the Special Master's duties in going forward with a Phase III investigation, this Order does not otherwise modify the Court's Appointment Order,[13] including those portions of the Appointment Order that: (1) set forth the Rule 53(b)(2)[14] authority for the appointment; (2) detail the Special Master's "Complementary Duties;" (3) direct the parameters of the Special Master's "Communications with the Parties and the Court;" (4) pertain to the "Special Master's Record;" (5) pertain to the Court's "Review of the Special Master's Rulings;" (6) require that "All Relevant Parties" provide full cooperation to the Special Master;  and (7) require "All Relevant Parties" to provide the Special Master with "Access to Information."

With respect to the Special Master's compensation, this Order does not modify the "Compensation" section of the Court's Appointment Order ***except*** that for all Phase III investigation, the ***government will not bear the cost***; rather, the Special Master's compensation shall be paid by Timothy J. O'Brien, the Clerk of Court, up to $350,000.00,  from funds appropriated for this specific purpose.

### III.     Phase III Investigation will not Include Certain Fully Investigated Matters

---

[13]Doc. 146.

[14]Fed. R. Civ. P. 53(b)(2).

The Special Master's investigation to date, which has primarily focused upon CCA and Securus' actions relative to video and audio recording of attorney-client communications, has put to rest some concerns about the privacy of attorney-client communications. The investigation has shown that attorney-client communications over the video conferencing equipment installed at CCA have not been compromised and will not be compromised in the future. The video conferencing equipment has never had monitoring or recording capability. As the Special Master's report details, although there is a panic button system currently installed in the attorney-client conference rooms, that system does not allow for audio or video recording in those rooms.

Further, pursuant to this Court's cease and desist order, all video cameras have been removed from the attorney-client conference rooms at CCA.[15] Thus, attorney-client communications in those rooms are no longer video recorded; and there never was audio recording of communications in those conference rooms. And, pursuant to this Court's order, all video recordings of attorney-client conference rooms have been impounded by the Court; the government thus has no access to past video recordings.

Furthermore, although CCA personnel have an intercom system throughout the CCA facility, that system has no recording capability and is not used to monitor conversations. And, although there are separate intercom systems in the attorney-client conference rooms, making it theoretically possible for CCA guards to monitor conversations, there is no practical way for CCA personnel to monitor live conversations given the scope of their duties, which include

---

[15]They were also removed from the attorney-client conference rooms in all county jails in Kansas that currently house detainees charged in the District of Kansas.

8

visually monitoring the entire facility (except for attorney-client conference rooms), and granting

visitors and CCA personnel ingress and egress to areas of the facility.  Further, as the Special

Master report details, if the guard in the main lobby attempted to monitor live conversations, this

would be within earshot of visitors and everyone else passing through the main access point of

the facility.  No one interviewed by the Special Master indicated that such live monitoring had

ever occurred.

Thus, the Court concludes that there is no need for further investigation concerning the

audio or video recording systems in the attorney-client conference rooms.  Nor is there any need

for further investigation of the video conferencing system.

But, as the Special Master's reports detail and as this Order further details, the problems

with the Securus system employed by CCA to audio record inmates' outgoing phone calls have

not been addressed.  The evidence to date demonstrates that despite the procedures CCA has

employed in the past, attorney-client telephone calls are still recorded.  CCA has inadequate

procedures to apprise inmates and instruct attorneys how to arrange for their calls to not be

recorded.  Moreover, even when phone numbers are input into the Securus system as "Private"

numbers, meaning numbers that should not be recorded, at times the system nonetheless records

telephone calls placed to those numbers.  The Phase III investigation will inform the Court's

determination of the appropriate prospective remedies for these problems.

Moreover, the Phase III investigation must focus on two key questions about the conduct

of the USAO: (1) has the government listened to audio recordings of any attorney-client

telephone calls of defendants charged in this case, defendants in other cases who have filed

motions for relief, or CCA inmates who are subjects or targets of the ongoing investigation?; and

(2) has the government viewed any video recordings of communications in the attorney-client

conference rooms at CCA of any of the above described defendants or inmates?  The Phase III

investigation will allow the Court to fashion individual and/or global remedies to address any

and all intrusions into privileged attorney-client communications, and any and all corresponding

violations of the Sixth Amendment rights of defendants.[16]

## IV.    Audio Recordings

After the Court conducted the emergency hearing on August 9, on August 15,  the FPD

filed a Motion for Court to Impound Additional Government Evidence, namely audio recordings

of certain inmates' phone calls that included calls between those inmates and their attorneys.[17]

The government did not bring to the Court's attention that there were audio recordings of

attorney-client calls; the FPD did.[18]

At the August 16 hearing, the FPD and defendants presented evidence about audio

recordings.  The government, appearing by AUSA Debra Barnett (not by the prosecutors

---

[16]As the Tenth Circuit stated in *Schillinger v. Haworth*, 70 F.3d 1132, 1142 (10th Cir. 1995),
"[A]prosecutor's intentional intrusion into the attorney-client relationship constitutes a direct interference with the
Sixth Amendment rights of a defendant, and because a fair adversary proceeding is a fundamental right secured by the
Sixth and Fourteenth Amendments, we believe that absent a countervailing state interest, such an intrusion must
constitute a per se violation of the Sixth Amendment. In other words, we hold that when the state becomes privy to
confidential communications because of its purposeful intrusion into the attorney-client relationship and lacks a
legitimate justification for doing so, a prejudicial effect on the reliability of the trial process must be presumed. In
adopting this rule, we conclude that no other standard can adequately deter this sort of misconduct. We also note that
prejudice in these circumstances is so likely that case-by-case inquiry into prejudice is not worth the cost." *Id.*

[17]Doc. 105.

[18]*See Black v. United States*, 385 U.S. 26 (1966) and *O'Brien v. United States*, 386 U.S. 345 (1967)
(explaining that United States has an affirmative obligation to bring to the court's attention any overhearing of
attorney-client communications, whether or not the defendant demands such).

assigned to this case at that time), responded that it did not know how the government came into possession of these audio recordings. In fact, the government provided no explanation until SAUSA Tomasic addressed the matter in a brief she filed on September 6, and answered the Court's questions during the September 7 hearing. Based on this evidentiary record, and based on the evidence developed by the Special Master in Phases I and II of his investigation, the Court makes the following findings of fact concerning the audio recordings.

### Findings of Fact Concerning Audio Recordings and Directives to Special Master

The Grand Jury issued a subpoena to CCA dated March 28, 2016 for production of all "inmate recorded calls" for twelve named inmates[19] for the time period from July 1, 2014 "until notified recorded calls are no longer needed." The subpoena further directed CCA to conduct reverse searches of all CCA-Leavenworth inmate calls for certain numbers listed in the subpoena and to provide copies of all recorded conversations associated with those numbers from July 1, 2014 until notified these recorded calls are no longer required. Later, at the request of the USMS, CCA supplemented its production with audio recordings for the entire time period of the identified detainees' custody at CCA. To date, the investigation has revealed that CCA-Leavenworth has produced audio recordings of telephone calls dating back to at least 2011.

But it is unclear whether the USMS's request was documented in an email or other writing. In Phase III, the Special Master will investigate who requested the USMS to obtain these additional audio recordings, when the request was made, and what were the parameters

---

[19]The subpoena is admitted under seal because it names these 12 inmates, some of whom are still under investigation; an unsealed, redacted form of the subpoena with the inmate names excised is also admitted into evidence. Def. Ex. 438.

(including the names and dates of the caller or recipient of the call) of such request.  The Special Master will further investigate when the government became aware of the audio recordings of attorney client calls, and what actions it took in response to that knowledge.

By the time of the August 16 evidentiary hearing, the government had provided all Defendants in this case, as well as some defendants in unrelated cases,[20] with audio recordings of inmate telephone calls from CCA.  These audio recordings included some attorney-client phone calls.  In producing audio recordings of phone calls, the government did not advise the defendants that there were audio recordings of attorneys and their clients.  The Court subsequently issued a clawback order directing the government to gather and surrender to the Court all audio recordings in its possession, in the possession of investigative agencies, and in the possession of other defendants who had received them in discovery.

At the August 16 hearing, Michael Jackson, counsel for Defendant Cathleen Rowlette, presented evidence that he received discovery that included audio recordings of phone calls of nine different CCA inmates and their respective attorneys.  Jackson explained that the audio recordings were produced in a format that allowed one to search for calls by inputting the last four digits of a particular attorney's phone number.  Jackson input the last four digits of the phone numbers of several defense counsel whose phone numbers he knew, and thereby retrieved attorney-client phone calls of the aforementioned nine inmates.   One of these inmates' phone calls dated back to 2011.

---

[20]The government represented that the defendants in other cases were provided with this discovery because it was relevant to sentencing issues in those defendants' cases.

It is unclear when the government became aware that the CCA audio recordings included recordings of attorney-client telephone calls.  At the September 7 hearing, SAUSA Tomasic stated that in January 2016 she had learned from Secret Service Agent Stokes that he had inadvertently listened to an attorney-client phone call.[21]  Tomasic offered that,

> the only instance I knew where an agent had encountered attorney-client video—or excuse me attorney-client recordings, audio-recordings, inmate calls, he told me, I immediately contacted our professional responsibility point of contact.  He emailed PRAO.  PRAO gave an advisory opinion...I emailed the attorney, let him know we had encountered them, let him know that an agent had inadvertently listened to between 10 and 15 seconds and that we did not intend to listen to them anymore.[22]

In response to the PRAO advisory opinion, the government took the following steps.  Agent Stokes advised CCA about the recording, in an email on January 22, 2016.[23]  Tomasic notified the affected attorney, Rick Johnson, by email on  January 22 as well.  Moreover, Tomasic acknowledged that after learning this from Agent Stokes, she spoke with other agents working on this investigation, who advised her that they had also encountered some additional attorney-client calls, but that they did not listen to them and had "minimized immediately."[24]

While notifying Rick Johnson and CCA, Tomasic admittedly never informed the defendants in this case, nor the Court, because she assumed that it was "an exceptional

---

[21]Sept. 7, 2016, Hr'g Tr., Doc. 135, at 30–31.

[22]*Id.* at  25.

[23]*Id.* at  32.

[24]*Id.* at 46.

circumstance."[25]   Notably, in managing the CCA investigation, Tomasic organized a "taint team" comprised of IRS agents and an AUSA in the Topeka division of the USAO, to review various materials seized from CCA, determine whether there were attorney-client privileged materials, and segregate and withhold those privileged materials from Tomasic and the other attorneys of record in this case.  Tomasic anticipated using the taint team to review materials on the computers seized from the CCA law library, as well as materials seized from inmates' cells during the execution of a search warrant at CCA.  But inexplicably, she did not employ the taint team to review recorded telephone calls after she became aware of the instances described above.[26]  Instead, Tomasic proceeded to disseminate the audio recordings indiscriminately to all Defendants in this case.

Tomasic further stated at the September 7 hearing that her management of the CCA investigation and her judgment was impaired by her lack of experience and exceptional family circumstances.  This was a complex and wide-ranging investigation.  The Court finds it surprising that Tomasic, a relatively inexperienced prosecutor, was the lead attorney on this case, rather than a more senior AUSA.  At the same time, Tomasic was aware that there were audio recordings of some attorney-client conversations included in the audio recordings from CCA, yet she did not take steps to further investigate this, nor to submit the recordings to the taint team.

Moreover, despite the earlier PRAO opinion, at some point in this case, the government made the unilateral decision that the audio-recordings of attorney client telephone calls in this

---

[25]*Id.* at 50–51.

[26]The Court recognizes that the FPD takes the position that employing a taint team would not cure a privilege violation or a Sixth Amendment violation with respect to audio recordings of attorney-client telephone conversations.  The Court does not rule upon this legal issue at this time.

investigation were *not* privileged; and they made the decision to neither notify the Court nor the

Defendants nor affected CCA inmates that they were in possession of such recordings.  That, in

fact, is the litigation posture the government has taken in this case, that the attorney-client

telephone calls are not privileged.[27]  The government essentially argues that the inmates waived

any privilege, because when an inmate places a phone call on the Securus pay telephones at

CCA, they hear a pre-recorded warning that all calls are recorded or monitored.  According to

the government, this warning, coupled with signage on and around the Securus phones, placed

the inmates on notice that their calls were recorded, and constituted a waiver of their attorney-

client privilege.

The fact that the government takes this litigation posture, coupled with the fact that the

government unilaterally decided the telephone calls were not privileged, and did so without

notice to the Court or the parties, leads this Court to direct the Special Master to conduct a Phase

---

[27]Relying upon *Weatherford v. Bursey*, 429 U.S. 545, 558 (1977),  the government argues that intrusions into the attorney-client relationship are not per se violations.  *Weatherford* illustrates the weakness in the government's argument, for in *Weatherford* there was no evidence that the informant, who was present during two attorney-client meetings, had conveyed information about defense strategy to the government.  *Id.* There, the court had the ability to isolate what meetings and communications were had between the attorney and client, had the ability to determine whether the informant even communicated these to the prosecution, and given the stage of the proceeding, had the ability to conclude that none of the information gleaned was used at trial.  Here, the Court operates in an environment of many unknowns.  What communications if any did the government listen to?  For there is no intermediary, such as an informant or undercover agent, who can testify that they did or did not share information with the government.  Here the attorney-client communications were recorded, indicating that if the government listened, it may have heard the entire communication, not just an account of the communication by an ear-witness informant.  Moreover, here, if the government listened to the recordings, they may have listened pre-indictment and used the information to foster their ongoing investigation of the detainee or other, as yet unindicted targets of the ongoing investigation.  Or, the government may have listened post-indictment and used the information to further their ongoing pre-trial investigation, or used the information tactically in their plea negotiations, if any, with the indicted detainee.  In other words, under the circumstances in this case, there is a real and likely possibility of prejudice *if* the government listened to recorded attorney-client phone calls and/or watched recorded attorney-client visits, under the four-factor test for prejudice in *Weatherford*:  (1) whether the government purposely intruded into the attorney-client relationship; (2) whether any evidence offered at trial was obtained directly or indirectly from the intrusion; (3) whether the prosecutor obtained any details of the defendant's trial preparation or defense strategy; and (4) whether overheard conversations had been used in any other way to the substantial detriment of the defendant.  *Id.* at 552–57.

III investigation into the government's conduct concerning these audio recordings.   While the

Court does not rule in this Order upon the issues of privilege, waiver, and Sixth Amendment

violations, the Court notes that any waiver must be done knowingly and intelligently.[28]

Furthermore, based on the evidentiary record developed thus far, there are serious

questions about whether any or all inmates waived their attorney-client privilege knowingly and

intelligently.  In that regard, the Court finds that CCA employed a procedure to inform inmates

how to shield their attorney-client calls from monitoring or recording.  At the time a person is

first taken into custody at CCA, or within a few days of arrival, they receive a thirty-page inmate

handbook[29] and a counseling session reviewing substantial information, including information

about their right to private communications with their attorneys.   The inmates are required to

sign a form acknowledging that they have been advised that

> Corrections Corporation of America reserves the authority to monitor (this
> includes recording) conversations on any telephone located within its institutions,
> said monitoring to be done to preserve the security and orderly management of
> the institution and to protect the public.  An inmate's use of institutional
> telephones constitutes consent to this monitoring.  A properly placed phone call to
> an attorney is not monitored.  You must contact your unit team to request an
> unmonitored call.[30]

---

[28]*Patterson v. Illinois*, 487 U.S. 285, 292 (1988) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)) ("In
the past, this Court has held that a waiver of the Sixth Amendment right to counsel is valid only when it reflects 'an
intentional relinquishment or abandonment of a known right or privilege.'"); *see United States v. Ary*, 518 F.3d 775
(10th Cir. 2008) (explaining that attorney-client privilege is waived when disclosure of communication is voluntary).

[29] Gov. Ex. 2.

[30]Gov. Ex. 11 is a sample of these signed acknowledgement forms.

Despite this language, if an inmate contacts their unit team to request an unmonitored call, CCA allows them to place the call from their counselor or unit team's office, but only in the presence of the counselor or unit team leader.  In other words, their call is not private, it is monitored.

In fact, the only way attorney-client calls are *not* recorded or monitored is if the inmate places the call from one of the 121 Securus pay phones installed at CCA, *and* all calls to

that attorney's phone number have previously been designated as "private" within the Securus system.  And the only way calls are designated as private, is if the inmate's attorney has initiated the CCA phone call procedure.  The procedure requires that an inmate's attorney, and no one else, initiates this "private" designation by faxing a letter to CCA, on the attorney's letterhead, directing CCA to block all calls to the attorney at the phone number(s) identified in the letter.  Upon receipt of such a letter,  CCA personnel input the attorney's phone number(s) into the Securus system  such that all calls placed from Securus phones at the CCA-Leavenworth location[31] to that attorney's phone number(s) are rendered private and are not recorded by the Securus system.

But this procedure is inadequate for several reasons.   First, the only notice or explanation of the procedure is buried in the inmate handbook, provided to inmates at the time of their admission.[32]  CCA does not inform attorneys of the procedure, yet CCA requires that the

---

[31]As the Special Master found, if an attorney's phone number is input into the Securus system at CCA-Leavenworth, that will not result in that phone number being treated as "private" at other jails or detention facilities serviced by the Securus company.

[32]The handbook states, "Your attorney may request of our facility that calls to their office not be recorded to ensure Attorney/Client privilege.  They may request this by way of sending CCA/LDC a fax on their office letterhead.  This request must include contact information and signature.  They may fax it to (913)727-2231. **IT IS YOUR RESPONSIBILITY TO ENSURE THAT YOUR ATTORNEY IS AWARE OF THIS PROCEDURE: THEIR TELEPHONE CALLS ARE SUBJECT TO BEING RECORDED IF THEY DO NOT REQUEST**

17

attorney initiate the procedure.   The thirty-page inmate handbook covers a lot of information,

including information about visitation, and personal safety, as well as the many rules and

regulations inmates must abide by to avoid disciplinary action.  It is not surprising that someone

newly detained, someone lacking the legal education to fully  understand their rights, and

someone who is absorbing a volume of information all at once, might not remember to convey to

their attorney, the need for the attorney to initiate the phone call procedure.  Indeed, some of

those newly detained inmates may not yet have an attorney, may not know the name of their

attorney and likely have not yet met with their attorney.  And, one can imagine the concerns that

might eclipse the inmate's focus at their first or next meetings with their attorney—can they get

bond, what are the charges, what are the penalties, how soon will they see the evidence and how

long it might be before trial.

CCA provides no other notice to inmates, other than the information in the inmate

handbook and the acknowledgment form.  To be sure, there are signs on and near the Securus

phones that warn that all calls are monitored or recorded; but there are no signs on or near the

Securus phones that provide further notice or instruction about the CCA phone call procedure.

There is also a prerecorded message at the beginning of some outgoing calls that advises the

inmate that their call is being recorded or monitored.  But, as the Special Master's report details,

it is unclear whether this message is never played for calls that have been duly designated as

"private;" it is unclear whether this message is always played for calls that have not been

designated as "private," and it is unclear what message is played when the call has been

---

**THAT THEY BE RESTRICTED."**  Gov. Ex. 2.

designated as "private" but the Securus system fails to block recording of that particular call. Furthermore, there is no indication in the inmate handbook, nor on the signage on or near the Securus phones, that if the inmate hears the prerecorded message it means their call will be recorded, but if they do not hear a prerecorded message it means their call will not be recorded.

Moreover, even if an inmate remembers and understands the importance of taking affirmative action to protect their attorney client communications, an inmate cannot initiate the phone call procedure; only their attorneys can initiate it. Inmates are not allowed to provide to CCA their attorney's name and phone number at the time of the intake and orientation, nor at any time thereafter.[33]

Further, despite touting their policy to protect attorney-client communications, CCA does not post this phone call procedure on its website or otherwise communicate this procedure to inmates' attorneys.[34] This surely explains the many affidavits of seasoned, experienced, highly competent counsel, who are members of the Court's selective panel of court-appointed lawyers, who aver that they were never aware of CCA's procedure for blocking calls to

---

[33]Undoubtedly in response to this Court's Orders and this ongoing investigation, in early 2017 CCA-Leavenworth amended its procedures to now provide to detainees an "Attorney Verification Form," on which they can list their attorneys' names, addresses, and telephone numbers. The Form explains: "Attorney telephone calls can be placed through the inmate telephone system. Telephone calls between inmates and their attorneys are privileged and should not be recorded or monitored. To ensure attorney telephone calls placed on the inmate telephones in the units are not recorded and monitored, inmates must submit all attorney telephone numbers for authorization. The attorney information will be verified for accuracy. If the attorney telephone number is verified as a valid attorney, the attorney telephone number will be marked within the inmate telephone system as 'privileged/do not record.'" As the Special Master found, it is unclear to what extent the newer "Attorney Verification Form" procedure supercedes the requirements set out in the Inmate Handbook. Furthermore, this procedure still places the onus on the detainee to advise their attorney of the procedure.

[34]Attorneys routinely visit their clients at CCA and CCA should at least then, if not before, notify and instruct attorneys about the phone call procedure. CCA could easily accomplish this by providing clear and obvious notice on CCA's website, by posting signs in the attorney client conference rooms, and by posting signs, and/or providing written instructions as well as the "Attorney Verification" form at the time the attorney signs the visitation log at CCA. Doc. 214 at 21–23.

attorneys, and who gave credence to CCA's website and published policies that tout its commitment to protect Sixth Amendment rights.   Other attorneys stated that although they were not aware of CCA's phone call procedure, out of an abundance of caution, they notified CCA by letter that they wanted their numbers blocked.

The inadequacy of CCA's notice and instruction on its phone call procedure is demonstrated by the Special Master's analysis of how many phone numbers have been designated as "private" in the Securus system at CCA-Leavenworth.   CCA maintains a list of only 528 "private" attorney phone numbers, although there are approximately 18,500 attorney phone numbers identified for attorneys practicing in the areas (Kansas, Missouri and Nebraska) where federal detainees at CCA are under prosecution.   In other words, only a small fraction of attorney phone numbers are designated as private and blocked from recording by the Securus system at CCA-Leavenworth.   This suggests that CCA's phone procedure has not been adequately communicated to inmates or their attorneys.   This raises a serious question as to whether there was any knowing and intelligent waiver of attorney-client privilege.

As troubling is the fact that the Securus system has not blocked phone calls to all numbers that attorneys have duly designated as private through the CCA phone procedure.   Both anecdotal evidence and the Special Master's analysis demonstrates that the Securus system has failed to block recording of calls to all "private" numbers.   Gary Hart, an experienced CJA panel attorney in this Court, submitted an affidavit detailing how he had followed CCA's phone procedure.   He not only submitted an initial letter to CCA identifying his phone numbers that should be designated as private, Hart also followed up with annual letters to CCA confirming the same.   Nonetheless, the Securus system recorded calls from Hart's clients at CCA.   Hart

20

subpoenaed from Securus recordings from January 1, 2000 to the present.  Securus provided

Hart with Call Detail Reports for 2005–2007 and 2009–2013 that included numerous recordings

of attorney-client calls placed by his client, Domingo Uriarte.  The Call Detail Report evidenced

that calls from Uriarte to Hart were recorded as were calls from Uriarte to two attorneys who had

previously represented him, Assistant Federal Public Defender Tom Bartee, and attorney Tricia

Bath.  Bartee understood that no calls to FPD attorneys were recorded by Securus.  And Tricia

Bath, like Hart, had duly followed the CCA phone procedure.

The Special Master's investigation further revealed that Securus' recording of inmate

calls designated as "private" is not a rare occurrence.  For the time period from November 26,

2012 to December 15, 2016, in connection with the CCA investigation, the government obtained

audio recordings of 182,084 inmate outgoing phone calls from the 121 Securus pay telephones

installed at CCA.  Of those recorded calls, more than 700 were calls from inmates to their

attorneys.  And of those more than 700 calls, 188 were calls from inmates to attorney phone

numbers that had been duly designated as "private" in the Securus system.  Neither Securus nor

CCA have explained how or why this happened.[35]

This evidence informs the Court's finding that the operational and systemic issues with

CCA's procedure and Securus's system have not been cured at this time.  The evidence also

suggests that even for those attorneys who have now followed CCA's phone procedure, their

earlier recorded calls have not been erased by the Securus system, and are still accessible to the

---

[35]Of the 188 calls, 134 were deemed "inmate status change calls," 17 were to numbers designated as "private for all," and 37 were inexplicably to numbers designated as private for only "inmate subgroups." As the Special Master's report explains, Securus and CCA have not explained why these  private calls were classified in this manner.  *Id.* at 21–23.

government.  Absent clear evidence that these problems are cured, this Court will fashion prospective relief that recognizes that attorney-client phone calls are likely still being recorded.

Moreover, while the Phase III investigation will not focus on the actions of CCA or Securus, CCA's procedures, and the deficiencies in the Securus system, informs the Court's decision that a Phase III investigation of the government's conduct is warranted.  The evidence suggests that a significant number of attorney-client calls have been recorded, and given the government's practice of obtaining inmates' phone calls in this, and in other investigations, there are serious concerns about whether the government has at least inadvertently, if not intentionally, obtained attorney-client phone calls in this investigation and in other cases in which defendants have moved for relief.  Needless to say, there are concerns about whether the government has listened to any attorney-client phone calls.  Even though the audio recordings in this case have been impounded by the Court, the defendants in this case are understandably concerned that the government listened to those recordings before impoundment.

The government's denials that it listened to any attorney-client phone calls does not obviate the need for a Phase III investigation into their conduct.  To be sure, with respect to the audio recordings, the government's conduct has encouraged such suspicion.  Before the Special Master was appointed, the government was not forthcoming about how it procured all of the audio recordings in its possession, for some of the recordings were subpoenaed, some were not.  And, the government's litigating posture, as well as its past practices in obtaining jail calls, has fueled other defendants' suspicion that the government has listened to their audio recordings as well.

The Phase III investigation will further focus on whether the government's conduct in obtaining attorney-client calls was intentional and purposeful, or inadvertent and unintentional. Although any intrusion into attorney-client communications is of grave concern, the government's intent or lack of intent will inform the Court as to the type and extent of appropriate remedial action the Court will order.   Thus, the Court directs the Special Master to investigate the intent of the USAO's attorneys and staff as well as the intent of investigative agents.[36]

The Court also directs the Special Master to investigate how the government used the information, if at all.  Did the government use any such information in its investigative strategy, in its charging decisions, in its litigation posture on bond, or in defending motions filed by the defendant?  Did the government obtain information, directly or indirectly, that it has or could use at trial, in plea negotiations, or in any other way?

Here, the ways a defendant is potentially prejudiced are too numerous to catalogue.  But, examples of the types of information the government might glean says it all: admissions, confessions, inculpatory evidence, exculpatory evidence, defense witnesses, alibis, defense strategy, attorney advice on sentencing, attorney mental impressions on strengths and weaknesses of evidence, and negotiating strategy and posture.

## V.    Video Recordings

---

[36]For example, there is a question as to who, what, when and how certain calls were "selected" for downloading in the Securus system and provided to the government.

Based on the evidence presented before the Court appointed the Special Master, and based on the evidence the Special Master gathered during Phases I and II of his investigation, the Court makes the following findings of fact concerning the video recordings.  Based on the evidence gathered to date, there is evidence suggesting that the government procured, viewed and used video recordings of an attorney-client meeting of at least one CCA inmate, Richard Dertinger.  This justifies a Phase III investigation into the government's use of video recordings of Dertinger's attorney-client meetings, as well as the government's procurement and use, if any, of any other video recordings of attorney-client meetings.

At the conclusion of the August 9 hearing, the Court viewed *in camera*, a video recording of a meeting between inmate Richard Dertinger and his attorney, Jacqueline Rokusek, in one of the attorney-client conference rooms at CCA-Leavenworth.  In viewing this recording, the Court could easily observe non-verbal communications, including the communicants' use of their hands, fingers, and other body language.  Communication, needless to say, can be verbal and non-verbal; and non-verbal communication is at times highly communicative and easily subject to understanding through observation.

As several witnesses testified at the August 9 hearing, non-verbal communication can provide an observer a wealth of information about the communicants.  Is their relationship strong, positive, collaborative, collegial?  Or is their communication troubled, tense, unproductive?  In the context of representation in a criminal case, non-verbal communication might include the inmate re-enacting an event, such as a shooting, for the benefit of the attorney's understanding.  Non-verbal communication might include the attorney and/or inmate using a map or a schematic to illustrate where something happened.  Non-verbal communication

24

might also include an inmate pointing to photographs or otherwise identifying places or participants in an activity.  For this reason, all communication, verbal and non-verbal, falls within the ambit of privileged, confidential attorney-client communications.

Moreover, non-verbal communication between the inmate and investigators or other professionals retained by the defense may be highly communicative.  These same attorney-client rooms at CCA are utilized by defense investigators, psychologists, and polygraphers retained by the defense.  Non-verbal communication between an inmate, his or her counsel, and/or psychologists retained to evaluate him or her, might be highly communicative about the inmate's competence and state of mind.  Non-verbal communication between a polygrapher, who typically first interviews the inmate to ferret out admissions and/or confessions, might be highly communicative.  And, one observing a video recording of a polygrapher using a polygraph machine might well be able to ascertain the results of the polygraph.  All of these examples illustrate that confidential non-verbal communications between an inmate and the defense team must be protected just as much as verbal communications.

**Findings of Fact Concerning Video Recordings and Directives to Special Master**

As the following findings of fact detail, there is evidence that the government has demonstrated a lack of transparency to the Court and counsel about its possession, knowledge and use of video recordings.  The government has made inconsistent, inaccurate or misleading statements to the Court about the video recordings.  There is also a troubling development that may constitute either an intentional or an inadvertent spoliation of evidence concerning the video recordings.  Thus, based on the following findings of fact the Court concludes that the Phase III

investigation should include an investigation into the conduct of the USAO attorneys and staff, and into investigative agencies concerning their procurement, knowledge, and use of video recordings of attorney-client communications in the conference rooms at CCA-Leavenworth.

### Government's Lack of Transparency

The subject of video recording of attorney-client conference rooms at CCA-Leavenworth first arose during the July 21 discovery conference conducted by the Court. At that hearing, the government did not mention the reality or even possibility that there were video recordings of the attorney-client conference rooms. Instead, in the midst of the government speaking about having obtained voluminous video surveillance footage from video cameras stationed throughout the CCA facility, the Court posed this question, "[A]nd there are cameras that are identified with particular—the visitor room and the attorney/client room as well, or no?"[37]   SAUSA Tomasic responded, "Yes. Except that there is no—there are no audio in attorney/client unless someone at CCA, an employee, took it upon themselves to turn on the audio. But I don't believe it's recorded. It's just that it would allow a particular CCA employee to listen in without recording if—if the employee believes something was afoot that he needed to be aware of."[38]

During the July 21 hearing, Tomasic offered no further explanation or information about video cameras or video recording in the attorney-client conference rooms. Yet, she later claimed, in a brief filed on September 6 and orally during a hearing on September 7, that she had placed this Court and counsel on notice during the July 21 hearing that there was video recording

---

[37]July 21, 2016, Hr'g Tr., Doc. 75, at 11.

[38]*Id.* at 11–12.

of the attorney-client conference rooms.[39]  As the above-quoted colloquy demonstrates, Tomasic instead stressed that there was only monitoring, not recording, of the attorney client rooms;  she certainly did not clearly express that there was video recording in the rooms.

Moreover, Tomasic did not share with the Court or counsel during the July 21 hearing, other information she had about video recording of attorney-client rooms at CCA.  Just four months earlier, in March 2016, Tomasic now acknowledges that she had learned from a cooperating individual detained at CCA that there were video cameras that recorded the attorney-client conference rooms.  Tomasic found this information so significant that she explored the possibility of conducting a controlled buy of controlled substances inside one of the attorney client conference rooms.[40]  Although Tomasic decided not to conduct a controlled buy in an attorney-client conference room, she gave the cooperating individual's information sufficient credence to at least consider conducting a controlled buy in March or April of 2016.  But Tomasic did not mention this at the July 21 hearing.    Nor did Tomasic mention that on April 12, 2016, within a few weeks after receiving this information from the cooperating individual, she drafted a broad grand jury subpoena for "all video footage or still images

---

[39]Doc. 133 at 12 ("During the status hearing on July 21st when SAUSA Tomasic publicly stated to the Court that the 18 terabytes of surveillance footage received from CCA contained recordings of attorney-client meeting rooms and visitation rooms . . ."); *Id.* at 13 ("On July 21, 2016, SAUSA Tomasic stated to the Court, the FPD, Ms. Rokusek, and all parties in this case that the government had the recordings."); Sept. 7, 2016, Hr'g Tr., Doc. 135, at 21–22 (testimony of SAUSA Tomasic that she "made a clear representation" to the Court at the July 21, 2016, hearing "[t]hat the government–that the CCA video-recordings included attorney-client video-recordings based on what the cooperator had told me").

[40]In law enforcement parlance, a controlled buy is a law enforcement sponsored purchase of a controlled substance by a cooperating individual.  The buy is controlled in the sense that law enforcement is able to audio and/or video record the transaction,  which allows law enforcement to ensure that the putative seller in fact supplied the controlled substance to the cooperating individual; and if law enforcement is able to simultaneously audio and or video monitor the transaction, it allows them to provide some measure of security to the cooperating individual during the transaction as well.

Appellate Case: 18-3007   Document: 1-1   Date Filed: 01/16/2018   Page: 126

currently retained by Corrections Corporation of America (CCA) depicting any internal or external surveillance video or still image taken between July 2014 and April 12, 2016 at the CCA facility in Leavenworth, Kansas." This subpoena did not expressly exclude video footage of attorney-client rooms. Tomasic stated that by then she had forgotten about what the cooperating individual said, not recalling it until the Court raised the question during the July 21 hearing.

On the other hand, by the time of the July 21 hearing, Tomasic had access to other information that there were in fact video recordings of attorney client rooms. In response to the April 12 subpoena, on May 17 CCA produced voluminous video recordings from the entire facility, including the attorney-client rooms.[41] CCA produced the recordings on six hard drives, each with a three-terrabyte capacity. Each of the six hard drives was produced in a separate box. Two of the six boxes were clearly labeled, "[m]ay contain attorney/client material." While the United States Secret Service took initial custody of the video recordings on May 17, it provided a copy of six hard drives to the USAO on June 1 and on June 6 advised the USAO what equipment it would need to play the recordings. Further, although the video recordings were voluminous, on June 10, CCA produced an index to the six hard drives[42] which itemized the location situs of each of the six hard drives. This one-page index clearly identified that included on DVR #5 was the "Low Custody Attorney" room and included on DVR #6 were seven attorney rooms. Tomasic did not share any of this information during the July 21 hearing.

---

[41]Even before CCA produced the video recordings, apparently based on information from CCA, Tomasic was emailing defense counsel to advise that they needed to procure sufficient DVR drives to store the 18 terrabytes of information that comprised the video recordings from CCA. Gov. Ex. 8.

[42]Def. Ex. 439.

During the September 7 hearing, Tomasic described being overwhelmed by the scope and complexity of the CCA investigation.  The Court does not doubt that, particularly given that Tomasic was a relatively inexperienced prosecutor, hired for a term as a SAUSA, who seemingly handled the CCA investigation alone, although by the time the charges were filed, other AUSAs were counsel of record.  It is possible that Tomasic, who had the foresight to assemble a taint team for review of seized computers and materials seized from inmate cells, did not have the foresight to assemble a taint team to review the video recordings, and particularly the video recordings on DVR #5 and DVR #6, which the index clearly identified as including recordings of attorney-client rooms.[43]

At the same time, lack of foresight or not, Tomasic's actions during and after the July 21 hearing, and the actions of other AUSAs who represented the government in the August 9, August 16, and September 7 hearings, demonstrated a troubling lack of transparency about the government's knowledge, procurement, and use of the video recordings.

The government did not advise the Court that there were video recordings; the FPD and defense counsel Jacqueline Rokusek did.  This prompted the Court to conduct an emergency hearing on August 9, followed by a second evidentiary hearing on August 16.  The government was not forthcoming with information at either hearing, for SAUSA Tomasic, the lead prosecutor on this case who had the most information about the video recordings,[44] did not appear at either hearing.   Instead, the government was represented by USAO Criminal Chief,

---

[43]As previously discussed, Tomasic also failed to use the taint team to review the audio recordings despite the PRAO opinion.

[44]Tomasic also had the most information about the audio recordings, which first came to light during the August 9 hearing.

AUSA Debra Barnett,  as well as by other AUSAs who had no personal knowledge of the video and audio recordings and thus had little substantive information to offer at either hearing. Frustrated by the government's failure to answer the Court's questions, the Court scheduled an evidentiary hearing on September 7, specifically ordering that Tomasic and others with personal knowledge appear to answer the Court's questions.  The night before the September 7 hearing, Tomasic filed an extensive brief; and the brief as well as Tomasic's colloquy with the Court at the September 7 hearing was the first time the government offered direct answers to the Court's many questions.

This lack of transparency, coupled with the actions of Tomasic, AUSA Kim Flannigan and others in the interim between July 21 and September 6, as more fully detailed below, warrant a Phase III investigation into the government's knowledge, procurement, intent and use concerning the video recordings.

### Inconsistent, Inaccurate, or Misleading Statements

In addition to the lack of transparency described above, the government has offered a number of inconsistent, inaccurate, or misleading statements about their knowledge of the existence of the video recordings and whether they viewed or otherwise used any of the video recordings.  These statements have clouded the issues, as has the government's lack of transparency, thereby warranting a  Phase III investigation.

First, with respect to the government's knowledge of the existence of the video recordings, at the July 21 hearing, SAUSA Tomasic stated that the attorney-client rooms had cameras but stressed that there was no recording, only monitoring.  She did not advise the Court

of the information she had learned from a cooperating individual, nor advise the Court that CCA

had produced six hard drives of video recordings in boxes, two of which bore a label "[m]ay

contain attorney/client material," as well as a one-page index that clearly showed that there were

recordings of attorney-client rooms.   Yet Tomasic later characterized her July 21 colloquy with

the Court as placing the Court and counsel on notice that there were video recordings.[45]

Regardless of Tomasic's assertion that she placed the Court on notice of the video

recordings at the July 21 hearing, by August 5 Tomasic was no longer representing that she had

placed the Court and counsel on notice of the existence of the video recordings.  Rather, on

August 5 Tomasic sent an email to the Court and counsel claiming that she was uncertain

whether there were video recordings of the attorney-client rooms.  Tomasic's email stated in

pertinent part,

> Since our status hearing in *US v. Black* (16-20032-JAR) on July 21, 2016, two
> issues have arisen that need to be addressed with the parties and the Court:
>
>     ...    ...    ...    ...    ...
>
>  2)   During the hearing, the Court asked, "And there are cameras that are
> identified with particular—the visitor room and the attorney/client room as well,
> or no?"  Counsel for the government responded, "Yes.  Except that there is
> no—there are no audio in attorney/client unless someone at CCA, an employee,
> took it upon themselves to turn on the audio.  But I don't believe it's recorded.
> It's just that it would allow a particular CCA employee to listen in without
> recording if—if the employee believes something was afoot that he needed to be
> aware of."  At the time of the hearing, counsel for the government believed that
> CCA's system operated in that manner based on descriptions provided by a
> cooperating inmate and his attorney during the course of the investigation.

---

[45]Tomasic further asserted in the September 6 brief, that "[n]o one in the courtroom asked for clarification following this statement by SAUSA Tomasic regarding the video recordings available from CCA," suggesting that she had placed the Court and counsel on notice, and that their lack of clarity was because of their failure to further inquire of Tomasic during the July 21 hearing.  Doc. 133 at 12–13.

Since the hearing, defense counsel has expressed concerns that the government may be in possession of video footage of attorney/client interactions at CCA, and that footage may contain privileged communications. In response to those concerns, USAO supervisors reached out to the Warden of CCA via the US Marshals Service. The Warden provided the following information:

"In visitation rooms, where attorneys meet with their clients, there is a button (I will call it the panic button) that can be pushed in order to contact "control" if there is an issue and the attorney or client needs help from prison personnel. If the panic button is activated, there is a camera in the visitation room that "control" can activate to see what is going on in the room. There is no recording function associated with this camera or the panic button. To be more clear, there is no way to record visual or audio with this camera. So, if someone is assaulted in the visitation room, the contact will not be captured on video."

Defense counsel has concerns that CCA's former surveillance system, which was in place prior to the new Warden's tenure, may have captured video and/or audio recordings in attorney/client rooms. As such, one defense attorney requested in writing that counsel for the government, nor any party acting on the government's behalf, view any attorney/client footage provided by CCA until the issue is resolved. Counsel for the government agreed that no one acting on behalf of the government will view the footage until the matter is resolved. This same defense attorney is beginning review of the CCA surveillance footage today.

Thus, the government is not certain at this point whether any of the surveillance footage turned over by CCA in response to a subpoena by the government issued in *US v. Black* contains video footage of the attorney/client rooms, but, based on the Warden's statements, counsel for the government now believes the information provided by the cooperator was incorrect. Further, because the government has agreed not to review that footage, this matter will not be resolved until defense counsel has completed their review of the surveillance footage.

If, in fact, the government is not in possession of any surveillance footage in the attorney/client rooms, then the government will resume its review of the surveillance footage and any concerns by defense counsel should be alleviated. If, however, the government is in possession of such footage, counsel for the government intends to coordinate with defense counsel to identify whether use of a taint team to review any such footage would alleviate their concerns. I apologize for my misunderstandings, and I hope these matters can be resolved quickly to move this case along in an efficient manner.[46]

---

[46]Def. Ex. 445 at 2–3.

Similarly, the day before, on August 4, AUSA Deb Barnett, who was not personally involved in the CCA investigation, responded to an email from FPD, advising that a deputy United States Marshal had learned from CCA's warden that the cameras in the attorney-client rooms are activated by a panic button, but there is no audio or video recording of the attorney-client rooms.

Despite Tomasic's expressions of uncertainty in the August 5 email, from late July through August 5, Tomasic and AUSA Kim Flannigan had engaged in multiple conversations with Jacqueline Rokusek in which they discussed the existence of video recordings.  Rokusek represented CCA inmate Richard Dertinger in an unrelated case filed in this Court.  Beginning in late July, Tomasic and Flannigan, the attorneys of record in the Dertinger case,  started calling Rokusek to set up a meeting.  They finally reached Rokusek on August 2 and demanded that she present herself to the USAO to discuss a matter they would not discuss with her by phone.   So, Rokusek met with Tomasic and Flannigan on August 2 in the USAO.

According to Rokusek's testimony, in the August 2 meeting, Tomasic and Flannigan told her that they were holding the meeting instead of filing a motion for Rokusek to withdraw from representing Dertinger.  They represented that based on information they had, they knew Rokusek had a conflict of interest in representing Dertinger.  Tomasic told Rokusek that she knew that Rokusek had perceived that some of Tomasic's actions in the past were intended to conflict Rokusek off of the Dertinger case, such as when she alleged Rokusek's attorney fee had

been improper.[47]  Tomasic then accused Rokusek of improperly distributing protected discovery[48] to Dertinger and suggested that Rokusek seek an opinion from the Kansas disciplinary administrator.  According to Rokusek, Flannigan stated that they had a case agent who was reviewing attorney-client meetings from CCA to determine whether this document had been provided to Dertinger, and so far the agent had seen Rokusek walking down the hall, but he was continuing to review the videos.

Rokusek attempted to view the videos on August 4, but could not view them because USAO Litigation Support Specialist Pauletta Boyd was not available.  Rokusek did view the videos on August 5, with the assistance of Pauletta Boyd, who showed Rokusek how to open the videos on Boyd's computer, demonstrating how to input a date and time to find a particular meeting and also demonstrating how the split screen function would allow Rokusek to view multiple attorney-client rooms at once.   Rokusek, armed with information about the dates and times of her meetings with Dertinger, attempted to find the video of their meeting, as Tomasic and Flannigan had suggested.  In the process, Rokusek inadvertently opened multiple windows at one point that exposed her to video recordings of attorney-client meetings between other attorneys and inmates.

The fact that on August 2, 3, and 4, Tomasic and/or Flannigan discussed Rokusek viewing video recordings and the fact that on August 5 at approximately 2:30 p.m. Rokusek was

---

[47]Indeed, from the Court's review of the Richard Dertinger docket sheet and filings, Case No. 14-cr-20067-CM-6, Tomasic and Flannigan, who are co-counsel on the Dertinger case, attempted, to no avail,  to force Rokusek's withdrawal with an alleged conflict of interest based on Rokusek's husband being a deputy Johnson County sheriff.  They next sought, to no avail, to investigate her for the attorney fee Dertinger paid her during the two months she was retained counsel before she was appointed to represent Dertinger.

[48]Aug. 9, 2017, Hr'g Tr., Doc. 104, at 34–35.

viewing a video recording of her attorney-client meeting with Dertinger illustrates a number of

misrepresentations or inconsistencies in Tomasic's August 5 email to the Court and counsel in

this case.  In fact, *while* Rokusek, at Tomasic's bidding, was in the USAO's office viewing

video recordings, Tomasic transmitted the above-quoted email at 2:57 p.m. on August 5.[49]

Notably, Tomasic's email to Court and counsel begins by quoting what Tomasic said during the

July 21 hearing, then explains that on July 21 she believed that CCA's system operated in the

manner she had described, i.e., without recording video of attorney-client communications.

Tomasic went on to say that since the July 21 hearing, "defense counsel" has expressed concerns

about video footage of privileged attorney/client interactions, and in response "USAO

supervisors reached out to the Warden of CCA" and learned that there is "no recording function"

associated with the cameras or panic buttons in the attorney client rooms.  Tomasic went on to

state that the "government is not certain at this point" whether the CCA surveillance footage

contains any footage of attorney-client rooms.[50]  Tomasic also notes that the same defense

counsel who had expressed concerns about video recording, "is beginning review of the CCA

surveillance footage today," and that the government had agreed not to review the footage until

the defense counsel had completed their review and the matter was resolved.

　　　　Tomasic's email represents that she is uncertain whether video recordings exist, and

suggests that it was an (unnamed) defense counsel who first raised the issue of the existence of

video recordings.  Tomasic's email leaves the impression that the defense counsel was

investigating to see whether video recordings existed, at the initiation of the defense counsel.

---

[49]Def. Ex. 445.

[50]Def. Ex. 445 at 3.

Tomasic's email omits that she and AUSA Flannigan demanded that this defense counsel come view the videos as evidence that the defense counsel had improperly shared discovery with her client.

The Court recognizes that the government's version of the conversations between Rokusek, Tomasic and Flannigan is quite inconsistent with Rokusek's version.[51]  Rokusek's version is that Tomasic and/or Flannigan told her that the agent was reviewing videos of attorney-client meetings to find the meeting where Rokusek allegedly provided discovery to her client.  The government's version, which Tomasic offered in her September 6 brief, is that she and Flannigan merely told Rokusek that the agent was viewing the videos to see what Dertinger's actions were *outside of the attorney-client rooms* and in his residential pod, after his meeting with Rokusek.  Tomasic's brief further asserts that she and Flannigan neglected to tell Rokusek that the agent would not view the videos but would immediately turn them over to a taint team.

These highly disputed versions of the critical events warrant a Phase III investigation. For if Rokusek's version is correct, then it is clear that government counsel have made misrepresentations to the Court, have acted with a lack of transparency and candor, and have, at least through their investigative agent, viewed a recording of Rokusek and Dertinger.  If the government's version is correct, the government has not engaged in misconduct and has not viewed any video recording of Rokusek and Dertinger.  Resolving these controverted facts is

---

[51]Consistent with its avoidance and lack of transparency on this issue, the Court did not learn the government's version until Tomasic's September 6 brief, and her explanatory statements during the September 7 hearing.  In contrast, Rokusek's version was offered by sworn affidavit as well as testimony.

critical not only to the question of whether the government intruded on Rokusek and Dertinger's attorney-client communication by watching a recording of the same, but may be relevant to the concerns of the defendants in this case and in other cases in the District of Kansas that there has been a similar intrusion on their attorney-client communications.

The Court directs the Special Master to investigate the credibility of these two versions of the events, particularly in the light of other credible evidence.  Among the many questions to be explored are these.  If Tomasic and Flannigan did not know about the existence of video recordings, why would they demand that Rokusek view video recordings as proof that she handed certain documents to Dertinger?  Why did Flannigan suggest to Rokusek that there was urgency in Rokusek viewing the videos?   If the agent was not going to view the videos but was going to turn them over to a taint team, why was that not already accomplished, given that: Tomasic had information from a cooperator that there were video cameras in the attorney-client rooms; the videos were in boxes, two of which were labeled "[m]ay contain attorney/client material;" the USAO had received a one-page index showing attorney-client rooms were included on two of the six hard drives; and on August 5, the USAO litigation support specialist, Pauletta Boyd, directed Rokusek to the recordings of the attorney-client rooms?

Further, if Tomasic and Flannigan's version of the events is accurate, why on August  3 did Rokusek tell the FPD that there were video recordings of the attorney-client rooms, prompting the FPD to contact USAO management in an email at 10:36 p.m. on August 3? Moreover, if Tomasic and Flannigan's version of the events is accurate, what explains their response to Rokusek's August 3 email to them?

On August 3, Rokusek emailed Tomasic and Flannigan and asked to view the video before making a decision on how to proceed with the case.  Rokusek's email stated, "[y]ou mentioned that you were reviewing video of my visits with [my client] at CCA. I would like an opportunity to review the same video footage . . . ."[52]  Neither Tomasic nor Flannigan challenged Rokusek's statement that they told her they were reviewing video of her visits with her client. Instead, Tomasic replied that the videos were available for Rokusek's viewing, and that "the agent looking through the video for your visits said he has locate the time/date of your visits but has not paired those dates up to the video yet.  That agent is on vacation this week and is preparing for a hearing next week.  If you want him to pull the video for you, it might take a while, but we are willing to do so."[53]  In a separate email Flannigan responded, urging Rokusek to come soon to "try to find the video" before a deadline in some other case.[54]  In Tomasic and Flannigan's responses to Rokusek's August 3 email, there was no mention of a taint team, and no denial that the government was going to view the video of Rokusek's meeting with her client.

**Spoliation of Evidence**

Did the government view video recordings of any attorney-client communications at CCA?  This is one of the critical questions raised by defendants in this case and by movants in other cases.  As detailed above, the Phase III investigation will focus on this and related questions, as the evidence suggests that there is a good-faith basis for suspicion and concern that

---

[52]Def. Ex. 441.

[53]*Id.*

[54]*Id.*

the government has viewed and/or used video recordings, not only of Richard Dertinger, but of others.

But there is yet another reason justifying a Phase III investigation into the government's conduct.  As detailed above, when CCA produced six hard drives of video recordings of its entire facility, the Secret Service quickly advised the USAO of the software it would need to play the videos.  The USAO procured the necessary software, and its litigation support specialist, Pauletta Boyd, possessed the computer and the knowledge to run the software necessary to play the videos.  This is evidenced by the fact that Rokusek was not able to view the videos on August 4 because Pauletta Boyd was out of the office.  And on August 5, when Rokusek viewed the videos, it was Pauletta Boyd who showed her how to use the computer and software and who directed her to the hard drive(s) that included video recordings of the attorney-client rooms.  Boyd showed Rokusek how to input a date and time to pinpoint recordings made at the time Rokusek believed she was visiting with Dertinger.

On August 10, the Court issued a cease and desist order to CCA, ordering CCA to not video record the attorney-client rooms and further ordering CCA to produce originals and all copies of video recordings within the scope of the grand jury subpoena.  The Court followed with an order on August 18 that directed CCA to produce all video recordings made after the time period of the grand jury subpoena, that is from May 1, 2016 to August 18, 2016.  The USAO took possession of the recordings and delivered them to the Court on or about August 25; the Court then impounded the recordings.

At the September 7 hearing, the government advised that it was going to commence a cyclical replacement of all hard drives for personal and laptop computers for its attorneys and staff throughout the District of Kansas.  The Court orally ordered the government to produce all hard drives, for personal and laptop computers assigned to attorneys and staff in the Kansas City, Kansas division of the USAO.  The government advised at the hearing that all hard drives had been removed, labeled and secured.  The Court ordered the government to retain and preserve all of the hard drives as well as all of the hardware necessary to access the information on the hard drives.  Although the Court was not explicit, its order necessarily included the computer that was regularly used by Pauletta Boyd and was dedicated to playing the video recordings that Rokusek accessed on August 5.

After his appointment, the Special Master directed the USAO to produce all of the hard drives and necessary hardware for his inspection and analysis.  The USAO responded that it was able to produce all of the hardware except for one computer, that is, the very computer used by Pauletta Boyd to play the video recordings.  That computer had not been preserved.  Instead, its hard drive had been wiped clean.  Needless to say, this precluded the Special Master from examining and analyzing the one computer that could have provided meta data and information revelatory of when video recordings were played, perhaps by whom, and perhaps what video recordings were played.  This critical evidence has been destroyed despite the Court's order on September 7.   While the Court has no evidence that this happened intentionally or inadvertently, the fact that it happened serves as one more basis for a Phase III investigation into the government's conduct.

## VI.   Culture of Distrust

The Special Master's report voiced how the revelation that the government had obtained video and audio recordings of attorney-client communications was a "spark [that] lit a flame" of contentiousness between the USAO and the defense bar and demands by the defense bar for investigation.[55]  Indeed, from this Court's observations and experiences, and the observations and experiences of the other judges on this Court, there has been a long-simmering culture of distrust occasioned by the prosecutorial practices of several prosecutors in the Kansas City, Kansas division of the USAO.   The FPD objects to the Special Master's characterization that the discord and mistrust is borne out of mutual conduct, and argues that it is borne out of the unilateral conduct of some prosecutors in the USAO.

While this Court is certainly not privy to all of the behaviors the defense bar complained to the Special Master about, it is essential that prosecutors comport themselves with the civility and professionalism that all attorneys are expected to adhere to.  In fact, prosecutors are expected to adhere to even higher standards.  As the Supreme Court long ago recognized in *Berger v. United States*,[56]

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor–indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to

---

[55]Doc. 214 at 25.

[56]295 U.S. 78 (1935).

41

Add. 96

refrain from improper methods calculated to produce a wrongful conviction as it
is to use every legitimate means to bring about a just one.[57]


Indeed, the power and grave responsibilities society places on those who investigate and

prosecute others is quite high, and must be tempered with the highest standards of

professionalism and civility.  In the Court's view, the defense bar's negative perceptions are not

unfounded with respect to the practices of some, and probably a minority, of prosecutors.  For

example, the Court recently adopted a new criminal pretrial order, designed to encourage

reasonably early and reasonably complete discovery.  The new criminal pretrial order was the

product of a lengthy, collaborative bench-bar project to address repeated complaints from the

defense bar about late disclosure of *Brady* and *Giglio* materials, complaints about "protected

discovery" practices,[58] and prosecutors' practice of encouraging defendants to plead early, with

more favorable plea agreements, before the defendant has the benefit of a strong bargaining

position informed by having access to discovery materials.   Notably, the long-standing

prosecutorial discovery practices addressed by the PTO are the genesis of much of the discord

---

[57]*Id.* at 88.

[58]Protected discovery refers to a number of discovery practices followed by some of the prosectors in the
USAO.  Some discovery documents can only be viewed by defense counsel within the confines of the USAO.  This
means defendants who are detained never see these documents.  Defense counsel are not allowed to make copies, but
can only take notes in order to share information about the content of these documents with their clients.  Defense
counsel may be allowed to possess some discovery documents, but may never leave those documents with their
detained clients.  Still other documents may be possessed by defendants and/or defense counsel, but only in redacted
form, such that the defense cannot identify the witness who has made inculpatory statements about the defendant.
These protected discovery practices are most often used to "protect" proffer statements from cooperating individuals.
Needless to say, these proffer statements are sometimes the most inculpatory evidence against the defendant.  Yet
the custodial defendant is expected to trust and rely on their defense counsel to deliver a summary of the proffer
statement to them, from the counsel's memory or notes.  Often the identity of the cooperator is redacted until shortly
before trial as well, so that a defendant does not know until shortly before trial *who* is making these inculpatory
statements about him.  If the defendant pleads, the defendant may *never* know who inculpated him.  This is a
practice about which this Court has expressed great reservation.  So has the Tenth Circuit.  *See United States v.
Woods*, -- F. App'x --, No. 15-3304, 2016 WL 3457754, at *3 (10th Cir. June 23, 2016) (Holmes, J., concurring).

and mistrust the Special Master recognized after interviewing many defense counsel who practice in the Kansas City division of this Court.

## VII.   Conclusion

The focus of this Court's attention at this time is to direct the Special Master to turn his investigation in a different direction.  The Special Master's investigation has focused on the conduct, process and procedures of CCA and Securus, in an effort to determine how audio and video recordings were made and then accessed by the government.  The investigation has also focused on culling privileged from non-privileged evidence for purposes of the CCA investigation.  The investigation has further focused on how the Court might fashion an order that prospectively cures any problems, that is, precludes the audio and/or video recording of attorney-client conversations in the future.  To be clear, there remains a problem that is as yet not addressed by CCA and Securus.  CCA needs to establish a better procedure to provide detainees and their attorneys with clear, easily-received notice of how to ensure their calls are not recorded.  And CCA needs to work with Securus to ensure the system *always* blocks recording of calls to numbers marked private, and gives clear notice to attorneys and detainees whether their call is or is not being recorded, and identifies detainees' calls to attorneys that were recorded.

As the FPD posits, the Special Master's investigation has not focused on the government's conduct.  This Order directs a Phase III investigation of the government's knowledge and intent, the government's procurement of the recordings, and whether the

Appellate Case: 18-3007   Document: 1-1   Date Filed: 01/16/2018   Page: 142

government listened to, watched, or otherwise used the audio and video recordings of attorney-client communications.

The Court recognizes that no matter the outcome of this investigation, and no matter the outcome of this Court's de novo review of the Special Master's future reports and this Court's own findings and conclusions, the long-simmering culture of distrust may not cool upon the filing of this Court's final order.  If the Court ultimately finds that the government has engaged in misconduct, or has wilfully violated detainees' Sixth Amendment rights, the Court will issue a remedial order.  But curative action will have to occur in the USAO and may need to go beyond the bounds of what this Court may properly order.  If the Court ultimately finds that the government has not engaged in misconduct, or if the Court finds that the investigation is inconclusive, there may still be a need for remedial and curative action.

The Court is aware that United States Attorney Tom Beall has advised the Special Master that he has already made some procedural changes that address some of the issues raised in this investigation.  The Court or the Special Master will detail any internal changes the USAO has or will make in a later order.  The Court trusts that Mr. Beall and his upper management have been and will continue to demonstrate their commitment to curing problems that preceded the CCA investigation and problems that arose during it as well.

Furthermore, no matter the outcome of the investigation, the Court has in mind certain steps it will take that will hopefully encourage a cultural change, and hopefully restore, particularly in the Kansas City  division, an environment of mutually earned respect, understanding, trust and even appreciation, of the critical and admirable roles that defense

counsel and prosecutors both play in our exemplary and well-respected system of criminal justice.

## VIII.  Order: Scope of Phase III Investigation and Compensation

The Court ORDERS the Special Master to conduct a Phase III investigation, including:

(1)     Determine how and when the USAO and investigative agencies (and which individual prosecutors, USAO staff and/or investigative agents) came into possession of audio and video recordings of attorney-client communications of defendants in this case, inmate targets and subjects of the CCA investigation, and defendants with pending motions for relief in the District of Kansas based on allegations of such;

(2)     Determine whether the USAO and investigative agencies (and which individual prosecutors, USAO staff and/or investigative agents) watched video recordings of attorney-client communications at CCA-Leavenworth or any other detention facilities housing the defendants in this case, targets and subjects of the CCA investigation, and defendants with pending motions for relief in the District of Kansas based allegations of such;

(3)     Determine whether the USAO and investigative agencies (including individual prosecutors, USAO staff and/or investigative agents) purposefully, intentionally, unintentionally or inadvertently,  procured, obtained, relied upon, used in any manner, and/or disseminated to anyone, video and/or audio recordings of attorney client communications as described above, or attempted to do so;

45

Add. 100

(4)     Determine whether and how the USAO and investigative agencies (including individual

prosecutors, USAO staff and/or investigative agents) used or attempted to use the

substance of attorney-client communications  in any investigation, grand jury proceeding,

or litigation, regardless of whether the use or attempted use was disclosed to the Court or

to the parties;

(5)     Determine whether the USAO and investigative agencies (including individual

prosecutors, USAO staff and/or investigative agents) interfered or attempted to interfere

with a defendant's attorney-client relationship, such as investigating or seeking forfeiture

of attorney fees or alleging conflicts of interest.

(6)     Identify, by using visitation logs and other facility records, the attorneys and clients who

met during the time span covered by the audio and/or  video recordings that are the

subject of the Special Master's investigation;

(7)     Identify, by using Securus and CCA records, and other evidence,  the attorneys and

clients who communicated by phone during the time span covered by  the audio and/or

video recordings that are the subject of the Special Master's investigation;

(8)     Direct Securus and/or CCA to cease any routine purging of inmate calls until further

order of the Court;

(9)     Inspect and copy files, documents, communication, and electronic data of any pretrial

holding facility, the USMS, and the government as necessary to

complete the above duties;

46

(10)   Report to the Court the identity of parties affected by any breaches of privilege, confidence, constitutional rights, statutory rights, or ethical obligations, and recommend available remedies, in this case or others, if appropriate; and

(11)   Determine what remedial measures, if any, have been taken and/or planned by the USAO in the District of Kansas  and/or investigative agencies to address the inadvertent, unintentional, purposeful, and/or intentional procurement, dissemination and/or use in any manner of video and/or audio recordings of attorney-client communications in any investigations and/or cases now and prospectively

IT IS FURTHER ORDERED, that while this Order expands and directs the Special Master's duties in going forward with a Phase III investigation, this Order does not otherwise modify the Court's Appointment Order,[59] including those portions of the Appointment Order that: (1) set forth the Rule 53(b)(2)  authority for the appointment; (2) detail the Special Master's "Complementary Duties;" (3) direct the parameters of the Special Master's "Communications with the Parties and the Court;" (4) pertain to the "Special Master's Record;" (5) pertain to the Court's "Review of the Special Master's Rulings;" (6) require that "All Relevant Parties" provide full cooperation to the Special Master;  and (7) require "All Relevant Parties" to provide the Special Master with "Access to Information."

IT IS FURTHER ORDERED that with respect to the Special Master's compensation, this Order does not modify the "Compensation" section of the Court's Appointment Order ***except***

---

[59]Doc. 146.

that for all Phase III investigation, the ***government will not bear the cost***;[60] rather, the Special

Master's compensation and the costs for third-party assistance (such as American Discovery)

shall be paid by Timothy J. O'Brien, the Clerk of Court, up to $350,000, from funds appropriated

for this specific purpose.

IT IS SO ORDERED.

Dated: May 17, 2017

S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE

---

[60]Although the Court relieves the government from bearing the cost of the Special Master's investigation going forward, there is one exception.  If the government does not cooperate regarding the inspection and copying described in Section VIII. (9) above, or otherwise litigates the production of materials and information necessary for the Special Master to pursue his investigation, then the fees, costs, and expenses associated with that noncooperation will be paid by the government.

16CR20032M-ord(PhaseIII-Status1).wpd

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | **CASE NO. 16-CR-20032** |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **SPECIAL MASTER DAVID R. COHEN** |
| | : | |
| **LORENZO BLACK,** *et al.*, | : | **FIRST STATUS REPORT REGARDING** |
| **Defendants** | : | **PHASE III INVESTIGATION** |
| | : | |

Beginning in December of 2016, the undersigned issued several *Reports* regarding: (1) CCA-Leavenworth's use of the hardware and software provided by Securus Technologies to record phone calls made by inmates to their attorneys; and (2) CCA-Leavenworth's use of a PELCO multi-camera system to record video of inmates' meetings with their attorneys.  *See* docket entries 183, 187, 193, & 214 (first four *Reports* issued by the Special Master); *see also* docket no. 146 (*Order of Appointment*, setting out "Phase I and Phase II" of the Special Master's duties).

The detailed findings set out in these *Reports* were made possible because both CCA-Leavenworth and Securus were fully responsive to requests for information by the Special Master. For example, CCA-Leavenworth provided unfettered access to its jail facility and personnel, and produced emails responsive to search terms suggested by the Special Master.  Similarly, Securus responded with particularity to the Special Master's inquiries by producing several custom-designed spreadsheets containing data regarding audio-recordings at CCA-Leavenworth, and also providing

access to its online database.  *See Report Regarding Other Issues Related to Recordings at CCA-Leavenworth* at 1 (docket no, 214) (noting that CCA-Leavenworth and Securus were both "laudably cooperative" during the Special Master's investigation).

Following issuance of the Special Master's first four *Reports*, on May 17, 2017, the Court ordered the undersigned to pursue a "Phase III investigation."  This follow-up investigation was directed toward assessing the possession and use of CCA audio- and video-recordings by the Office of the United States Attorney for the District of Kansas ("OUSA"), as well as the investigative agencies with which the OUSA works.  *See "Phase III Order"* at 45-47 (docket no. 253).

Accordingly, the Special Master has requested certain information from: (1) the OUSA; (2) the Kansas Bureau of Investigation ("KBI"); (3) the United States Marshals Service ("USMS"); and (4) the United States Secret Service ("USSS").  (The Special Master refers below to these four entities collectively as "Agencies.")   Specifically, the Special Master made two types of requests.  First, the Special Master provided the Agencies with certain search terms, and asked the Agencies to produce responsive emails and other documents.  Second, the Special Master sent to each Agency a letter, asking it to respond to about a dozen specific, written Requests for Information.

The timing and details of these requests, and the responses so far received, are set forth below.

Beginning in November of 2016, the Special Master worked cooperatively with the OUSA to craft language directing OUSA staff to: (1) preserve and collect information relevant to the *Black* investigation, and (2) let the other Agencies know they also had an obligation to preserve and collect the same information.  On December 17, 2016, the language for this "Litigation Hold" was finalized and the OUSA issued it shortly thereafter.  *See* Exhibit A (email thread between AUSA Emily

2

Metzger and the Special Master finalizing agreement on the language of the Litigation Hold).

At the same time, the Special Master also worked cooperatively with the OUSA to craft search terms to be applied to the OUSA's electronic repository of emails and other documents. In an effort to ensure the search terms were neither over- nor under-inclusive, the Special Master worked with the OUSA's technology staff to test and "tweak" various iterations, a process that went on for several months. *See* Exhibits B & C (exemplar emails between OUSA and the Special Master, dated January 26, 2017 and May 18, 2017, reflecting ongoing testing and modification of search terms). During this time, the OUSA did not actually produce any documents; this was frustrating to the undersigned, but the Special Master remained patient. Finally, on June 5, 2017, the Special Master directed the OUSA to run the latest iteration of search terms against the document repository of a single custodian, SAUSA Erin Tomasic, and to produce responsive documents. *See* Exhibit D (email directing OUSA to make some final changes to the search terms and to "Please run this search on Tomasic's repository and produce the results to me . . . as soon as possible.").[1]

In response to this June 7th directive, however, the OUSA contacted the undersigned and explained it had new concerns regarding production of Tomasic's documents for various reasons,

---

[1] On February 28, 2017, the OUSA identified for the Special Master about 30 "employees who responded that they were likely to have or might have information responsive to the Litigation Hold." In an effort to minimize the size of the collection of OUSA documents gathered by the search terms, the Special Master and the OUSA began to discuss not only modifying the search terms, themselves, but also running the search terms against fewer than all of these 30 employees. The Special Master and the OUSA eventually agreed that, as a starting point, the search terms would be run only against SAUSA Tomasic's document repository; upon reviewing the results, the Special Master could then work with the OUSA to further limit the search terms, if necessary. Among other reasons, Tomasic was chosen as the first employee for document production because her employment with the OUSA had ended in mid-May of 2017, so her document repository was static.

primarily including unresolved internal personnel matters between the OUSA and Tomasic.  The

OUSA explained that, because of this internal dispute, the OUSA might have a conflict – and

therefore might have to assign to some other entity all responsibility for document production,

including review of the Tomasic documents for relevance, national security concerns, privacy issues,

and so on.  On June 30, 2017, the OUSA explained:

> The over-arching issue we face is getting a determination on whether or not
> we have a conflict in our representation.  We have pushed hard to get to a resolution
> on this issue.  We are anticipating, but cannot guarantee an answer next week.  If it
> is determined that we have a conflict, the matter will go before the Deputy A.G. to
> determine whether to waive the conflict, or appoint conflict counsel.

Email from United States Attorney Tom Beall to the Special Master.  Ultimately, on July 14, 2017,

the Department of Justice sent a letter to the Court and the Special Master stating it had "appointed

Assistant United States Attorney (AUSA) Steven D. Clymer, Northern District of New York

(NDNY), as a Special Attorney to assist the United States Attorney's Office for the District of

Kansas (USAO) in the Special Master's [Phase III] Investigation."  *See* Exhibit E.

Up until June of 2017, the Special Master had refrained from seeking information directly

from KBI, USMS, and USSS, for two reasons.  First, the Special Master expects that most of the

information necessary to answer the questions posed by the Court in the *Phase III Order* is in the

possession of the OUSA, and not the other Agencies.  Second, given the importance of their work,

the Special Master hopes to impose as little as possible on *all* of the Agencies (including the OUSA),

while still undertaking a thorough investigation; accordingly, the Special Master intended to seek

information from KBI, USMS, and USSS only after reviewing information from the OUSA, so that

follow-up requests to the other Agencies (if even necessary) could be more limited.

In light of the delays in production of any information by the OUSA, however, the Special

4

Master changed this approach.  Specifically, on June 11, 2017, the Special Master sent to KBI, USMS, and USSS a letter asking them to run a document search using the same search terms as had been negotiated with the OUSA.  *See* Exhibit F.  Also, the Special Master wrote a letter to all four Agencies (including the OUSA), asking each Agency to respond to a dozen or so "Requests for Information ('RFIs')."  *See, e.g,* Exhibit G.[2]  The Special Master purposefully asked the Agencies ***not*** to "wait to respond until you have gathered ***all*** of the information requested; rather, please submit the requested information as you gather it, with an explanation of which RFIs you are responding to."  This instruction was meant to ensure the flow of information began quickly, unlike the delays that had so far occurred with the OUSA.  Also, the Special Master designed the RFIs with the expectation that the OUSA could answer at least *some* of them, despite the OUSA's concern about a possible conflict of interest regarding Tomasic's documents, or other issues like national security.

Thereafter, the Special Master checked in with each Agency periodically to determine whether it was making progress in collecting the requested information.  As summarized below, the Agencies' responses since June of 2017 have been mixed.

---

[2] Exhibit G is the letter sent to the OUSA; the specific Requests for Information sent to each of the four Agencies were slightly different.

**KBI** has so far responded quickly and thoroughly.[3]  KBI assigned two attorneys to serve as points of contact for the undersigned.  These attorneys designed an internal survey to gather information from KBI agents, and have provided much of that information to the Special Master; this production is ongoing.  The KBI attorneys also worked with the Special Master to tweak the search terms in order to make their document production more accurate and speedy; counsel is now in the process of reviewing for relevance and privilege the documents it gathered.  As of this writing, KBI expects to begin producing responsive documents next week, and expects to produce all responsive documents within several weeks.

**USMS** has also responded quickly and thoroughly.  USMS designated a senior agent to serve as a point of contact for the undersigned in connection with the written RFIs.  USMS also designated an attorney and an information technology administrator ("IT-Admin") as points of contact in connection with production of documents responsive to the search terms.  The senior agent has gathered information from other USMS agents, and has produced written responses to the RFIs; the Special Master recently requested some follow-up information.  The senior agent has also produced some relevant hard-copy documents, which the Special Master requested separately (e.g., Audio Request Forms submitted by USMS to CCA-Leavenworth).  The IT-Admin expects to produce all documents responsive to the search terms within a week.

---

[3] The Special Master is aware that at least some of the Kansas bar is frustrated, and believes the Phase III investigation is taking too long, and would question whether anything has been "quick."  The Special Master empathizes with this sentiment.  That said, the amount of information requested of the Agencies is voluminous; and KBI, USMS, and USSS have each offered believable and legitimate explanations that it takes substantial time to collect the requested information, review it for relevance and privilege, and produce it in a usable format.  Moreover, each of these Agencies has had to divert resources from other, important law enforcement efforts to attend to the RFIs.  The Special Master wishes the Agencies could respond more quickly, but it is fair to say that KBI has been assiduous.

**USSS** assigned an agent-attorney to serve as a point of contact for the undersigned in connection with both the written RFIs and the production of documents responsive to search terms. Until late September of 2017, USSS consistently assured the undersigned (who called periodically for status updates) that it: (1) was collecting information responsive to the RFIs; and (2) had collected documents responsive to the search terms, and was reviewing them for relevance and privilege, with the expectation of forthcoming production. *See* Exhibit H. Recently, however, an event occurred that caused USSS to inform the Special Master that it might not produce anything at all.

Specifically, on September 12, 2017, the Special Master received a 24-page letter from AUSA Clymer, wherein he "respectfully decline[s] to provide most of the information and documents sought in the RFI[s] [from OUSA]." *See* Exhibit I.[4] The Special Master was surprised by this position, as the OUSA had previously objected to production of documents based only on a possible conflict of interest relating to Tomasic (which was to be *resolved*, not heightened, by obtaining "outside counsel"), or on issues of national security or employee privacy. The OUSA never suggested it did not intend to produce any responsive documents even after determining whether it needed to obtain conflict counsel.

The Special Master's initial response to Mr. Clymer's letter was simply to turn to more productive veins – that is, to focus instead on obtaining information from KBI, USMS, and USSS

---

[4] Given that the Special Master sent the RFIs to the OUSA in a non-public letter, Mr. Clymer was appropriately concerned and sent his responding letter to the undersigned privately, rather than copying the parties or filing the letter on the docket. Mr. Clymer graciously noted, however, that "the government does not oppose you providing a copy of this letter to the defendants and their attorneys, along with the 'interested parties' and the 'intervenor.'" *Id.* at 1. In light of the number of such recipients and the nature of the Phase III investigation, the Special Master concludes it is appropriate simply to attach Mr. Clymer's letter to this *Report*.

Appellate Case: 18-3007   Document: 1-1   Date Filed: 01/16/2018   Page: 154

– with the intention of returning to the OUSA later.  In other words, having learned the OUSA was not going to be cooperative, the undersigned has continued to pursue the Phase III investigation by working with the other Agencies.

About two weeks ago, however, USSS has pointed to Mr. Clymer's letter and stated it is now re-thinking whether it will produce any responsive information.  Thus, at this juncture, neither OUSA nor USSS is cooperating with the Special Master's investigation.[5]

Unfortunately, then, the Department of Justice was incorrect when it stated in July of 2017 that it was "confident that [appointment of outside conflict counsel] will be of great assistance to the OUSA and the Court in bringing the Investigation to completion."  Exhibit E at 1.  From the Special Master's perspective, that the OUSA *may* have valid bases upon which to refuse production of information does not mean it is wise to do so.  As the Special Master noted earlier, "there is a widespread undergrowth of mistrust between the Office of the United States Attorney for the District of Kansas and defense counsel," *Report* at 25-26 (docket no. 214).  The Court ordered the Phase III investigation in order to cure (or at least improve) this situation.  *See Buckley v. Valeo*, 424 U.S. 1, 67 ("Sunlight is said to be the best of disinfectants.") (quoting Justice Brandeis, *Other People's Money* 62 (1933)).  The OUSA's recent choice not to produce information responsive to the Special Master's requests is a drawing of shades against sunlight; this will not ameliorate any mistrust from the defense bar.  And the OUSA's choice may be against its own interests – as Mr. Clymer acknowledged, the Special Master's *initial* investigation suggested that "[defense bar] suspicions of regular incursion into attorney-client communications . . . are groundless."  *Report* at 26 (docket

---

[5]  Just as the Special Master sat down to file this Report, USSS indicated it **does** intend to respond to the written RFIs next week, but will not produce any documents responsive to search terms.

no. 214); *see* Exhibit I at 1 ("The Department of Justice . . . is heartened by the results of your investigation to date . . . ."). Indeed, the Phase III investigation to date suggests there is only *one* instance where the OUSA even made a *request* for video-recordings of meetings at CCA between inmates and their attorneys, and the OUSA did not actually view any such meeting.

Obtaining a neutral declaration of good behavior, and acknowledging bad behavior (if any) and taking action to fix it, is the surest way to OUSA reconciliation. The Special Master believes that the Agencies' allowing the undersigned to pursue fully the Phase III investigation is the best, and perhaps only, way to repair "the underlying mistrust between the prosecution and defense bars in Kansas City," which "manifests itself in the squandering of scarce judicial resources, increased expense and frustration of all parties, and ultimately a diminished quality of justice for the entire community." Report at 27-28 (docket no. 214). Eradicating these harms are surely goals the OUSA shares, but its latest position does not bring the goals any closer.

That said, as matters now stand, the Special Master is compelled to note that the Court earlier addressed the possibility of non-cooperation by the OUSA. On March 20, 2017, the OUSA wrote a letter to the Court complaining that having to pay for Phases I and II of the Special Master's investigation was affecting adversely its "annual litigation budget;" thus, the OUSA "request[ed] relief from paying additional fees and expenses associated with any further review and investigation herein." The Court acceded to this request, stating the OUSA would not bear the cost of the Phase III investigation. *Phase III Order* at 48 (docket no. 253). But the Court added this caveat:

> Although the Court relieves the government from bearing the cost of the Special Master's investigation going forward, there is one exception. If the government does not cooperate regarding the inspection and copying described in Section VIII. (9) above, or otherwise litigates the production of materials and information necessary for the Special Master to pursue his investigation, then the

fees, costs, and expenses associated with that noncooperation will be paid by the government.

*Id.* at 48 n.60.

The Special Master regretfully reports that the OUSA has chosen to bring this caveat into play.  In any event, the Special Master will continue to pursue the Phase III investigation by using other sources of information, including those discussed above.

**RESPECTFULLY SUBMITTED,**

/s/ David R. Cohen
**David R. Cohen**
**Special Master**

**DATED**: October 20, 2017

Add. 113

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

<table>
<tr><td>

**UNITED STATES OF AMERICA,**

    **Plaintiff,**

    **v.**

**LORENZO BLACK,
KARL CARTER,
DAVID BISHOP,
ANTHON AIONO,
ALICIA TACKETT, and
CATHERINE ROWLETTE,**

    **Defendants.**

</td><td>

**Case No. 16-CR-20032-JAR**

</td></tr>
</table>

## MEMORANDUM AND ORDER

    This matter comes before the Court on the Government's Motion to Terminate Phase III of the Special Master's Investigation (Doc. 336), Corrected Motion to Quash Subpoenas Issued by the Federal Public Defender (Doc. 340), Corrected Motion to Quash the Special Master's Subpoena *Duces Tecum* and Subpoenas *Ad Testificandum* to United States Attorney ("USAO") Employees and Motion to Vacate Special Master's Order of Production (Doc. 341), Motion to Quash Additional Subpoena Issued by the Federal Public Defender (Doc. 360), and Motion to Quash Additional Subpoenas Issued by the Federal Public Defender and Subpoenas Issued by Defendants Carter and Bishop (Doc. 370).[1]  Aside from the Government's motion to quash additional subpoena issued by the federal public defender, these matters are fully briefed and the Court is prepared to rule.  For the reasons explained in detail below, the Court denies in part the Government's motions to quash and denies the Government's motion to terminate Phase III.

---

[1] A number of other motions remain pending in this case, including the Federal Public Defender's Motion for Order to Show Cause (Doc. 301) and Defendant Karl Carter's Motion to Dismiss Indictment (Doc. 333).  These motions are not yet ripe for ruling, and the Court intends to hear argument on them at the January 18, 2018 hearing.

I.      **Background**

On May 4, 2016, the grand jury returned an Indictment charging six Defendants with drug crimes arising out of the alleged introduction and sale of controlled substances inside the Detention Center in Leavenworth, Kansas operated by Corrections Corporation of America, now known as CoreCivic (referred to as "CCA" in this Order). The investigation of the conspiracy included executing a search warrant inside CCA in March 2016, during which agents seized materials from detainees' cells as well as computers and other materials from CCA personnel. During an early discovery hearing on July 21, 2016, the Government stated it anticipated the grand jury would indict as many as 95 more individuals, including CCA detainees, associates of those detainees who were outside the facility, and also personnel at the facility, as part of the drug conspiracy. Addressing the topic of video recordings that agents had seized from CCA, the Government also stated at this hearing that CCA had cameras in attorney-client meeting rooms, but that these rooms were only video-monitored for security purposes, and not recorded.

On August 5, 2016, the Federal Public Defender ("FPD") filed a motion for Fed. R. Crim. P. 41(g) Return of Information based on information and belief that the Government was, in fact, in possession of video recordings of the attorney-client meeting rooms at CCA, and these recordings intruded into privileged, confidential communications of attorneys and clients housed at CCA.[2] The FPD filed an amended motion on August 7, 2016, in which it alleged that in addition to the video recordings, "[w]e understand that all legal calls are also recorded, and the

_____

[2]Doc. 82.

Add. 115

content of those calls are provided to the USAO."[3]  Defendants Catherine Rowlette, Lorenzo

Black, David Bishop, and Karl Carter joined in the motions, as did Interested Parties Richard

Dertinger and David Lougee (who were alleged co-conspirators indicted in separate criminal

cases).

   The Government's initial production of discovery in this case included recordings of

attorney-client phone calls.  Moreover, the Government produced these recordings not just to the

attorney who was on the call, but to other defense counsel as well.  As discussed further below,

the Court appointed a Special Master to investigate, among other things, the scope of audio and

video recording of attorney-client communications at CCA.  Having learned through the hearings

in this case of audio- and video-recording of attorney-client communications at CCA,

Defendants in other cases across this District filed Rule 41 motions based on the dissemination in

this case of their private communications with attorneys.

   Ultimately, defendants in at least 30 cases filed Rule 41 motions in this and other cases.

Some Judges denied the motions before them without prejudice to refiling following the Special

Master's investigation, while others held the motions in abeyance pending the conclusion of the

investigation.  Other motions were terminated following sentencing proceedings in the respective

cases.  Other Defendants across the District have also filed motions for post-conviction relief,

based on the issues central to the Special Master's appointment.  At this writing, seven motions

for relief pursuant to Rule 41 remain pending.  One of the defendants who filed a Rule 41 motion

in another case, Michelle Reulet, moved to join the defense motions filed in this case, alleging

that prosecutors in her case had listened to phone calls between her and her attorney that were

recorded at  CCA.  The Court initially orally granted Ms. Reulet's motion, but granted the

---

[3]Doc. 85.

Government's motion for reconsideration after reviewing the pleadings in her case, conferring

with the judge assigned to her case, and finding that the issues raised in her motion were distinct

from those raised in this case.

On August 9, 2016, the Court conducted an emergency hearing on the FPD's Rule 41

motions and the motions to join or intervene.  The FPD, all Defendants except for David Bishop

and Alicia Tackett, and the Government appeared at this hearing.  The FPD presented the

testimony of several witnesses, and the Government cross-examined several of these witnesses.

Jackie Rokusek, counsel for a defendant in another case in this District, *United States v.*

*Dertinger*, made a statement asserting that Special Assistant United States Attorney ("SAUSA")

Erin Tomasic and Assistant United States Attorney ("AUSA") Kim Flannigan had confronted

her and attempted to make her withdraw from that case by using the video recordings obtained in

this case to suggest a conflict of interest.[4]  Based on the evidence presented at the August 9

hearing, the FPD and the Government agreed that the Court should appoint a Special Master,

though the FPD and Government disagreed about the scope of the Special Master's investigation.

The Government wanted the Special Master's work to be limited to acting as a taint team or

privilege master, culling the video recordings of attorney-client conferences from the video

recordings of all other recorded activity throughout the CCA facility.

On August 16, 2016, the Court held a second evidentiary hearing on these matters.  The

Government, Defendants, the FPD, and Interested Party David Lougee each appeared and

presented argument as to the appointment of a Special Master.  At the hearing, the Court

acknowledged arguments regarding standing with respect to the FPD that the Government made

---

[4]SAUSA Tomasic made statements to the Court on September 7, 2016 challenging Ms. Rokusek's account, and AUSA Kim Flannigan gave testimony during a hearing conducted on June 20 and 21, 2017 in *United States v. Dertinger* challenging Ms. Rokusek's account.

Add. 117

in a previous response to pending motions.[5]  The Court explained that irrespective of the standing of the FPD, the issues raised in the Rule 41 motions were properly before the Court because all Defendants had moved to join in the motion.[6]  Michael Jackson, counsel for Defendant Catherine Rowlette, presented evidence of recorded phone calls between numerous other CCA detainees and their attorneys, which the Government obtained and disseminated to him and other defense counsel in this case.[7]  During these initial hearings, the Government did not provide an explanation of how it obtained the recordings, how it used the recordings, or why the recordings were disseminated to persons other than the client and attorney who were recorded.

The Court held a third hearing on these issues on September 7, 2016.  The Government, all Defendants except for Lorenzo Black, and the FPD appeared at this hearing, during which the Court heard argument from the parties concerning the appointment of a Special Master and directed questions to SAUSA Tomasic.  Although SAUSA Tomasic provided information, many of the Court's questions regarding the Government's conduct in obtaining and disseminating the recordings, including the Government's intent in doing so, went unanswered.

Based on the hearings and the parties' submissions, the Court entered an order on October 11, 2016 appointing David R. Cohen as Special Master in this case.[8]  The Court ordered Mr. Cohen to conduct two phases of an investigation ("Phases I and II").  Phase I would involve determining the feasibility of culling potentially privileged and confidential attorney-client recordings from the universe of audio and video recordings the Government obtained from CCA

---

[5]Aug. 16, 2016 Hrg. Tr., Doc. 118, at 7–8.

[6]*Id.* at 60–61.

[7]*Id.* at 18–23.

[8]Doc. 146.

Add. 118

in this case.  Phase II would involve culling the potentially privileged materials, and providing progress updates to the Court and the parties.  The Court explained that following the completion of Phases I and II, the Court would consider expanding the scope of the Special Master's appointment to a third phase ("Phase III"), focused on determining whether the Government intentionally sought and used the potentially privileged recordings, which was the issue at the heart of the pending Rule 41 motions.

On October 27, 2016, the Government moved to reconsider the Special Master's appointment.[9]  The Court denied the Government's motion for reconsideration, finding that the Special Master's duties were properly assigned and that the costs for the initial Phases I and II of the investigation were properly imposed on the Government.  On October 28, 2016, the Court held a discovery conference, during which the Special Master, the government, the Defendants, the FPD, and Interested Parties Michelle Reulet, David Lougee, and CCA all appeared.

The Special Master proceeded to conduct Phases I and II of the investigation and filed several detailed status reports with the Court during the course of the investigation.[10]  Phases I and II revealed that CCA routinely recorded all telephone calls of detainees. Although CCA had signage and aural warnings on the calls advising detainees of this practice, as well as language in the detainee handbook, CCA's website and other materials recognized the confidential nature of attorney-client communications.  Phases I and II also revealed that CCA had a form that an attorney could complete to block the recording of their clients' calls to the attorney's phone numbers.  These forms were provided to detainees, who were obligated to provide the forms to their attorneys to complete the blocking process.  Phases I and II revealed that hundreds of

---

[9]Doc. 163.

[10]Docs. 176, 177, 182, 183, 186, 187, 193, 214.

Add. 119

attorney-client calls were recorded at CCA and obtained by the Government, including calls of detainees whose attorneys had completed the blocking process.

On May 17, 2017, the Court ordered the Special Master to commence with Phase III of the investigation, which would focus on, *inter alia*, determining "how and when the USAO and investigative agencies (and which individual prosecutors, USAO staff and/or investigative agents) came into possession of audio and video recordings of attorney-client communications of defendants in this case, inmate targets and subjects of the CCA investigation, and defendants with pending motions for relief in the District of Kansas based on allegations of such."[11]   The Court explained that Phase III would also focus on whether the USAO or investigative agencies intentionally or unintentionally obtained or used the attorney-client recordings.   This issue is germane to the Defendants' motions, which argue that the Government has violated their Sixth Amendment right to counsel.   While the Government bore the cost of the Special Master's fees and expenses for Phases I and II, the Government has not borne the cost of the Special Master's fees and expenses for Phase III.   The Court has entirely borne the cost of Phase III, from specially appropriated funds.

On June 19, 2017, the Government filed a Notice of Record Clarification and Correction,[12] meant "to clarify and correct any and all prior representations that may be deemed misleading or potentially misleading."[13]   The Government explained that based on information it had received from SAUSA Tomasic, it believed she had listened to attorney-client calls not only in connection with this case, but also in connection with *United States v. Herrera-Zamora*,[14] a

---

[11]Doc. 253 at 45.

[12]Doc. 276.

[13]*Id.* at 2.

[14]14-20049-01-CM.

case before another Judge in this Court.  Ultimately, the Defendant in *Herrera-Zamora* filed a

motion to Vacate Judgment and for New Trial based on the information provided in the

Government's similar notice of correction of record in that case.[15]  The Government did not

oppose this motion, and the Court has indicated that it will grant the motion following remand of

the Defendant's appeal.[16]

The defendant in *United States v. Dertinger* filed several motions, including a motion to

dismiss indictment, based on the allegations of the Government's use in his case of the attorney-

client recordings obtained in this case.  *United States v. Dertinger* was transferred to this Court in

May 2017 based on the interrelatedness of the issues in that case and this case.[17]  The Court held

an evidentiary hearing in *United States v. Dertinger* on June 20 and 21, 2017.  The Court

continued the hearing on Defendant's motion to dismiss and several other motions until

September 14, 2017.  Before the hearing, however, the parties entered into a plea agreement in

which they agreed to a sentence of time served.[18]

For several months following the Court's Order directing the Special Master to proceed

to Phase III of his appointment, the Government worked collaboratively with the Special Master

to compile documents relevant to the Phase III investigation. The Government also asked the

Special Master to serve as a "taint team" to review materials seized in the March 2016 search of

CCA to segregate out attorney-client letters and communications. On September 12, 2017, the

Special Master received a letter from Special Attorney for the United States Steven Clymer,

wherein he "respectfully decline[d] to provide most of the information and documents sought"

---

[15]*United States v. Herrera-Zamora*, 14-20049-01-CM, Doc. 181.

[16]*United States v. Herrera-Zamora*, 14-20049-01-CM, Doc. 200.

[17]14-20067-JAR-6, Doc. 520.

[18]Defendant Dertinger was charged with four counts of drug and money laundering charges.  Based on the drug quantity charged in Count I, Defendant was subject to a five-year mandatory minimum prison sentence.  *United States v. Dertinger*, 14-20067-JAR-6, Doc. 237.

Add. 121

by the Special Master as a part of the Phase III investigation.[19]  The Special Master filed a Phase III report on October 20, 2017, in which he described Special Attorney Clymer's refusal to provide information sought in the course of the Phase III investigation.  The Court set a hearing for November 28, 2017 to discuss "the Special Master's findings concerning the Government's failure to comply with the Phase III investigation" and "any other issues the parties may want to address related to the Phase III investigation."[20]  On November 3, Special Attorney Clymer entered his formal appearance on behalf of the United States.  The hearing was continued until January 18, 2018, at Special Attorney Clymer's request.

On December 4, 2017, the Special Master issued an Order of Production directing Special Attorney Clymer to bring to the January 18 hearing certain documents and materials. The Special Master issued a subpoena *duces tecum* directed at the same documents, and issued subpoenas *ad testificandum* directed at seven present and former employees of the United States USAO.  Each subpoena *ad testificandum* was accompanied by a summary of testimony sought from the subpoenaed witnesses, as required by 28 C.F.R. § 16.23(c).  In December 2017, the FPD also issued several subpoenas *ad testificandum* directed at eleven current employees and one former employee of the USAO, also accompanied by summaries of testimony sought, as well as subpoenas *ad testificandum* directed at two former employees of CCA.  The FPD also issued a subpoena *duces tecum* to CCA for records of legal visits by FPD employees and consultants.

On December 18, 2017, Defendant Karl Carter moved to dismiss the Indictment based on prosecutorial misconduct.

---

[19]Doc. 298, Exh. I at 2.

[20]Doc. 300.

Add. 122

The Government moved to quash the Special Master's order for production and subpoenas, and also moved to quash the FPD's subpoenas. The Government also moved to terminate Phase III of the investigation. On December 21, 2017, the Court stayed compliance with the following: the Court's Order granting the FPD's motion for Production,[21] the Special Master's order for production, and the Special Master's subpoena *duces tecum*. The Court did not stay compliance with any of the subpoenas *ad testificandum*, instead setting a briefing schedule for the Government's motions to quash. The Court also set briefing deadlines for Defendant Carter's motions to dismiss and to join the motions filed by the FPD and the Government's motion to terminate Phase III of the investigation.

## II.    Discussion

The Government moves to terminate Phase III of the investigation and quash the challenged subpoenas and the Special Master's production order before the scheduled January 18, 2018 hearing. As an initial matter, the Court must determine the issues that are properly before the Court at this time. As explained above, the Court previously stayed compliance with the FPD's subpoena *duces tecum*, the Special Master's order for production, and the Special Master's subpoena *duces tecum*.[22] The Court will not be lifting this stay before or during the January 18 hearing. Thus, the Government's motions to quash with respect to these issues are not properly before the Court at this time. The Court therefore proceeds to consider the Government's motion to terminate Phase III and the Government's motions to quash as they relate to the Special Master's, FPD's, and Defendants' subpoenas *ad testificandum*.

The Government argues that its motions present "two threshold questions": (1) whether the Special Master's Phase III investigation exceeds a federal district court's Article III

---

[21]Doc. 329.

[22]Doc. 345.

authority; and (2) whether the FPD has Article III standing in this case.  The Government argues

these two issues "are dispositive of all pending matters in this case other than the motions filed

by defendants Karl Carter and David Bishop."[23]  Therefore, the Government argues that the

Court must resolve these questions before the January 18, 2018 hearing "because both the

Special Master and FPD have issued impermissible subpoenas [*ad testificandum*] to numerous

members of the USAO management team and staff, and the resulting obligation to appear on

February [sic] 18, 2018, would be unduly burdensome and inappropriate in light of the respect

due to a coordinate branch of government."[24]

Before addressing the Government's arguments as to the scope of Phase III and the

FPD's lack of standing, the Court notes that the January 18, 2018 hearing is necessary to address

several pretrial motions before the Court.  This hearing will address the FPD's motion for order

to show cause, as well as "any other issues the parties may want to address related to the Phase

III investigation."[25]  These related issues include a volume of Rule 41 motions filed in this case

and related cases, and also a motion to dismiss premised on allegations of prosecutorial

misconduct.  The January 18, 2018 hearing will inform whether the Phase III investigation is

both proper and necessary to the resolution of the underlying pretrial motions and issues in this

case.  Thus, although the Court will address the "threshold issues" the Government has identified

before the Janaury 18 hearing, the Court finds that the hearing is necessary to resolve the

underlying pretrial motions at issue in this case.

    **A.**      **Standing**

---

[23]Doc. 361 at 6.

[24]*Id.* at 5.

[25]Doc. 300.

Add. 124

The Government argues that the FPD lacks standing.  To establish standing, a party must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct, and (3) that is likely to be redressed by a favorable judicial decision.[26]  To establish injury in fact, a party must show that he or she suffered "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"[27]

At the outset of this case, the Government explained that 95 detainees, CCA personnel and other associates were potentially involved and could be charged in the underlying conspiracy.[28]  After learning that FPD attorney visits and conversations had been recorded at CCA and obtained and disseminated by the Government in this case, the FPD filed its motions for return of information pursuant to Fed. R. Crim. P. 41(g).  The Court allowed the FPD to intervene because it was clear that the Government had procured recordings of dozens of detainees at CCA, including FPD clients.  Since August 2016, information has come to light confirming what the FPD initially suspected in its Rule 41 motion—that is, that the Government obtained recordings of FPD attorneys communicating with their clients at CCA, and disseminated those recordings to parties in this case.[29]  Also since August 2016, evidence has come to light in collateral litigation that the Government obtained from CCA and possibly used attorney-client communications, including in *United States v. Dertinger* and in *United States v. Herrera-Zamora.*

---

[26]*Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992); *Friends of the Earth, Inc. v. Laidlaw Environmental Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000)).

[27]*Id.* (quoting *Lujan*, 504 U.S. at 560).

[28]July 25, 2016 Hrg. Tr., Doc. 75 at 23.

[29]Doc. 183 at 3–5 (Special Master's Report providing table listing attorney-client recordings obtained in this case, including calls made to "Kansas Federal Public Defender Office").

Add. 125

Based on the above undisputed facts, the Court finds that the FPD has standing to litigate its Rule 41 motion and the issues central to the Phase III investigation in this case. The injury to the FPD in having its communications with clients at CCA recorded and disseminated in this case is concrete and particularized. Indeed, the original impetus for the Rule 41 motions was allegations of the Government using recorded conversations obtained in this case to interfere in another case.[30] Thus, the FPD's injury, and its concern that recordings of its attorney-client communications obtained in this case could be used outside this case, was "not conjectural or hypothetical."[31] Furthermore, the injury is fairly traceable to the particular conduct at issue in this case of the Government obtaining and disseminating confidential attorney-client communications. Finally, as the Court has explained in previous orders, the injury to the FPD and other parties is potentially remediable by curative measures the Court may implement following the conclusion of Phase III of the Special Master's investigation.[32]

Moreover, even if the Court erred in granting the FPD's motion to intervene and in finding that the FPD has standing to litigate these issues, there are Defendants who clearly do have standing. Throughout this litigation, Defendants Carter, Bishop, and other Defendants have appeared alongside the FPD and have joined in the FPD's arguments and motions. All Defendants joined in the FPD's Rule 41 motion that spurred the Court's appointment of the Special Master and the three Phases of his authorized investigation. Furthermore, Defendant Carter has a pending motion to dismiss based on the issues central to the Phase III investigation, and Defendants Carter and Bishop have issued subpoenas *ad testificandum* nearly identical to

---

[30]*See* Doc.85; Aug. 9, 2017 Hrg. Tr.,Doc. 104.

[31]*See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992); *Friends of the Earth, Inc. v. Laidlaw Environmental Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000)).

[32]*See* Doc. 253 at 47 (directing the Special Master to recommend available remedies, if appropriate); Doc. 146 at 8 (same).

Add. 126

those issued by the FPD.[33]   Accordingly, the Court finds that the Government's concerns

regarding standing do not justify quashing the subpoenas *ad testificandum* or further delaying the

evidentiary hearing intended to explore significant issues related to Defendants' pending

motions.

B.    **Scope of Phase III**

The Government argues that the Phase III investigation constitutes "a judicial

investigation into the operations and decision-making of a co-equal branch of government," in

violation of the separation of powers doctrine.[34]   But rather than a wide-ranging "judicial

investigation into the operations and decision-making of" the USAO, Phase III is a limited

investigation grounded in the Rule 41 motions at issue in this case and other, related cases.   In its

original Rule 41 motion, joined by Defendants, the FPD argued that the conduct of the USAO in

obtaining and disseminating recorded attorney-client communications violated its clients' Sixth

Amendment attorney-client privilege.   As the Government has repeatedly argued, to rise to the

level of a Sixth Amendment violation, government interference in attorney-client

communications must be purposeful.[35]   Importantly, there already exists some evidence that the

Government did, in fact, purposefully obtain and use attorney-client communications related to

criminal defendants in this and other cases.   Thus, the Phase III investigation, limited to the

questions of whether the Government intentionally viewed or listened to attorney-client

---

[33]*See* Doc. 366; Doc. 370.

[34]Doc. 361 at 3.

[35]Doc.336 at 17 (citing *Weatherford v. Bursey*, 429 U.S. 545, 558 (1977)); Doc.237 at 10; Doc.133 at 27–28.

Add. 127

communications, is both proper and necessary to the resolution of the underlying Rule 41 motions in this case.[36]

The Government attempts to analogize this case to *In re United States*,[37] in which the Seventh Circuit found that a district court judge's demand for information about a defendant's eligibility for favorable treatment under U.S.S.G. § 5K1.1 was an impermissible "means to supervise the internal operations of another branch of the national government."[38]  The judge's inquiries sought the names of case agents and witnesses, asked the prosecutor to disclose the status of ongoing investigations, and asked the prosecutor for evaluations of whether the defendant had provided "enough assistance."[39]  Here, Phase III is not a "means to supervise the internal operations" of the USAO or an attempt to obtain evaluations of evidence in ongoing investigations, but rather is to determine whether the USAO or investigative agencies intentionally or unintentionally viewed or listened to attorney-client communications, as alleged in the Rule 41 motions at issue in this and related cases.

Certainly, the Court accepts and respects that the Government is entitled to assert legitimate concerns regarding its privileges and the potential overreach of questions that may be presented to witnesses at the January 18, 2018 hearing.  To the extent the Government is concerned that certain inquiries will intrude into the "operations and decision-making" of the USAO, the Court is confident that the Government will assert any statutory and legal protections it has against providing testimony, as well as its regulatory privileges found at 28 C.F.R. §§ 16.21–26.  Indeed, the Court will provide the Government a full opportunity to raise any relevant

---

[36]While not the impetus for the Special Master's initial appointment or Phase III, Defendant Carter's Motion to Dismiss relates directly to issues central to the Phase III investigation.

[37]503 F.3d 638 (7th Cir. 2007).

[38]*Id.* at 641.

[39]*Id.*

Add. 128

protections or privileges, and the Court will consider the same.  But the Court cannot find that the Government's concerns justify a wholesale termination of Phase III of the Special Master's appointment.  Accordingly, the Court denies the Government's motion to terminate Phase III of the Special Master's investigation.

C.      **Subpoenas** *Ad Testificandum*

Relying on Fed. R. Crim. P 17(c)(2) and various *Touhy*[40] privileges, the Government moves to quash the subpoenas *ad testificandum* issued by the Special Master, the FPD, and Defendants Carter and Bishop.  Rule 17(c)(2) provides a mechanism for quashing "unreasonable or oppressive" subpoenas directed at the production of documents and objects.  Rule 17(c)(2), however, does not control subpoenas *ad testificandum*, and there is no applicable privilege that exempts federal employees from *appearing* before a court pursuant to a subpoena.  As the Government argues, there are substantive statutory and legal protections, as well as regulatory privileges, that shield testimony of federal employees under certain circumstances.  *Touhy* prevents courts from holding in contempt those Department of Justice employees and former employees who refuse to answer questions for lack of authority to answer from Department officials.[41]  But these privileges do not exempt an employee from appearing pursuant to a properly issued subpoena and either testifying or raising an appropriate privilege.  As explained above, the Government will have a full opportunity to assert any applicable privileges at the January 18 hearing.  While some of the testimony sought at the hearing may indeed be privileged, the Government has failed to show that the subpoenas must be quashed because *all* of the sought testimony comes within the scope of *Touhy* privileges.

---

[40]*Touhy v. Ragen*, 340 U.S. 462 (1951).

[41]*See* 28 C.F.R. §§ 16.21–26; *Touhy*, 340 U.S. 462.

Add. 129

Additionally, the Government argues that the Court must quash the subpoenas "to prevent witnesses from being compelled improperly to gather documents, travel to Kansas City, Kansas, and appear for the hearing."[42]  The Court is not convinced that compliance with the subpoenas *ad testificandum* would impose an undue burden on the Government or its employees. The Government witnesses are either attorneys who entered appearances in this case, employees who participated in Phases I, II, and III of the investigation, or individuals who otherwise are material witnesses in the Phase III investigation and the underlying litigation.  Those witnesses still employed by the USAO or the federal government are all located in this District or a bordering District.  Those witnesses who are not federal government employees may have privileges that can be asserted by the Government, but the Government is not entitled to raise the argument of "undue burden" on their behalf.  For these reasons, the Court denies the Government's motions to quash as they relate to subpoenas *ad testificandum*.

**IT IS THEREFORE ORDERED BY THE COURT** that the Government's Motion to Terminate Phase III of the Special Master's Investigation (Doc. 336) is **denied**.

 **IT IS FURTHER ORDERED BY THE COURT** that the Government's Corrected Motion to Quash Subpoenas Issued by the Federal Public Defender (Doc. 340) is **denied as it relates to subpoenas *ad testificandum*.**  The Government's original Motion to Quash Subpoena issued by the Federal Public Defender (Doc. 334) is **denied as moot**.

**IT IS FURTHER ORDERED BY THE COURT** that the Government's Corrected Motion to Quash the Special Master's Subpoena *Duces Tecum* and Subpoenas *Ad Testificandum* to USAO Employees and Motion to Vacate Special Master's Order of Production (Doc. 341) **is denied as it relates to subpoenas *ad testificandum*.**  The Government's original Motion to

---

[42]Doc. 361 at 14–15.

Add. 130

Quash the Special Master's Subpoena *Duces Tecum* and Subpoenas *Ad Testificandum* to USAO

Employees and Motion to Vacate Special Master's Order of Production (Doc. 335) is **denied as**

**moot**.

      **IT IS FURTHER ORDERED BY THE COURT** that the Government's Motion to

Quash Additional Subpoena Issued by the Federal Public Defender (Doc. 360) is **denied**.

      **IT IS FURTHER ORDERED BY THE COURT** that the Government's Motion to

Quash Additional Subpoenas Issued by the Federal Public Defender and Subpoenas Issued by

Defendants Carter and Bishop (Doc. 370) is **denied**.

      **IT IS SO ORDERED.**

      Dated: January 12, 2018

                        S/ Julie A. Robinson
                        JULIE A. ROBINSON
                        CHIEF UNITED STATES DISTRICT JUDGE

Add. 131