IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

IN RE: UNITED STATES, PETITIONER

On Mandamus from the United States District Court
For the District of Kansas (Kansas City)
The Honorable Chief Judge Julie A. Robinson
Case No. 2:16-cr-20032

**Joint Response to Petition for a Writ of Mandamus**

David J. Guastello
811 Grand Blvd., Suite 101
Kansas City, Missouri 64106
Tel: (816) 753-7171
Email: david@guastellolaw.com
    *for Respondent Karl Carter*

John Jenab
7431 Broadway, # 9
Kansas City, Missouri 64114
Tel: (816) 759-8686
Email: john.jenab@gmail.com
    *for Respondent Lorenzo Black*

Cynthia M. Dodge
312 SW Greenwich Drive, #10
Lee's Summit, Missouri 64082
Tel: (816) 246-9200
Email: cindy@cdodgelaw.com
    *for Respondent David Bishop*

Jason P. Hoffman
CoreFirst Bank & Trust Bldg.
100 E. 9th St. Third Floor East
Topeka, Kansas 66612
Tel: (785) 233-5887
Email: jphoffman@sbcglobal.net
    *for Respondent Anthon Aiono*

Melody Brannon, Federal Public Defender
Branden A. Bell
Paige A. Nichols
Assistant Federal Public Defenders
117 SW 6th Street, Suite 200
Topeka, Kansas 66603
Tel: (785) 232-9828
Email: paige_nichols@fd.org
    *for Respondent Federal Public Defender*

# Table of Contents

Issues Presented................................................................................................1

Statement of the Case.......................................................................................2

Argument Summary...........................................................................................9

Argument..........................................................................................................10

1. Mandamus is not the government's only adequate means for relief. .......11

2. The government has not shown that the district court clearly and
   indisputably usurped its power..................................................................12

   A. The district court has ample authority to support its Sixth Amendment
      inquiry.....................................................................................................12

      (1) Once a district court determines that the government has obtained
          attorney-client communications, this Court's precedent obligates the
          district court to inquire whether the government acted intentionally. ..........13

      (2) The district court's Sixth Amendment inquiry promotes separation-
          of-powers interests by acting as a check against government abuse. ............15

      (3) The district court has authority to take evidence necessary to decide
          the motions before it..........................................................................17

      (4) Phase III is a proper exercise of the district court's inherent power to
          vindicate its judicial authority...........................................................18

   B. The district court has ample facts to support its Sixth Amendment
      inquiry.....................................................................................................19

   C. The district court has properly allowed the Federal Public Defender to
      participate in its Sixth Amendment inquiry. ...........................................21

3. This Court need not and should not exercise its discretion to intervene and
   impose the drastic remedy of mandamus at this late stage of the district
   court's Sixth Amendment inquiry. ............................................................23

Conclusion........................................................................................................26

# Table of Cases and Authorities

## Cases

*Bankers Life & Casualty Co. v. Holland*, 346 U.S. 379 (1953) ............................................10

*Butler v. Biocore Medical Technologies, Inc.*, 348 F.3d 1163 (10th Cir. 2003).........................11

*Cheney v. U.S. Dist. Court*, 542 U.S. 367 (2004) ....................................................................10

*De Beers Consol. Mines v. United States*, 325 U.S. 212 (1945) ................................................10

*Ex Parte Fahey*, 332 U.S. 258 (1947)......................................................................................10

*Farmer v. Banco Popular of N. Am.*, 791 F.3d 1246 (10th Cir. 2015)...................................18

*Feinberg v. C.I.R.*, 808 F.3d 813 (10th Cir. 2015)...................................................10, 11, 23

*Gschwind v. Cessna Aircraft Co.*, 232 F.3d 1342 (10th Cir. 2000).......................................12

*In re United States*, 398 F.3d 615 (7th Cir. 2005) ..................................................................17

*In re United States*, 441 F.3d 44 (1st Cir. 2006) ...................................................................16

*In re United States*, 503 F.3d 638 (7th Cir. 2000) .................................................................16

*In re United States*, 572 F.3d 301 (7th Cir. 2009) .................................................................21

*In re Weston*, 18 F.3d 860 (10th Cir. 1994)...........................................................................23

*Kerr v. U.S. Dist. Court*, 426 U.S. 394 (1976) .................................................................10, 27

*Lundahl v. Halabi*, 600 Fed. Appx. 596 (10th Cir. 2014) ...................................................18

*Prop-Jets v. Chandler*, 575 F.2d 1322 (10th Cir. 1978)...................................................21, 26

*Shillinger v. Haworth*, 70 F.3d 1132 (10th Cir. 1995) ..........................13, 14, 15, 16, 18, 19

*Touhy v. Ragen*, 340 U.S. 462 (1951).....................................................................................12

*United States v. Comprehensive Drug Testing*, 621 F.3d 1162 (9th Cir. 2010) ................ 18, 22

*United States v. Copar Pumice Co.*, 714 F.3d 1197 (10th Cir. 2013) ..................................... 10

*United States v. Hardman*, 297 F.3d 1116 (10th Cir. 2002) ................................................. 11

*United States v. Jackson*, 771 F.3d 900 (5th Cir. 2014) ................................................. 17, 22

*United States v. Nixon*, 418 U.S. 683 (1974) ..................................................................... 15

*United States v. Rodriguez-Aguirre*, 264 F.3d 1195 (10th Cir. 2001) ................................. 21

*United States v. Singleton*, 52 Fed. Appx. 456 (10th Cir. 2002) .................................... 14, 15

*Waymo LLC v. Uber Technologies, Inc.*, 870 F.3d 1350 (Fed. Cir. 2017) ............................ 23

*Wayte v. United States*, 470 U.S. 598 (1985) ...................................................................... 16

*Will v. United States*, 389 U.S. 90 (1967) .......................................................................... 10

**Statutes**

18 U.S.C. § 3731 .................................................................................................................. 11

28 C.F.R. § 16.21 .................................................................................................................. 11

**Other Authorities**

Fed. R. Crim. P. 17 ............................................................................................................... 26

Fed. R. Crim. P. 41(g) ............................................................. 3, 6, 9, 11, 17, 18, 21, 22

Fed. R. Crim. P. 41(h) .......................................................................................................... 22

Rachel E. Barkow, *Separation of Powers and the Criminal Law*, 58 Stan. L. Rev. 989
    (2006) ........................................................................................................................... 16

U.S. Const. amend. VI.. 1, 2, 5, 7, 9, 11, 12, 13, 14, 15, 16, 18, 19, 20, 21, 22, 23, 25, 26

Wright & Miller, 3A Fed. Prac. & Proc. Crim. § 690 (4th ed. 2017) ............................... 22

## Issues Presented

Seventeen months ago, a Kansas district court judge learned that the United States Attorney's Office for the District of Kansas was in possession of what would ultimately prove to be hundreds of secretly recorded attorney-client meetings and telephone calls. The district court acted quickly to protect those communications and determine the extent of any Sixth Amendment violations. At the request of both the government and the Kansas Federal Public Defender, the district court appointed a Special Master to assist the court in conducting a carefully conscribed inquiry. The government initially opposed the scope of the inquiry, but nonetheless pledged cooperation. Months later and after the expenditure of significant judicial and other resources, the government changed course, flatly refusing to respond to the Special Master's requests for information and moving to quash his subpoenas. Now facing a show-cause motion as a result of its intransigence, the government seeks this Court's intervention, claiming that the district court has usurped its power and must be brought to heel by the extraordinary remedy of mandamus. The issues presented are:

1. Whether mandamus is the government's only adequate means for relief;

2. Whether the district court clearly and indisputably usurped its power in seeking information from the government in aid of its Sixth Amendment inquiry, or in allowing the Federal Public Defender to participate in that inquiry; and

3. Whether this Court should exercise its discretion to intervene and impose the drastic remedy of mandamus at this late stage of the district court's Sixth Amendment inquiry.

## Statement of the Case

The government seeks mandamus to quell the district court's efforts to uncover and remedy Sixth Amendment violations potentially affecting a large number of criminal defendants. The district court has responded by referring this Court to five orders that set forth in detail the district court's findings and efforts during the burgeoning course of this litigation. We strongly recommend a close, sequential reading of those orders for a full understanding of how these matters developed before the district court, and the district court's careful attention to them. The following is necessarily but a brief summary:

In April 2016, the government filed a criminal complaint against Lorenzo Black and others (the *Black* case), charging them with distributing contraband within a private detention facility, Corrections Corporation of America (CCA),[1] in Leavenworth, Kansas. D.E. 1.[2] The United States Marshal Service for the District of Kansas contracts with CCA to house pretrial detainees. Attorneys meet with their clients in meeting rooms at the facility, and clients must use CCA's phones to call their attorneys. Unbeknownst to attorneys (including the Federal Public Defender),

---

[1] Now CoreCivic.

[2] We will cite to the government's petition as Pet. __, and to the government's two-volume appendix as 1 Pet. App. __, and 2 Pet. App. __. We will cite to district court records not included in either appendix by Docket Entry number and page number, e.g., D.E. __ at __.

CCA was secretly videotaping all attorney-client meetings at the facility. 1 Pet. App. 255-59. CCA was also recording attorney-client phone calls, despite assurances to the contrary. 1 Pet. App. 273-82. During its 2016 investigation of the *Black* case, the government obtained video footage of hundreds of attorney-client meetings and recorded attorney-client phone calls, mostly unrelated to the *Black* case, dating back to at least 2011. 2 Pet. App. 299, 314-16, 405-06.

This all came to light in the summer of 2016, when two prosecutors referenced the video footage while pressuring defense counsel to withdraw from representing the defendant in *United States v. Dertinger*, D. Kan. No. 14-20067-JAR. 2 Pet. App. at 321-22. At around this time, it also became apparent that the government had distributed in discovery recordings of other lawyers' attorney-client communications to defense counsel in *Black*. D.E. 182 at 2. As soon as the FPD learned that its own client communications may have been compromised, the FPD moved in *Black* under Federal Rule of Criminal Procedure 41(g) for the return of any recordings in possession of the government and other appropriate sanctions. 1 Pet. App. 64. The *Black* defendants joined in this motion, D.E. 89, 92, 94, 96, 97, and federal defendants across Kansas filed similar motions in their own cases, 2 Pet. App. 402.

The district court acted quickly, ordering all local federal detention facilities to cease recording attorney-client meetings and phone calls; impounding the video recordings; ordering the government to preserve its computer hard drives; and setting

a hearing "to determine the appointment and scope of work of a special master." D.E. 102; 2 Pet. App. 327-28.

This order precipitated a series of even more concerning events. To begin with, as the district court would later find, the government "offered a number of inconsistent, inaccurate, or misleading statements about their knowledge of the existence of the video recordings and whether they viewed or otherwise used any of the video recordings." 2 Pet. App. 318-26. The government also destroyed critical evidence by wiping clean the hard drive of the very computer it had used to access the video recordings, despite the district court's preservation order. 2 Pet. App. 328. And in one particularly odd turn of events, the prosecutor responsible for delivering the recordings to the district court for impoundment did so after hours and, without court permission, imposed upon a deputy United States Marshal to unlock the door leading to the district court's chambers for her. D.E. 118 at 152-63.

After several hearings, "many of the [district] [c]ourt's questions regarding the Government's conduct in obtaining and disseminating the recordings, including the Government's intent in doing so, went unanswered." 2 Pet. App. 404. With the parties' agreement, on October 11, 2016, the district court appointed a Special Master to assist the court going forward. 1 Pet. App. 234. The district court directed the Special Master to start by conducting what the court termed "Phase I and Phase II," that is, determining the number of recordings possessed by the government and how to index and segregate them, and identifying privileged or confidential information

within those recordings. *Id.* at 237-38. The district court reserved the possibility that it might later expand the Special Master's duties to include determining whether and to what extent the government had violated the Sixth Amendment. *Id.* at 240. The district court ordered all parties to "provide full cooperation to the Special Master . . . and observe faithfully the requirements of any orders of the Court and rulings by the Special Master." *Id.* at 246. The district court set forth a detailed procedure for objecting to any aspect of the Special Master's inquiry. *Id.* at 243-44.

On May 17, 2017, after receiving several preliminary reports from the Special Master, the district court expanded its inquiry to "Phase III" and directed the Special Master "to investigate the actions and conduct of the government, the USAO attorneys and staff, and the participating investigative agencies . . . in procuring, obtaining and perhaps using video and audio recordings of attorney-client meetings and phone calls at CCA." 2 Pet. App. 293-94. The district court set forth in detail its findings in support of this Sixth Amendment inquiry, noting especially the government's "lack of transparency," "inconsistent, inaccurate, or misleading statements," and destruction of evidence. *Id.* at 299-328. The district court emphasized that the government had not been "forthcoming about how it procured all of the audio recordings in its possession," and that, after many months, it was still "unclear when the government became aware that the CCA audio recordings included recordings of attorney-client telephone calls." *Id.* at 301, 310. The district court noted as well the government's "unilateral" (and legally questionable) decision—without

notice to the district court or the parties—that none of the recorded calls between attorneys and their CCA clients were privileged. *Id.* at 303. Given the seriousness of a number of unresolved questions, the district court turned its focus to "whether the government's conduct . . . was intentional and purposeful, or inadvertent and unintentional." *Id.* at 311. The government did not thereafter seek reconsideration of the Phase III order. Instead, the government assured the district court that a Special Attorney appointed to assist the government in Phase III would "be of great assistance to the USAO and the Court in bringing the Investigation to completion." D.E. 298-5.

About a month after the start of Phase III, even more concerning evidence emerged. To this point, the government had consistently "deni[ed] that it listened to any attorney-client phone calls." 2 Pet. App. 310. At least one lawyer for a client in another case[3] had good reason to strongly suspect otherwise, but the government convinced him he was wrong. D.E. 395-2. Only after that lawyer withdrew his own Sixth Amendment-based motions, and after his client was sentenced and had appealed, did the government confess that a prosecutor had intentionally obtained and listened to both that lawyer's and at least one other lawyer's calls. *Id.*; 2 Pet. App. at 337.

_____

[3] *United States v. Herrera-Zamora*, D. Kan. No. 14-CR-20049-CM.

Despite growing evidence of wrongdoing with respect to attorney-client communications, and despite its pledges of cooperation, the government abruptly ceased all cooperation with the Special Master on September 12, 2017. 2 Pet. App. 350, 407-08. In response, the FPD moved the district court to issue an order directing the government to show cause why it should not be held in contempt of court for violating the court's orders. D.E. 301. The district court scheduled a hearing for January 18, 2018 "to discuss the Special Master's findings concerning the government's failure to comply with the Phase III investigation and the appropriate response and/or remedies for such," as well as to consider "any other issues the parties may want to address related to the Phase III investigation." D.E. 300, 308. The Special Master issued a subpoena and an order of production to the government. D.E. 317. The FPD and counsel for the remaining *Black* defendants also subpoenaed government attorneys and other witnesses. 2 Pet. App. 384; D.E. 363, 368, 369. And Defendant Carter moved to dismiss the indictment as to him, on Sixth Amendment and other grounds. D.E. 333.

For its part, the government moved to quash the subpoenas and terminate Phase III. D.E. 336, 340, 334, 335, 360, 370. The district court denied the government's motions, assuring the government that it would have "a full opportunity" to "assert any statutory and legal protections it has against providing testimony" at the hearing itself. Pet. App 414-15. Notwithstanding this order, the Phase III hearing preparations

came to a halt when the government filed its mandamus petition and secured a stay

from this Court. D.E. 386 (notice of cancelled hearing).

## Argument Summary

The government cannot establish any of the prerequisites for the drastic and extraordinary remedy of a writ of mandamus. To begin with, given the district court's promise to entertain the government's objections at the Phase III hearing, and the appealability of any order likely to result from the district court's Sixth Amendment inquiry, mandamus is not the government's only adequate means for relief.

Second, the government has not shown and cannot show that the district court clearly and indisputably usurped its power. The district court's Sixth Amendment inquiry is not only authorized; it is required by this Court's jurisprudence. Indeed, the district court's inquiry will promote separation-of-powers interests by acting as a check against government abuse. And the district court has authority to decide the many Sixth Amendment-related motions (Rule 41(g) and otherwise) pending before it. Phase III is also a proper exercise of the district court's inherent power to vindicate its judicial authority.

Additionally, contrary to the government's assertions, the district court has ample facts to support its Sixth Amendment inquiry, and it has properly allowed the Federal Public Defender to participate in that inquiry (and mandamus is not an appropriate vehicle to challenge the FPD's standing in any event).

Finally, the government has not offered any persuasive reason why this Court should exercise its discretion to intervene and impose the drastic remedy of mandamus at this late stage of the district court's Sixth Amendment inquiry.

## Argument

A writ of mandamus remains a "drastic and extraordinary" remedy, *Ex Parte Fahey*, 332 U.S. 258, 259-60 (1947), reserved for "exceptional circumstances amounting to a judicial usurpation of power," *Will v. United States*, 389 U.S. 90, 95 (1967), or a "clear abuse of discretion," *Bankers Life & Casualty Co. v. Holland*, 346 U.S. 379, 383 (1953). Here, the government does not argue that the district court clearly abused its discretion, but only that it usurped its power, that is, that it "has no judicial power to do what it purports to do." *De Beers Consol. Mines v. United States*, 325 U.S. 212, 217 (1945).

To prevail, the government must clear three distinct hurdles. First, it must "show that no other adequate means exist to secure the relief" it seeks." *Feinberg v. C.I.R.*, 808 F.3d 813, 815 (10th Cir. 2015). The government "must also show a clear and indisputable entitlement to that relief." *Id.* Finally, "even if [the government] can satisfy these two requirements, [it] still must convince this court that exercising its discretion to intervene in an ongoing trial court proceeding is 'appropriate' in the interests of justice." *Id.* (citing *Cheney v. U.S. Dist. Court*, 542 U.S. 367, 380-81 (2004); *Kerr v. U.S. Dist. Court*, 426 U.S. 394, 403 (1976); and *United States v. Copar Pumice Co.*, 714 F.3d 1197, 1210 (10th Cir. 2013)). As we explain below, the government has made none of these showings.

### 1. Mandamus is not the government's only adequate means for relief.

"[A] writ of mandamus isn't available when an appeal in the normal course would suffice to supply any necessary remedy." *Feinberg*, 808 F.3d at 816. The government claims in a single short paragraph that the district court's inquiry is "unlikely" to result in an appealable order. Pet. 31-32. But the government admits in the same breath that it "could appeal an order dismissing the indictment or suppressing evidence for a Sixth Amendment violation as to Defendant Carter." Pet. 31. This is true, *see* 18 U.S.C. § 3731, as is the fact that the government could appeal other orders that might result from the district court's inquiry. For instance, it could appeal a Rule 41(g) order to return the recorded communications to counsel. *United States v. Hardman*, 297 F.3d 1116, 1120 (10th Cir. 2002) (en banc) (government appeal from order returning property under then-Rule 41(e)). And it could appeal the imposition of contempt sanctions or other findings of misconduct. *Butler v. Biocore Medical Technologies, Inc.*, 348 F.3d 1163, 1166-69 (10th Cir. 2003) (recognizing appellate jurisdiction over order finding attorney misconduct). These available appellate remedies weigh heavily against the government's mandamus request.

But the government has an even more immediate remedy for its complaint that the district court intends "to examine the prosecutorial practices of the USAO." Pet. 32. Specifically, the government may assert its privilege and relevance claims before the district court at the Phase III hearing. The government has already indicated that it intends to invoke various privileges under 28 C.F.R. § 16.21, *et seq.*, and *Touhy v. Ragen*,

340 U.S. 462 (1951). 2 Pet. App. 351-53. And the district court explicitly recognized its right to do so, pledging to "provide the [g]overnment a full opportunity to raise any relevant protections or privileges." *Id.* at 414-15.

With these protections at hand in the district court, and given the appealability of possible district court orders, the government cannot show that "no other adequate means" exist to attain the relief it seeks. Its petition for mandamus may be denied for this reason alone.

## 2. The government has not shown that the district court clearly and indisputably usurped its power.

The government argues that the district court clearly and indisputably usurped its power by conducting Phase III of its Sixth Amendment inquiry because the district court (A) lacks authority for the inquiry, (B) lacks a factual predicate for the inquiry, and (C) should not have allowed the FPD to participate in the inquiry. Pet. 22-31. The government is wrong on all three counts.

## A. The district court has ample authority to support its Sixth Amendment inquiry.

As an initial matter, the government does not argue, and it cannot be said, that the district court usurped its power simply by exercising jurisdiction over the Sixth Amendment issues in this case—even if that exercise was wrong. "A court does not usurp its power when it erroneously exercises jurisdiction." *Gschwind v. Cessna Aircraft Co.*, 232 F.3d 1342, 1346 (10th Cir. 2000). More importantly, and more directly to the

government's point, the district court has acted well within its authority throughout its Sixth Amendment inquiry.

**(1) Once a district court determines that the government has obtained attorney-client communications, this Court's precedent obligates the district court to inquire whether the government acted intentionally.**

The government argues that the district court lacks authority to investigate whether it intentionally obtained attorney-client communications. Pet. 22-26. But the law of this Circuit not only authorizes this inquiry—it requires it. *See Shillinger v. Haworth*, 70 F.3d 1132 (10th Cir. 1995), *reh. den.* (10th Cir. 1996).

In *Shillinger*, the defendant in a state criminal case moved to suppress evidence of and comment on attorney-client communications. *Id.* at 1134-35. The prosecutor had learned the content of the communications from a deputy sheriff who had, at the sheriff's insistence, been present during attorney-client meetings. *Id.* The state trial court allowed the prosecutor to use what he had learned from the communications at trial (within some limits). *Id.* at 1134-36. The defendant was convicted, and the Wyoming Supreme Court affirmed. *Id.* at 1136. A federal district court subsequently held that the defendant's Sixth Amendment rights had been violated, granted federal habeas relief, and ordered a retrial. *Id.* This Court used the state's appeal from the district court's order to "determine the appropriate Sixth Amendment standards governing an intrusion by the prosecution into the defendant's communications with his attorney." *Id.* at 1134.

After surveying the law, this Court held in *Shillinger* that "a prosecutor's intentional intrusion into the attorney-client relationship constitutes a direct interference with the Sixth Amendment rights of a defendant," and "absent a countervailing state interest, such an intrusion must constitute a per se violation of the Sixth Amendment." *Id.* at 1142. This Court agreed with the district court that the defendant's Sixth Amendment rights had been violated, but remanded "for factfinding procedures to determine the extent of the intrusion as well as the proper remedy," that is, whether a retrial alone would be sufficient to cure the violation, or rather whether a retrial by a new prosecutor was required, or even dismissal of the indictment with prejudice. *Id.* at 1144. Further inquiry was necessary "[g]iven the inadequacy of the state court factfinding procedures," which did not include the taking of any testimony but instead relied solely on the prosecutor's unsworn and "arguably hearsay" statements. *Id.* at 1137, 1144.

This Court reaffirmed the appropriateness of factfinding in the face of intrusions into attorney-client communications seven years later in *United States v. Singleton*, 52 Fed. Appx. 456, 459-60 (10th Cir. 2002) (unpublished). Confronted with evidence that the prosecution had seized attorney-client privileged materials from the defendant's jail cell, the district court appointed a special master to review the seized documents and conduct an evidentiary hearing. *Id.* Citing *Shillinger*, this Court held that these procedures along with subsequent court-imposed remedies were appropriate in the

circumstances of that case, obviating the need for further habeas relief. 52 Fed. Appx. at 460.

The clear message of both *Shillinger* and *Singleton* is that a when a district court learns of an intrusion by the government into attorney-client communications, the court must inquire into the intent of the government, the extent of the intrusion, and the type of remedy necessary to cure any Sixth Amendment violation. That is exactly what the district court is doing in this case. The district court's inquiry is not only authorized; it is required as a matter of Sixth Amendment jurisprudence.

## (2) The district court's Sixth Amendment inquiry promotes separation-of-powers interests by acting as a check against government abuse.

The government argues that any judicial inquiry into its "conduct and decisions" will violate the separation of powers. Pet. 22-26. But "the separate powers were not intended to operate with absolute independence." *United States v. Nixon*, 418 U.S. 683, 707 (1974). And the executive branch's Article II power does not provide it with "an absolute privilege" to avoid judicial inquiry—indeed, that view would "upset the constitutional balance of 'a workable government' and gravely impair the role of the courts under Art. III." *Id.* The "primary constitutional duty of the Judicial Branch" is "to do justice in criminal prosecutions." *Id.* In this context, it is especially important for the separation of powers to act "as a direct check against the accumulation of too much power in one branch and against the evasion of the process required of that branch." Rachel E. Barkow, *Separation of Powers and the Criminal Law*, 58 Stan. L. Rev.

989, 1032-33 (2006). Given the broad power prosecutors have over the criminal-justice process, the need for judicial checks against prosecutorial abuses of that power is great. *Id.*, *passim*. As a full reading of the district court's orders illustrates, the district court's carefully crafted Sixth Amendment inquiry does not violate separation-of-powers principles; rather, it furthers them. *Cf. Shillinger*, 70 F.3d at 1142-44 (adopting per se standard for establishing Sixth Amendment violations when government intentionally and illegitimately intrudes on attorney-client communications, because "no other standard can adequately deter this sort of misconduct").

The government relies on three cases to claim an extraordinary and unsupported rule that *any* "judicial inquiry into the USAO's conduct . . . violates separation of powers, [regardless of] the objective of the inquiry." Pet. at 23-26. But those cases all recognize the authority of district courts to inquire into a prosecutor's conduct upon evidence of misconduct. For instance, in *In re United States*, 503 F.3d 638 (7th Cir. 2000), the Seventh Circuit recognized that "[e]xercises of prosecutorial discretion may be overseen" when necessary "to ensure that the prosecutor does not violate the Constitution or some other rule of positive law." *Id.* at 642 (citing *Wayte v. United States*, 470 U.S. 598 (1985)). Likewise, in *In re United States*, 441 F.3d 44, 58 (1st Cir. 2006), the First Circuit recognized that if it has a "reasonable basis," a district court may "launch an inquiry into claims that the prosecutor engaged in . . . misconduct." The "traditional means" of conducting such an inquiry includes "requiring the government to disclose information." *Id.* at 59; *accord In re United States*, 398 F.3d 615,

618-19 (7th Cir. 2005) (per curiam) (investigation lacked reasonable basis absent evidence that prosecutors had done anything improper). None of these cases support the government's broad separation-of-powers argument.

**(3) The district court has authority to take evidence necessary to decide the motions before it.**

At least three relevant motions remain pending before the district court: the FPD's original Rule 41(g) motion, 1 Pet. App. 64 (joined by Defendant Carter, D.E. 97); the FPD's show-cause motion, D.E. 301; and Defendant Carter's Motion to Dismiss, D.E. 333. Each of these motions requires resolution by the district court.

Federal Rule of Criminal Procedure 41(g)[4] authorizes "[a] person aggrieved by an unlawful search and seizure of property or by the deprivation of property" to "move for the property's return." The government argues that Rule 41(g) is inapplicable because the government obtained the recordings sought to be returned "through subpoenas, not through a 'search' or 'seizure.'" Pet. 26. The government offers no authority for the proposition that Rule 41(g) relief is limited to the return of evidence implicating warrant requirements, and nothing in the text of the rule or the caselaw supports such a limit. *See, e.g., United States v. Jackson*, 771 F.3d 900, 902-03 (5th Cir. 2014) (noting right to seek return of documents subpoenaed in criminal case through Rule 41(g)); *United States v. Comprehensive Drug Testing*, 621 F.3d 1162, 1172-73 (9th Cir.

---

[4] Formerly Rule 41(e).

2010) (en banc) (recognizing Rule 41(g) as proper mechanism to seek return of property obtained by grand-jury subpoena) (abrogated on other grounds).

The plain language of Rule 41(g) directs that "[t]he court must receive evidence on any factual issue necessary to decide the motion." The anticipated Phase III hearing will accomplish this directive. It will also satisfy the district court's need to take evidence on both the FPD's pending show-cause motion (predicated on the government's violations of the district court's orders during this litigation) and Defendant Carter's motion to dismiss (predicated on, *inter alia*, Sixth Amendment violations and *Shillinger*). Taking evidence on pending motions is part of the ordinary course of a district court's duties, and well within its authority.

**(4) Phase III is a proper exercise of the district court's inherent power to vindicate its judicial authority.**

Finally, a district court has inherent authority to impose "a sanction for abuse of the judicial process, or, in other words, for bad faith conduct in litigation." *Farmer v. Banco Popular of N. Am.*, 791 F.3d 1246, 1256 (10th Cir. 2015) (citation and marks omitted). Phase III will, in addition to allowing the district court to rule on the Sixth Amendment questions before it, also allow the district court to vindicate its judicial authority in light of the government's questionable conduct. It is thus a proper exercise of the district court's inherent power. *See Lundahl v. Halabi*, 600 Fed. Appx. 596, 605-06 (10th Cir. 2014) (unpublished) (district court retains inherent authority over sanctionable conduct).

**B. The district court has ample facts to support its Sixth Amendment inquiry.**

The government argues that the district court lacks a factual basis for its Sixth Amendment inquiry because the district court has not yet found any Sixth Amendment violations. Pet. 27. But the district court cannot make any final Sixth Amendment findings without first determining the extent of any government intrusions into attorney-client communications, and whether those intrusions were intentional or inadvertent—and it cannot make those determinations without proper factfinding. *Shillinger*, 70 F.3d at 1137-38, 1142. That is the primary purpose of Phase III. 2 Pet. App. 294.

And Phase III is itself supported by ample facts. As the district court found in overruling the government's motion to terminate Phase III: "Importantly, there already exists some evidence that the [g]overnment did, in fact, purposefully obtain and use attorney-client communications related to criminal defendants in this and other cases." 2 Pet. App. 413; *accord* 1 Pet. App. 190 (statement of then-AUSA Erin Tomasic that "the government had a good-faith basis to believe that the CCA video-recordings contained attorney attorney-client meetings at the time the issue—the subpoenas were issued"). More specifically, the district court found that "CCA routinely recorded all telephone calls of detainees," that "hundreds of attorney-client calls were recorded at CCA," and that those calls were "obtained by the [g]overnment, including calls of detainees whose attorneys had completed the blocking process." 2 Pet. App. 405-06. The district court further found that the government intentionally

listened to at least some of those calls: "The [g]overnment explained . . . it believed [a prosecutor] had listened to attorney-client calls not only in connection with this case, but also in connection with *United States v. Herrera-Zamora*, a case before another Judge in this Court." 2 Pet. App. 406-407 (referencing D. Kan. No. 14-20049-CM). And the government has confessed that it used these calls to secure a prosecutorial advantage in another case, *United States v. Huff*. There, the government even went so far as to mark a call between the defendant and her attorney as an exhibit to use against the defendant at sentencing. D. Kan. No. 14-CR-20067-CM, D.E. 536 at 2 (government notice of clarification and correction).[5]

For these and all of the other reasons set forth in detail in the orders referenced in the district court's mandamus response, the district court has ample facts to support its Sixth Amendment inquiry.

———————————————

[5] The government has endeavored to avert any Sixth Amendment findings in these and other cases by offering the defendants sweetheart deals. Defendant Herrera-Zamora was originally sentenced to 420 months of imprisonment. D. Kan. No. 14-20049-CM, D.E. 200. But once the government's conduct came to light, the government agreed to recommend that the district court vacate the 420-month sentence and impose instead a sentence of five years. 2 Pet. App. 407 (the final resolution of this case is still pending). In *Huff*, the government originally recommended a 97-month sentence, D. Kan. No. 14-CR-20067-CM, D.E. 375 at 3, but after the defendant filed a Rule 41(g) motion similar to the FPD's motion here, *id.* D.E. 397, the government agreed to a 36-month sentence (functionally time served)— but only if the defendant would withdraw her pending motions, *id.*, D.E. 481. The government made a similar time-served offer to the defendant in *United States v. Dertinger*, also contingent on that defendant withdrawing his Rule 41(g) and other motions. D. Kan. No. 14-20067-JAR, D.E. 396, 558.

## C. The district court has properly allowed the Federal Public Defender to participate in its Sixth Amendment inquiry.

The government challenges the FPD's standing to issue subpoenas to support its own Rule 41(g) motion. Pet. 29-31. The Court should reject this challenge for two reasons. First, "[j]oinder of a party is almost always left to the district court's discretion and a mandamus to appeal this ruling 'is almost always inappropriate.'" *In re United States*, 572 F.3d 301, 307 (7th Cir. 2009) (citing *Prop-Jets v. Chandler*, 575 F.2d 1322, 1324 (10th Cir. 1978)).

Second, the district court found that "it was clear that the Government had procured recordings of dozens of detainees at CCA, including FPD clients"; that "the Government obtained recordings of FPD attorneys communicating with their clients at CCA, and disseminated those recordings to parties in this case"; and that "the Government obtained from CCA and possibly used attorney-client communications," thereby giving the FPD appropriate intervenor status. 2 Pet. App. 411-12. The FPD has argued that these recordings constitute its own work product. *See, e.g.,* D.E. 357 at 13. Nothing more is required to establish standing under Rule 41(g). *United States v. Rodriguez-Aguirre*, 264 F.3d 1195, 1203-07 (10th Cir. 2001) (allegations of lawful possessory interest sufficed to establish then-Rule 41(e) standing).

The government argues that "it is impossible" for the FPD to have Rule 41(g) standing, because the FPD is not a criminal defendant. Pet. 30. But the plain text of

Rule 41(g) authorizes relief for any "person aggrieved," not just criminal defendants.[6] This point appears to be undisputed in the Rule 41(g) caselaw and commentary. *See, e.g., Jackson*, 771 F.3d at 902-03 (noting non-party newspaper's right to seek return of documents subpoenaed in criminal case through Rule 41(g)); *Comprehensive Drug Testing*, 621 F.3d at 1172 (affirming Rule 41(g) return of property to movants who were not criminal defendants); *see also* Wright & Miller, 3A Fed. Prac. & Proc. Crim. § 690 (4th ed. 2017) ("the person filing the motion need not be a party to the existing litigation").

Finally, removing the FPD from this proceeding would not obviate the district court's inquiry. Defendant Carter's Sixth Amendment-based motion to dismiss is still pending, and he and other defendants have joined the FPD motions and issued similar subpoenas. 2 Pet. App. at 412-13. The district court found that these defendants "clearly do have standing" to litigate the Phase III issues. *Id.*; *see also id.* at 400 n.1 (stating district court's intent to address defendants' motions at Phase III hearing). The government does not challenge this finding.

---

[6] In contrast, the Rule provides only that "[a] *defendant*" may move to suppress evidence. Fed. R. Crim. P. 41(h) (emphasis supplied).

**3. This Court need not and should not exercise its discretion to intervene and impose the drastic remedy of mandamus at this late stage of the district court's Sixth Amendment inquiry.**

The government has not offered any persuasive reason why it is "appropriate in the interests of justice" for this Court to exercise its discretion and intervene in the district court's Sixth Amendment inquiry. *Feinberg*, 808 F.3d at 815. "The extraordinary relief of a writ of mandamus . . . is not a vehicle to relieve persons of the consequences of their previous decision not to pursue available procedures and remedies." *In re Weston*, 18 F.3d 860, 864 (10th Cir. 1994); *accord Waymo LLC v. Uber Technologies, Inc.*, 870 F.3d 1350, 1363 (Fed. Cir. 2017) (denying mandamus in action challenging discovery order where petitioner previously waived claimed privilege). And yet that is exactly how the government has invoked mandamus here—to relieve it of its previous pledge of cooperation and disclosures of information.

While the government objected early on to the appointment of a Special Master for any purpose beyond screening attorney-client communications for privileged material, 1 Pet. App. 145; D.E. 163, it did not pursue those objections after the Special Master began his work despite the availability of a clear procedure for doing so, 1 Pet. App. 243-44. Instead, the government urged the district court to accept the Special Master's March 16, 2017 report recommending that the district court consider authorizing "further investigation" into the government's conduct. 1 Pet. App. 287. In addressing that report, the government emphasized its cooperation with the Special Master's investigation to date and noted that it (the government) "has not opposed

any of the orders, directions, and requests made by the Special Master." D.E. 237 at 7. Most importantly, the government "respectfully request[ed] that the Court affirm the Special Master's Report." D.E. 237 at 18; *see also* D.E. 250 at 10 (government's surreply again requesting "that the Court affirm the Special Master's Report").[7]

One month later, on May 17, 2017, the district court issued its Phase III order. 2 Pet. App. at 293-94. The government did not file any exceptions to this order or (at that point) request the district court to reconsider it. On July 10, 2017, the Special Master informally issued several requests for information to the government. 2 Pet. App. 346. Again the government did not object. Instead, on July 14, 2017, General Counsel for the United States Department of Justice wrote an ex parte letter to the district court to introduce AUSA Steven D. Clymer (NDNY), appointed as Special Attorney to assist the Kansas USAO in the Phase III investigation. D.E. 298-5. In this letter, General Counsel assured the district court that "[w]e are confident that AUSA Clymer will be of great assistance to the USAO and the Court in bringing the Investigation to completion." *Id.*

It was not until two months later, on September 12, 2017, that Special Attorney Clymer announced by letter to the Special Master that the government would no

---

[7] The government was undoubtedly encouraged at that point by the Special Master's "tentative[ ]" conclusion that the government had neither viewed any video of attorney-client meetings, nor previously (before May 2016) obtained such videos. D.E. 237 at 17.

longer cooperate with the district court's Sixth Amendment inquiry, citing a host of privileges and separation-of-powers concerns. 2 Pet. App. 350. But by this time, the government had not only *not* pursued available objections for months, it had actively *participated* in the district court's inquiry, divulging its own inner workings through multiple pleadings and oral statements to the court.

For instance, during a September 7, 2016 hearing in *Black*, a prosecutor described at length what she claimed to know when she obtained recordings of attorney-client meetings, as well as the government's policies regarding attorney-client telephone calls. 1 Pet. App. 190-215. Later, in *Dertinger*, eleven different government attorneys, employees, and law-enforcement agents testified about those same issues while the government introduced into evidence its own internal communications detailing how it had seized recordings of attorney-client meetings. *United States v. Dertinger*, Case No. 14-20067-JAR, D.E. 531, 532.[8] Given all of these disclosures about internal conduct

---

[8] Of the eleven government employees subpoenaed to testify in *Black*, two of them had already testified for the government on the same subjects in *Dertinger*, four of them disclosed factual information about the office's operations in open pleadings, and three others had their internal communications on those same subjects disclosed by the government at various hearings. The government's agents have also signed a host of pleadings containing factual assertions about its policy and practice of obtaining attorney-client recordings. *See, e.g.*, D.E. 133 at 28 (denying intent to obtain recordings); D.E. 163 at 3-5 (recounting how government obtained recordings); *United States v. Dertinger*, Case No. 14-20067-JAR, D.E. 453 at 6-10 (same); *United States v. Herrera-Zamora*, Case No. 14-CR-20049-CM, D.E. 176 (disclosing that prosecutor had intentionally eavesdropped on attorney-client conversations); *United States v. Huff*, Case No. 14-CR-20067-CM, D.E. 529 (same); D.E. 536 (disclosing that two prosecutors

and decision-making, the government is hard-pressed to claim that the "interests of justice" require this Court's intervention to prevent the district court from completing its inquiry into these same matters.

Finally, the government insists that this Court must exercise its discretion to intervene because "[i]f the special master and FPD can use Rule 17 to interrogate the United States Attorney and his senior staff about the conduct and decision-making of the USAO under these circumstances . . . it is hard to imagine when similar intrusions would be forbidden." Pet. 28. This floodgates argument is overwrought. Again, the district court has assured the government that it will have "a full opportunity" to "assert any statutory and legal protections it has against providing testimony" at the Phase III hearing. Pet. App 414-15. And the government can itself prevent "similar intrusions" from recurring—by refraining from Sixth Amendment violations and complying with the legitimate orders of the district court.

## Conclusion

Mandamus is a "drastic remedy that has traditionally been reserved for exceptional situations." *Prop-Jets*, 575 F.2d at 1324. The government has not shown that no other adequate means are available to protect its interests, or that the district court clearly

---

had listened to attorney-client recorded call and intended to use contents against defendant at sentencing).

and indisputably usurped its power, or that the interests of justice weigh in favor of this Court exercising its discretion to impose the drastic remedy of mandamus here. *Kerr*, 426 U.S. at 402-03. This Court should deny the government's mandamus petition.

Respectfully submitted,
By: s/ Melody Brannon
MELODY BRANNON
Kansas Federal Public Defender
117 SW 6th Avenue, Suite 200
Topeka, Kansas 66603-3840
Tel: (785) 232-9828
Fax: (785) 232-9886
Email: melody_brannon@fd.org

*On behalf of all respondents joined in this response*

## Certificate of Compliance with Fed. R. App. P. 21(d)(1)

I certify that this brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 21(d)(1) in that it contains 6,374 words in a proportionally spaced typeface (14-point Garamond), as shown by Microsoft Word 2016, which was used to prepare this brief.

s/ Paige A. Nichols
PAIGE A. NICHOLS
Assistant Federal Public Defender

Dated: January 29, 2018

## Certificate of Compliance with 10th Circuit Rule 25.5

I certify that this brief complies with the applicable privacy and redaction requirements of 10th Circuit Rule 25.5 and the rules cited therein.

s/ Paige A. Nichols
PAIGE A. NICHOLS
Assistant Federal Public Defender

Dated: January 29, 2018

## Certificate of Compliance with the Policies and Procedures or Electronic Filing via ECF

I certify that the hard copies of this brief submitted to the Court are exact copies of the version submitted electronically, and that the electronic submission was scanned for viruses with the most recent version of Symantec Endpoint Protection (Live Update on January 29, 2018), and is free of viruses.

s/ Paige A. Nichols
PAIGE A. NICHOLS
Assistant Federal Public Defender

Dated: January 29, 2018

**Certificate of Service**

I certify that on 01/29/2018, this brief was filed with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit by using the CM/ECF system. Because opposing counsel, Special Master David Cohen, and all respondents are registered CM/ECF users, they will also be served by the CM/ECF system. 10th Cir. R. 31.5. A copy of this response will also be served by email on the Honorable Chief Judge Julie A. Robinson.

Three hard copies will be mailed to the Clerk of the Court per Fed. R. App. P. 21(d) at:

Tenth Circuit Court of Appeals
1823 Stout Street
Denver, Colorado 80257

s/ Paige A. Nichols
PAIGE A. NICHOLS
Assistant Federal Public Defender

Dated: January 29, 2018